# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**DENISE L. LENKIEWICZ**,

*Plaintiff*,

v.

**JULIÁN CASTRO**,
Secretary, U.S. Department of
Housing & Urban Development,

*Defendant*.

---

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 13-0261 (RCL)

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT THAT DEFENDANT VIOLATED THE REHABILITATION ACT

Plaintiff Denise L. Lenkiewicz, by counsel, moves this Court under Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h) for an order granting summary judgment to Plaintiff on her Rehabilitation Act claim against Defendant Julián Castro, Secretary, U.S. Department of Housing & Urban Development. In support of this motion, Plaintiff submits a Memorandum of Law, a Statement of Undisputed Material Facts, the Declaration of J. Wells Harrell, and exhibits attached thereto. A proposed form of order is attached.

Respectfully submitted,

*/s/ J. Wells Harrell*
J. Wells Harrell (D.C. Bar No. 995368)
Evan E. North (D.C. Bar No. 995360)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6181
wharrell@bsfllp.com
enorth@bsfllp.com

Dated: March 4, 2015

*Attorneys for Plaintiff Denise L. Lenkiewicz*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DENISE L. LENKIEWICZ**, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No. 13-0261 (RCL) |
| v. ) | |
| ) | **ORAL ARGUMENT REQUESTED** |
| **JULIÁN CASTRO**, ) | |
| Secretary, U.S. Department of ) | |
| Housing & Urban Development, ) | |
| ) | |
| *Defendant*. ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**HER MOTION FOR SUMMARY JUDGMENT THAT**
**DEFENDANT VIOLATED THE REHABILITATION ACT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

UNDISPUTED MATERIAL FACTS ......................................................................... 3

    A.    Lenkiewicz Was Qualified for Her Position as a FOIA Specialist at HUD. .......... 3

    B.    Throughout Her Employment at HUD, Lenkiewicz Suffered from Physical Impairments Substantially Limiting Many Major Life Activities. ........................ 4

    C.    Lenkiewicz Requested Accommodations that Would Have Enabled Her to Perform the Essential Functions of Her Job. .......................................................... 6

    D.    Lenkiewicz's Request for a Printer at Her Workstation Was Denied ................... 8

    E.    Lenkiewicz's Request for a Parking Space at HUD Headquarters Was Denied. ................................................................................................................... 10

    F.    Lenkiewicz's Request for Relocation to a Different Building Was Ignored. ........ 12

    G.    Lenkiewicz's First Requests for Telework Were Ignored. ................................... 12

    H.    In December 2010, Lenkiewicz Submitted One Last Written Request for Accommodation and Included Medical Documentation. ..................................... 13

    I.    Rather than Grant Lenkiewicz's December 2010 Request, Even Provisionally, HUD Subjected the Request to an Arbitrary and Ineffective Medical Review ..................................................................................................... 15

    J.    Lenkiewicz Would Have Given HUD the Information It Thought Was Needed, if only HUD Had Asked. ........................................................................ 17

    K.    HUD Procedures Intended to Ensure Meaningful Consideration of Accommodation Requests Were Misunderstood, Misapplied, or Violated.......... 20

    L.    Flaws in HUD's Procedures for Reasonable Accommodation Caused Lenkiewicz's Requests to Languish.................................................................... 22

    M.    Lenkiewicz's Supervisors Knew She Was Disabled, Yet Fired Her for Absences Caused by Her Disabilities .................................................................. 25

LEGAL STANDARD ................................................................................................. 26

ARGUMENT................................................................................................................ 27

i

**I.     The Undisputed Material Facts Establish Each Element of Plaintiff's Rehabilitation Act Claim as a Matter of Law. .............................................. 28**

     A.     Lenkiewicz Was Disabled.................................................................... 28

     B.     HUD Had Notice of Plaintiff's Disabilities. ......................................... 30

     C.     With a Reasonable Accommodation, Plaintiff Could Have Performed the Essential Functions of a FOIA Specialist or Other Position at HUD. .................. 33

     D.     HUD Ignored or Denied *Every One* of Lenkiewicz's Accommodation Requests. ....................................................................................... 35

**II.    The Undisputed Material Facts Establish that HUD Failed to Engage in a Good-Faith Interactive Process with Lenkiewicz to Find an Accommodation. ........ 35**

     A.     HUD Was Required to Engage in a Good-Faith Interactive Process with Lenkiewicz. ...................................................................................... 36

     B.     Undisputed Evidence Establishes that HUD Acted in Bad Faith and Hindered the Interactive Process. ......................................................... 38

**III.   HUD Does Not Plead or Otherwise Assert that Accommodating Lenkiewicz Would Have Imposed an Undue Hardship. ................................................. 44**

**CONCLUSION ......................................................................................... 45**

**ORAL ARGUMENT REQUESTED ................................................................ 45**

# TABLE OF AUTHORITIES

**Cases**

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) ............................................. 34, 43

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 27

*\*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000).......................................... 35, 36, 40, 42

*Barth v. Gelb*, 2 F.3d 1180 (D.C. Cir. 1993) ............................................................ 27

*Battle v. United Parcel Serv., Inc.*, 438 F.3d 856 (8th Cir. 2006) .................................................. 38

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir. 1995)................................................ 35

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ................................................................ 30

*Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281 (7th Cir. 1996) .................................. 41, 43

*Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994) .......................................................... 34, 42

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................... 27

*Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011 (8th Cir. 2000)..... 32, 34, 37

*Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108 (5th Cir.2005) .............................. 43

*Edwards v. EPA*, 456 F. Supp. 2d 72 (D.D.C. 2006)................................................... 28

*\*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005).............................. 36, 37, 38, 42

*EEOC v. Yellow Freight Sys.*, No. 98cv2270, 2002 WL 31011859 (S.D.N.Y. Sept. 9, 2002) ........................................................................................................................ 36

*\*Faison v. Vance-Cooks,* 896 F. Supp. 2d 37 (D.D.C. 2012)................................................. 37, 38

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998)....................................... 34, 38

*Howard v. Gray*, 821 F. Supp. 2d 155 (D.D.C. 2011).................................................. 45

*Humphrey v. Memorial Hospital Assoc.*, 239 F.3d 1128 (9th Cir. 2001).................................... 37

*Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151 (E.D.N.Y. 2002) ............................................... 36

*Langon v. Dep't of Health & Human Servs.*, 959 F.2d 1053 (D.C. Cir. 1992) ..................... 34, 43

*Lee v. Dist. of Colum.*, 920 F. Supp. 2d 127 (D.D.C. 2013).......................................... 37

*\*Loya v. Sebelius*, 840 F. Supp. 2d 245 (D.D.C. 2012)................................................... 27, 28, 41

*Morris v. Jackson*, 994 F. Supp. 2d 38 (D.D.C. 2013) .................................................................. 35

*Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000) ........................................................... 38

*Schmidt v. Solis*, 891 F. Supp. 2d 72 (D.D.C. 2012)..................................................................... 42

*Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014) ........................................................................ 34

*\*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999)........................................... 36, 38

*Woodruff v. LaHood*, 777 F. Supp. 2d 33 (D.D.C. 2011) ............................................................. 38

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007)..................................................................... 44

**Statutes**

29 U.S.C. § 791 ............................................................................................................................ 27

29 U.S.C. § 794 ............................................................................................................................ 28

42 U.S.C. § 12102 ................................................................................................................... 25, 29

42 U.S.C. § 3608 ............................................................................................................................. 1

**Rules**

Fed. R. Civ. P. 56.................................................................................................................... 26, 27

Local Civil Rule 7 ......................................................................................................................... 45

**Regulations**

24 C.F.R. § 5.703 ........................................................................................................................... 1

29 C.F.R. § 1630.2 ........................................................................................................... 29, 30, 35, 45

29 C.F.R. § 1630.9 ........................................................................................................................ 27

29 C.F.R. app. § 1630 ............................................................................................................... 36, 39

## PRELIMINARY STATEMENT

This case is about an employer that repeatedly ignored or denied a disabled employee's requests for reasonable accommodation and, in the process, violated best practices and its own procedures for handling such requests.  When Plaintiff Denise Lenkiewicz's orthopedic and respiratory disabilities made it difficult for her to perform her job, she asked for accommodations that would have enabled her to continue working.  Lenkiewicz's employer granted none of her requests and proposed no workable alternatives; it simply was uninterested in finding solutions to improve her productivity.  Instead, her employer punished her for absences caused by the very disabilities for which she sought, but was denied, accommodation.  Her employer's repeated failures to accommodate her disabilities and its failure to engage in a good-faith interactive process with her violated the Rehabilitation Act, as the undisputed facts establish.

Lenkiewicz's employer cannot contend that it did not know any better.  Her employer was the U.S. Department of Housing and Urban Development ("HUD" or the "agency").  HUD is responsible for administering provisions of the Fair Housing Act of 1968 and other statutes that protect persons with disabilities from discrimination in housing.[1]  The agency develops and enforces housing-safety standards.[2]  And, like other federal agencies, it strives to be a "model employer" of disabled persons.  Yet, in its own headquarters, HUD allowed toxic mold to propagate and then fired an employee whose breathing problems had become so severe, and whose pleas for reasonable accommodation had been dismissed for so long, that she could no longer bear working there.  This record tragically illustrates how the hallmarks of dysfunctional bureaucracy—miscommunication, poor training, loopholes, lack of accountability, and

---

[1] *See* 42 U.S.C. § 3608.

[2] *See, e.g.*, 24 C.F.R. § 5.703.

indifference—can combine to work injustice on a disabled employee, even one who suffered to overcome severe medical problems and to contribute to the agency's mission.

One of HUD's reasonable accommodations specialists captured the essence of the agency's dysfunction in making this note about Lenkiewicz:

> Based on medical documentation, employee does have a disability but no major life activities were documented.

This perplexing comment—made over five months after Lenkiewicz had submitted her request and just before HUD "ceased processing" it—exemplifies why Lenkiewicz prevails on her Rehabilitation Act claim as a matter of law.  Lenkiewicz was disabled.  She submitted medical documentation to show it.  She asked for four different accommodations on many occasions over several years.  But rather than grant *any* of her accommodation requests, the agency either ignored or denied every one of them.  This employee's comment illustrates how that came to pass.   By definition, a disability limits one or more "major life activities," so one cannot "have a disability" without at least one major life activity being limited.  Yet HUD refused to infer or ask which major life activities were limited by the physical impairments that—by HUD's admission elsewhere—Lenkiewicz had.  This agency denied accommodations to an employee it believed was disabled because she did not speak certain magic words, HUD did not tell her what the magic words were, and HUD refused to speak those words itself.  As the undisputed facts show, this "gotcha" illogic reflects a broader recalcitrance at HUD, which thwarted Lenkiewicz's multi-year efforts to obtain some form of accommodation for her disabilities.

Lenkiewicz wanted to work.  HUD just wanted her gone.  No trial is necessary to reach this inescapable conclusion: HUD is liable to Lenkiewicz for violating the Rehabilitation Act.

## UNDISPUTED MATERIAL FACTS

A. <u>Lenkiewicz Was Qualified for Her Position as a FOIA Specialist at HUD.</u>

Lenkiewicz joined HUD as a FOIA Specialist in October 2008.  (SoF ¶ 1; Answer ¶ 1 (ECF No. 21).)[3]  As a FOIA Specialist, Lenkiewicz was responsible for analyzing the contents of HUD records to determine which of those records must be disclosed under the Freedom of Information Act of 1966 ("FOIA").  Lenkiewicz's tasks included reviewing incoming FOIA requests, assigning those requests to a responding office, and redacting responsive documents. (SoF ¶ 4; Answer ¶ 7 (ECF No. 21).)

Lenkiewicz was fully qualified for the FOIA Specialist position at HUD.  Before joining HUD, Lenkiewicz had been a federal employee for more than 19 years, including more than 10 years as a Paralegal Specialist at the U.S. Department of Commerce.  (SoF ¶ 3; Answer ¶ 9 (ECF No. 21).)  According to vocational rehabilitation specialist Fredric K. Schroeder, Ph.D., who has 30 years of experience working with government agencies to accommodate disabled employees and served as Commissioner of the Rehabilitation Services Administration under President Clinton, Lenkiewicz "has the skills, experience, and expertise necessary to perform the essential functions of the FOIA Specialist position at HUD."  (Ex. 12, Schroeder Rep. ¶¶ 12, 27, 29–30.)[4] Dr. Schroeder observed that Lenkiewicz's "career was typified by a steady progression of increasingly complex job duties" and that her "professional focus during much of her twenty-two years of government service was handling requests for information from the government under the Freedom of Information Act."  (Id. ¶ 29.)  HUD selected Lenkiewicz over other applicants

---

[3] As used in this memorandum, "SoF" refers to Plaintiff's Statement of Undisputed Material Facts in Support of her Motion for Summary Judgment, dated March 4, 2015.

[4] As used in this memorandum, "Ex." refers to an exhibit to the Declaration of J. Wells Harrell in Support of Plaintiff's Motion for Summary Judgment, dated March 4, 2015.

for the FOIA Specialist position because, according to her immediate supervisor Vicky Lewis, Lenkiewicz "appeared to be the best qualified at the time." (Ex. 16, Lewis Dep. 38:10–39:21; *see also* SoF ¶ 5.)

    B.  <u>Throughout Her Employment at HUD, Lenkiewicz Suffered from Physical Impairments Substantially Limiting Many Major Life Activities.</u>

At the time she joined HUD in October 2008, Lenkiewicz had been a long-time sufferer of chronic obstructive pulmonary disease ("COPD") with chronic bronchitis. (SoF ¶ 10.) According to pulmonary specialist Alan Schwartz, M.D., COPD "is a respiratory disease that makes breathing difficult." (Ex. 11, Schwartz Rep. ¶ 19.) Airflow in the lungs of COPD sufferers is "restricted" due to "inflammation and increased mucus production in the airways," "a loss of elasticity in the tissue forming the air sacs," and "degradation and destruction of the walls separating air sacs." (*Id.*) As a result, "COPD can cause not only physical symptoms such as coughing, wheezing, shortness of breath, and chest tightness, but also mental symptoms such as fatigue that result from reduced oxygenation of the brain and increased concentration of carbon dioxide in the bloodstream." (*Id.*) "[T]he leading cause of COPD is habitual cigarette smoking" (*id.*), and Lenkiewicz had "been smoking for a long time" (Ex. 18, Lenkiewicz Dep. 143:1–10). Unfortunately the disease is "progressive" and "is expected to worsen over time, especially without proper treatment." (*Id.* ¶ 19.) For these reasons, COPD is a "serious" and "life-threatening condition." (Ex. 15, Allen Dep. 157:22–158:11.)

Lenkiewicz's COPD symptoms were pronounced. Dr. Schwartz explains that symptoms such as shortness of breath and fatigue "can be particularly severe in overweight individuals" like Lenkiewicz, who "cannot breathe enough given their weight, severely limiting the level of physical activities their bodies can handle and worsening symptoms of COPD such as shortness of breath and fatigue." (Ex. 11, Schwartz Rep. ¶ 20.) As a result, "physical exertion that would

4

be considered light to moderate for healthy adults nonetheless strained Ms. Lenkiewicz's

respiratory system" such that her respiratory impairments "would increase in severity after even

short periods of physical exertion[.]" (*Id.* ¶ 23.) A simple test conducted by Dr. Schwartz during

his examination of Lenkiewicz is illustrative:

> [W]hen I performed a pulse-oximetry on Ms. Lenkiewicz during
> my July 16 examination, her oxygen saturation level was only
> about 86 to 87%, which is well below the 95%-99% range that
> would be considered medically normal.  … When I took another
> pulse-oximetry reading immediately following a brief walk on a
> level surface with Ms. Lenkiewicz for a few minutes, her oxygen
> saturation level had fallen even further and nadired at 79%, which
> represents a precipitous drop in oxygen level after only light
> physical activity for short intervals.

(*Id.* ¶ 21.) Dr. Schwartz added that Lenkiewicz's "lung function is so severely impaired that I

have recommended that [she] receive supplemental oxygen to compensate for her diminished

lung function and ensure that her body receives the necessary supply of oxygen." (*Id.*)

Lenkiewicz's COPD symptoms also were made worse by environmental factors. She

was susceptible to lung infections. (SoF ¶ 11.) One of Lenkiewicz's treating pulmonary

specialists, Dr. Moti Koul, noted that Lenkiewicz's COPD "probably" has an "underlying

allergic component" that is "made worse by environmental pollutants." (Ex. 26, KOUL_0001.)

Dr. Schwartz concurs that "airborne irritants such as mold can worsen symptoms of COPD."

(Ex. 11, Schwartz Rep. ¶ 19.)

After Lenkiewicz joined HUD in October 2008, she suffered from worsening orthopedic

impairments as well. (SoF ¶ 7.) These impairments include "degenerative joint disease of the

lumbar spine and right knee[.]" (Ex. 28, SHA_0080.) According to orthopedist Eric Dawson,

M.D., who has treated Lenkiewicz for years, "the tissues in Ms. Lenkiewicz's knee joints, around

the heel of her foot, and along her spine have a tendency to become inflamed and thereby cause

her numbness, spasms, and pain." (Ex. 10, Dawson Rep. ¶ 16.) Additionally, "[d]egeneration of several ligaments in Ms. Lenkiewicz's knees [has] also introduced instability into the joint, making walking difficult." (*Id.*) Also, during her employment at HUD, Lenkiewicz suffered two serious orthopedic injuries: a broken foot in late summer 2009 and a torn meniscus tendon in early spring 2010. (SoF ¶ 8.)

HUD "does not dispute that Plaintiff had physical impairments[.]" (Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.) More than that, the record establishes that Lenkiewicz's respiratory and orthopedic impairments substantially limited several major life activities. First, Lenkiewicz's pulmonary impairments (including COPD) "substantially limited her ability to breathe." (Ex. 11, Schwartz Rep. ¶ 9; *see also* SoF ¶ 10.) Second, Lenkiewicz's orthopedic impairments (including degenerative joint disease and injuries to her foot and knee) "substantially limited her ability to perform manual tasks, walk, stand, lift, bend, and engage in other physical activity." (Ex. 10, Dawson Rep. ¶ 8; SoF ¶ 9.) Third, the symptoms caused by Lenkiewicz's pulmonary and orthopedic impairments (including pain, fatigue, and shortness of breath) "limited her ability to concentrate and think." (Ex. 10, Dawson Rep. ¶ 8; Ex. 11, Schwartz Rep. ¶ 9; *see also* SoF ¶ 15.)

C.  Lenkiewicz Requested Accommodations that Would Have Enabled Her to
    Perform the Essential Functions of Her Job.

When Lenkiewicz joined HUD as a FOIA Specialist in October 2008, her worksite was on the tenth floor of the HUD headquarters building in downtown Washington, DC. (SoF ¶ 2.) Her daily commute from her home in Maryland involved an extensive amount of walking to, from, and within the DC Metro rail system. (SoF ¶ 13.) Her daily routine at HUD headquarters involved walking between her workstation and other parts of the building to retrieve files, make copies, and attend meetings. (*Id.*) While Lenkiewicz was recovering from a broken right foot

and a torn meniscus in her right knee, Lenkiewicz had difficulty walking.  (SoF ¶ 30.)  But even when Lenkiewicz was not recovering from these injuries, the walking involved in her daily commute and work routine would often leave her fatigued, short of breath, and in pain, owing to her impairments.  (SoF ¶ 13.)

Lenkiewicz's breathing impairments were made even worse by exposure to mold at her workplace.  (SoF ¶ 14.)  Air-quality testing performed on the tenth floor in June 2011 "did reveal the presence of mold."  (Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 8.)  Lenkiewicz's "breathing-related symptoms are consistent with exposure to mold[.]"  (Ex. 11, Schwartz Rep. ¶ 24.)  On her very first day on the job at HUD headquarters in October 2008, Lenkiewicz "lost [her] voice" and "couldn't breathe."  (Ex. 18, Lenkiewicz Dep. 57:24–58:5, 193:17–194:7.)   On some days thereafter, Lenkiewicz "found herself unable to breathe in the office."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 1.)  Her breathing-related symptoms worsened when she worked in the office, yet they improved when she was away from it.  (SoF ¶ 14; Ex. 26, KOUL_0001.)

To overcome these obstacles and continue doing her job as a FOIA Specialist, Lenkiewicz requested reasonable accommodations multiple times over nearly two years.  She requested four accommodations in total: (i) "a printer at her workstation," (ii) "a parking space," (iii) "relocat[ion] to the HUD office located in the portals building," and, on two separate occasions, (iv) the ability to work from home (or "telework").  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; *see also* SoF ¶ 23.)  Any of these accommodations would have reduced the level of physical activity associated with her commute and routine; relocation or telework would have allowed her to work away from the tenth floor of HUD headquarters, where mold was present.  (SoF ¶ 24.)  By improving Lenkiewicz's ability to breathe and reducing her pain and

7

fatigue, any of the reasonable accommodations Lenkiewicz requested would have enabled her to "perform[] the essential functions of the FOIA Specialist position[.]"  (Ex. 12, Schroeder Rep. ¶ 34; *see also* SoF ¶ 25.)  In addition, while other effective accommodations may have been available, HUD's RA Branch did not propose a single alternative.  (SoF ¶¶ 79–80.)

    D. <u>Lenkiewicz's Request for a Printer at Her Workstation Was Denied</u>

Lenkiewicz started small.  After breaking a bone in her right foot in August 2009, Lenkiewicz requested that a spare, unused printer be moved to her workstation "because she could not comfortably walk back and forth to the printer."  (Ex. 16, Lewis Dep. 58:14–18; *see also* SoF ¶¶ 27–28; Answer ¶ 17.)  The accommodation of a printer at Lenkiewicz's workstation "would have allowed her to perform the essential functions of her position by reducing the physical strain and shortness of breath associated with making frequent trips to the printer."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; *see also* SoF ¶ 29.)  Lenkiewicz made her request for a printer to her first-level supervisor, Vicky Lewis, who testified that, "[a]t the time, [Lenkiewicz] was using a scooter[.]"  (Ex. 16, Lewis Dep. 58:19–59:4; *see also id.* 68:19–69:6.)

In connection with her request for a printer, Lenkiewicz sought assistance from Debbie Rizzo, who was then the head of the agency's Reasonable Accommodations Branch ("RA Branch").  (SoF ¶ 30.)  Lenkiewicz emailed Rizzo on September 11, 2009, stating that she "has been out of work with a broken foot" and that "between back pain, foot pain and the wear and tear on my knees this foot is causing, I have no option but to leave a half day."  (Ex. 21, DEF.EMAIL.0073.)  After mentioning her failed attempt to obtain a spare, unused printer, Lenkiewicz asked Rizzo:

> ***How does one go about getting any accommodations when they're trying to come to work, without having to go through a long drawn out process which in the end makes the issue null and void?***  This is the first place in 20 years that while having an

> injury nobody has stepped forward to ask if I need anything and/or
> offered anything to make life easier.

(*Id.* (emphasis added).)  Rizzo did not respond.  Lenkiewicz emailed Rizzo eleven days later,

once again pleading for help:

> I'm still in need of guidance as to reasonable accommodation
> options, and how to go about it.  ***I figure by getting a printer to
> help with the problems of having to jump up and down on this
> broken foot would be a start.***  Normally by Wednesday it's all that
> I can bear as far as pain, in fact by Friday of last week it affected
> the syatic [*sic*] nerve on my left leg, and therefore I stayed home.
> ***The Wednesday before that I stopped to talk to Cynthia
> O'Conner with tears rolling down my face from pain.***

(*Id.* (emphasis added).)  Again, Rizzo did not respond.

On December 7, 2009—about five months after Lenkiewicz had requested the printer—

Lewis emailed Lenkiewicz informing her that her "request for a printer was denied."  (Ex. 20,

Def.00646; *see also* SoF ¶ 31.)  The denial of a printer left Lenkiewicz "needing to exert herself

physically in ways that worsened her breathing impairments and that caused her pain and

fatigue."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 9.)

On or around December 2009, Lewis also suggested that Lenkiewicz ask a HUD

contractor to retrieve print jobs.  (SoF ¶ 33.)  This suggestion struck Lenkiewicz as

"cumbersome" because the contractor "had a multitude of things to do[.]"  (Ex. 18, Lenkiewicz

Dep. 113:12–20, 225:6–25.)  Lenkiewicz would have been uncomfortable "interrupting [the

contractor] for my needs" and considered it "kind of degrading to have to keep jumping up" to

retrieve print jobs.  (*Id.* 225:6–25; *see also* Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.)  This

was the last time that Lewis or anyone else at HUD suggested any alternatives, workable or

otherwise, to Lenkiewicz.  (*See* SoF ¶ 79.)

E.   <u>Lenkiewicz's Request for a Parking Space at HUD Headquarters Was Denied.</u>

After breaking her right foot in August 2009, Lenkiewicz also asked Lewis for a parking space at or near HUD headquarters "to minimize the distance she needed to walk to her workstation and reduce the physical strain associated with commuting to work."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; *see also* SoF ¶¶ 35–38.)  At the time of Lenkiewicz's parking request, Lenkiewicz "was on crutches."  (Ex. 18, Lenkiewicz Dep. 101:3–10.)  Lenkiewicz told Lewis that "having a parking space could aid in … me not having to walk on my foot the way it was" and even showed Lewis "how [her leg] was swelling up … blowing up like that[.]"  (*Id.*)

In support of her request for parking, Lenkiewicz submitted medical documentation to Lewis that included a note from Dr. Dawson, one of her treating orthopedists.  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 5; *see also* SoF ¶ 37.)  Dr. Dawson's note explained that Lenkiewicz "has a delayed union and healing of a weightbearing fracture to her right 5th metatarsal that incapacitates her from walking or standing for prolonged periods."  (Ex. 23, LENK_0782.)  Dr. Dawson emphasized that "parking privileges" would "place her closer to the workplace and minimize standing or walking so that she may heal her injuries."  (*Id.*)  Finally, Dr. Dawson added that "[t]his injury has increased [Lenkiewicz's] pain and stress level and any modifications that keep this in mind are appreciated."  (*Id.*)

In connection with her request for a parking space, Lenkiewicz again sought assistance from Rizzo in the RA Branch.  Lenkiewicz told Rizzo in a December 7, 2009 email that she "needs to set up an appointment with you in addition to securing temporary handicap parking" and offered to send Rizzo "an updated doctor's note requesting parking and physical accommodations[.]"  (Ex. 21, DEF.EMAIL.0077.)  Lenkiewicz periodically sought updates from Rizzo on the status of the parking request.  For example, on December 10, 2009, Lenkiewicz

emailed Rizzo stating that she "hadn't heard from anyone on the parking" and asking "is there a way I can check on the status?" (*Id.*, DEF.EMAIL.0078.)  Rizzo did not respond.  (*See id.*, DEF.EMAIL.0079; *see also* SoF ¶ 40.)

Lewis did not grant Lenkiewicz's request for a parking space.  Instead, Lewis directed Lenkiewicz to request a parking space from HUD's Mail and Transportation Branch.  (*See* Ex. 18, Lenkiewicz Dep. 102:3–11 ("Q  … So is it your testimony that Ms. Lewis – when you made your requests for a parking space – that she told you, you need to go to the Parking Office to get the parking space?  A  Yes."); *see also* SoF ¶ 39.)  Lenkiewicz told the Mail and Transportation Branch that she "had a broken foot, it was not healing, [she] was swelling," and that a parking space "would help aid getting to work and getting around" because she "couldn't walk on it any longer."  (Ex. 18, Lenkiewicz Dep. 103:17–104:1.)  In response, she was told that "[t]here are no parking spaces for your department" and "that there weren't any available."  (*Id.*, Lenkiewicz Dep. 103:6–16.)

Not all HUD employees had such difficulty receiving a parking space as an accommodation.  Lenkiewicz's second-level supervisor, Dr. Dolores Cole, was given a parking space promptly after she fell down the stairs in her home.  Cole testified:

> *Q. Are you aware of HUD granting reasonable accommodations for other employees who have had mobility problems?*
>
> *A. I remember one and that would be me.*  I had an accident at home in January.  I fell down the stairs, was off work for two to three weeks, and I had been using Metro.  And I asked to get another -- to get a parking space again so that I could drive for a while…. *I filled out a form for a parking space.  I had to indicate that it was temporary medical and they allowed me to park temporarily on the street level without driving into the garage.*

(Ex. 17, Cole Dep. 80:13–81:7 (emphasis added).)

F.  <u>Lenkiewicz's Request for Relocation to a Different Building Was Ignored.</u>

Sometime in 2009, Lenkiewicz asked Lewis for Lenkiewicz's workstation to be relocated

to the HUD office located in the nearby "portals" building.  (Ex. 2, Pl.'s Resp. to Def.'s

Interrogatory No. 3; *see also* SoF ¶ 43.)  Lenkiewicz said to Lewis: "I need to be moved out of

that office space, can I get moved, can you move me somewhere, is there somewhere else that I

can work."  (Ex. 18, Lenkiewicz Dep. 130:18–25.)  Lenkiewicz requested relocation because she

was "experiencing over-and-over constant breathing problems" and "was convinced that there

[was] something in that office making [her] sick."  (*Id.*, Lenkiewicz Dep. 131:1–10.)  Relocating

Lenkiewicz's workstation away from the tenth floor of HUD headquarters, especially if "coupled

with a parking space, would have allowed Plaintiff to perform the essential functions of her job

by improving her ability to breathe and reducing the physical strain associated with commuting

to work."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; *see also* SoF ¶¶ 13, 51.)

Lenkiewicz's request to have her workstation relocated to another building was ignored.

(SoF ¶ 52.)  As a result, for the remainder of her employment at HUD, Lenkiewicz was "left

continuously exposed to toxic mold and airborne irritants that pervaded the 10th floor of HUD

headquarters during working hours and worsened her breathing difficulties."  (Ex. 2, Pl.'s Resp.

to Def.'s Interrogatory No. 9; *see also* SoF ¶¶ 14, 51.)

G.  <u>Lenkiewicz's First Requests for Telework Were Ignored.</u>

While recovering from a broken foot in late 2009, Lenkiewicz "made a verbal request to

Vicky Lewis that [she] be permitted to work from home in order to avoid rain damage to the

scooter that [she] was renting."  (Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; *see also* SoF

¶ 97.)  Lenkiewicz also spoke with Rizzo about whether Lenkiewicz could "work from home

during rain."  (Ex. 18, Lenkiewicz Dep. 108:21–109:12.)  With Rizzo's assistance, Lenkiewicz

completed and submitted Form 1000 in which Lenkiewicz requested "three days a week to work

from home." (*Id.*, Lenkiewicz Dep. 108:25–109:12.)  This Form 1000 apparently was

misplaced; HUD could not locate it in response to Lenkiewicz's discovery requests and did not

produce it.  (*See* SoF ¶ 55; Ex. 8, Def.'s Second Supp. Resp. to Pl.'s Requests for Production at

2.)  On January 19, 2010, Lenkiewicz asked Rizzo by email whether Rizzo had "heard anything

about the work from home" considering that it had "been well over a month and [Lenkiewicz]

hadn't heard from anyone." (Ex. 21, DEF.EMAIL.0079.)  Rizzo did not respond.  With that,

Lenkiewicz's 2009 request for telework was ignored.  (*See* Ex. 2, Pl.'s Resp. to Def.'s

Interrogatory No. 3.)  As a result, Lenkiewicz "called in and took off, not paid" on rainy days.

(Ex. 18, Lenkiewicz Dep. 111:9–11.)

### H.  In December 2010, Lenkiewicz Submitted One Last Written Request for Accommodation and Included Medical Documentation.

On December 22, 2010, Lenkiewicz submitted another written accommodation request

using Form 1000.  (Answer ¶ 26; *see also* SoF ¶ 56.)  She sought accommodation for her "2

hindering disabilities" of "COPD with chronic bronchitis, and debilitating arthritis." (Ex. 22,

LENK_0055.)  Lenkiewicz noted that she was experiencing "dizziness, fatigue, joint pain w/

swelling, confusion which are made worse by workplace stresses" and has even "fallen int[o her]

file cabinet at [her] workstation [on] 2 different occasions." (*Id.*)  She asked HUD to "expedite

[her] request" because of her "inability to keep up with work in [her] current situation." (*Id.*)

Lenkiewicz's original Form 1000 did not ask for a specific accommodation, but "(telework)"

was handwritten on a subsequent version of the form.  (*Compare* Ex. 22, LENK_0055 *with* Ex.

20, Def.00263.)  The records of RA Branch employee Yolanda Patterson confirm that

Lenkiewicz "brought in [a] Hud 1000 form and medical doc[uments]" on December 22, 2010.

(Ex. 20, Def.00261.)

Lenkiewicz submitted medical documentation in support of her December 22, 2010 request.  (*See* Ex. 22, LENK_0056 – LENK_0059; *see also* SoF ¶ 57.)  This documentation included a letter from Dr. Shammas, who wrote that "[b]ecause of her severe multi joint condition, I recommend for her, if at all possible, to work three days a week from home and also if possible to get her into a less stressful type of work."  (Ex. 22, LENK_0057.)  The documentation also included a "certificate of disability" in which Dr. Shammas diagnosed Lenkiewicz with "dizziness, fatigue, and multi joint pain" and recommended "light duty only due to fatigue and dizziness[.]"  (*Id.*, LENK_0058.)  Lenkiewicz submitted a release authorizing HUD to speak with Dr. Shammas.  (*Id.*, LENK_0056.)

On or around January 5, 2011, Lenkiewicz submitted additional medical documentation, including a report from Imelda Cabalar, M.D.  (Ex. 28, SHA_0079 – SHA_0080; *see also* Def.00265; SoF ¶ 57.)  Dr. Cabalar's report notes that Lenkiewicz "states that she still has pain on her joints mainly on her knees," "complains of feeling tired all the time and having no energy," and "states that at times she feels like she has no strength."  (Ex. 28, SHA_0079.)  According to Dr. Cabalar's report, "X-rays of the lumbar spine showed focal degenerative changes" and that "x-rays of the right knee showed mild osteoarthritis[.]"  (*Id.*)  Dr. Cabalar's report confirmed the diagnoses of "COPD" with "chronic bronchitis" and "degenerative joint disease[.]"  (*Id.*, SHA_0080.)  Lenkiewicz also submitted a note from Dr. Michael Williams, whom Lenkiewicz had seen for the first time for endocrine issues on January 4, 2011, as well as a release authorizing HUD to speak with him.  (Ex. 20, Def.00200, Def.00202, Def.00288; *see also* SoF ¶ 57.)   Dr. Williams's note recommended that Lenkiewicz "start working from home immediately."  (Ex. 20, Def.00202.)

I.   <u>Rather than Grant Lenkiewicz's December 2010 Request, Even Provisionally,</u>
    <u>HUD Subjected the Request to an Arbitrary and Ineffective Medical Review</u>

In January 2011, HUD's RA Branch referred Lenkiewicz's December 2010 request to the
Federal Occupational Health Service ("FOH"), asking FOH "to help … evaluate medical
information for the purpose of determining if [Lenkiewicz] should be given an accommodation
which would allow her to telework."  (Ex. 20, Def.00195 – Def.00196; *see also* SoF ¶ 58.)  HUD
could have provided a provisional or temporary accommodation to improve Lenkiewicz's
comfort and productivity on the job while her request underwent medical review.  (*See* SoF ¶
97.)  But HUD did not grant Lenkiewicz a provisional or temporary accommodation, as it had
done for other employees, including employees who had not submitted medical documentation.
(Ex. 20, Def.00037, DEF.02954 – DEF.02968; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory Nos. 1–
3, 9; SoF ¶¶ 97–98.)

FOH assigned Dr. James Allen to consult with HUD's RA Branch on Lenkiewicz's
request.  (SoF ¶ 61.)  But HUD failed to give Dr. Allen all of the information and direction
necessary to make any medical evaluation meaningful.  (SoF ¶¶ 63–66.)  First, HUD never sent
Lenkiewicz's Form 1000 to Dr. Allen, leaving him with no notice that Lenkiewicz sought
reasonable accommodation based on her respiratory impairments (and not simply her orthopedic
impairments).  (*See* Ex. 15, Allen Dep. 137:16–138:4, 150:15–21; *see also* Ex. 20, Def.00265.)
Second, HUD never provided Dr. Allen with a description of the FOIA Specialist position,
foreclosing any evaluation of which accommodations would have helped Lenkiewicz perform
the essential functions of the position.  (*See* Ex. 13, Patterson Dep. 133:2–5; Ex. 15, Allen Dep.
150:18–21.)  Third, HUD never provided Dr. Allen with the information about Lenkiewicz's
medical conditions that her supervisors (especially Lewis) had accumulated during Lenkiewicz's
employment at HUD.  (*See* Ex. 15, Allen Dep. 150:18–21.)  Finally, Dr. Allen was never given

FOH's treatment notes documenting Lenkiewicz's history of respiratory and orthopedic impairments and identifying pulmonary specialist Dr. Moti Koul, who treated Lenkiewicz for years.  (*See id.*; *see also* Ex. 25, FOH_0001 – FOH_0011; Ex. 18, Lenkiewicz Dep. 146:17–22.)

Medical review is intended to help HUD's RA Branch to identify potential accommodations that may be appropriate for an employee, even for those who have requested a specific accommodation.  (Ex. 14, Cumber Dep. 23:2–7.)  But HUD's RA Branch narrowed Dr. Allen's normally open-ended medical review by posing specific questions about the "medical basis" for permitting Lenkiewicz to telework and seeking a recommendation as to whether telework should be granted.  (Ex. 20, Def.00195; *see also* SoF ¶ 61.)  The FOH consultants who participate in the medical review process are not "typically asked to recommend to grant [a] request" for reasonable accommodation.  (Ex. 14, Cumber Dep. 40:11–22.)  Rather, FOH consultants like Dr. Allen typically determine whether a disability creates a substantial limitation on a major life activity and explain that limitation, which, in turn, permits the agency to select the most appropriate accommodation.  (*See* Ex. 15, Allen Dep. 33:9–15, 43:2–17.)  Even though Dr. Allen is not specially trained in selecting accommodations, HUD's RA Branch sought his recommendation on the "medical basis" for telework as an accommodation.  (*See id.*; Ex. 20, Def.00195.)  "Medical basis" is not a term that Dr. Allen ever uses, but he adopted the term in responding that, in his opinion, there was "no medical basis for this employee's need for telework."  (*See* Ex. 15, Allen Dep. 45:9–16; Ex. 20, Def.00177 – Def.00178.)  It was a deviation from his typical practice for him to recommend to the RA Branch whether to deny the request.  (Ex. 15, Allen Dep. 33:9–35:3.)

Without asking Lenkiewicz or HUD for additional information, considering whether accommodations would have improved Lenkiewicz's comfort or productivity, or even

16

acknowledging Dr. Shammas' recommendation that Lenkiewicz work from home, Dr. Allen recommended denying Lenkiewicz's request.  (Ex. 20, Def.00266, Def.00264.)  As Dr. Shammas testified, Lenkiewicz "had a lot of complaints of aches and pain in multiple joints, and so I thought that if she can be more productive on a lighter type of environment for work, she probably would be able to continue working."  (Ex. 19, Shammas Dep. 13:20–14:3; *see also id.* 14:7–10 ("Q. In your opinion, did the aches and pains that she was suffering prevent her from being able to come to work at that time?  A. To a certain point, yes.").)  Yet Dr. Allen disregarded Dr. Shammas' determinations that "[t]ravel is difficult" for Lenkiewicz and that telework would improve her productivity given her "severe multi joint condition[.]"  (Ex. 20, Def.00197, Def.00180.)   Dr. Allen instead focused on his telephone conversations with Dr. Williams, notwithstanding that Lenkiewicz had "been seen by Dr. Shammas for many years and seen by Dr. Williams *for the first time* on Jan[uary] 4, 2011."  (Ex. 20, Def.00288 (emphasis added).)  Dr. Williams also was evaluating Lenkiewicz's possible endocrine issues, not the respiratory and orthopedic impairments that Lenkiewicz cited on her Form 1000.  (*See* SoF ¶ 57.)

> J. **Lenkiewicz Would Have Given HUD the Information It Thought Was Needed, if only HUD Had Asked.**

HUD "admits that [Lenkiewicz] submitted medical documentation of physical impairments" and "does not dispute that Plaintiff had physical impairments."  (Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.)  Nonetheless, HUD maintains that the medical documentation did not "establish[] that her impairments substantially limited one or more major life activities."  (*Id.*)  HUD's position is based on Dr. Allen's belief that he had "no medical basis to identify the employee's functional limitations[.]"  (Ex. 20, Def.00266.)  Similarly, although Patterson acknowledged that, "[b]ased on medical documentation, [Lenkiewicz] does have a

disability," she accepted Dr. Allen's conclusion, writing that "no major life activities were documented." (*Id.*, Def.00288.)

Cumber acknowledged that an impairment, by definition, has to limit *something*. (Ex. 14, Cumber Dep. 54:9–13 (testifying that an impairment is "something that limits the functioning or limits your activities of daily living").) The major life activities limited by Lenkiewicz's impairments were inferable from the impairments themselves—severe arthritis and degenerative joint disease in the lower extremities limit the major life activities of performing manual tasks and walking (among others), and respiratory impairments like COPD with chronic bronchitis limit the major life activity of breathing. HUD refused to draw such inferences. (*See* SoF ¶ 70; Ex. 13, Patterson Dep. 35:11–16 ("Q. Does a request have to state precisely which major life activity is affected or can the Reasonable Accommodations Branch infer that based on documentation? … THE WITNESS: No. We don't – no."), *id.* 36:3–7 ("Q. When a major life activity is not identified in the documentation, does the Reasonable Accommodations Branch make any effort to identify it for themselves? A. No.").) Patterson testified that "joint pain with swelling" would have shown a limitation of a major life activity "[i]f [Lenkiewicz] had put walking there" on the Form 1000. (Ex. 13, Patterson Dep. 67:11–20.)

HUD never asked Lenkiewicz for the information it thought was missing. (SoF ¶¶ 71–72.) "HUD never asked Plaintiff to identify which major life activities were limited by her impairments." (Ex. 4, Pl.'s Request for Admission No. 10;[5] *see also* SoF ¶¶ 67, 69.) Patterson

---

[5] Defendant failed to serve a timely response to Plaintiff's requests for admission numbers 5–12, which therefore are deemed admitted under Fed. R. Civ. P. 36(a)(3). By motion on December 10, 2014, Defendant sought (1) permission to withdraw these admissions and (2) a *nunc pro tunc* extension of the deadline to serve its otherwise untimely responses. (ECF No. 47.) Plaintiff filed a memorandum in opposition to the motion on December 29, 2014. (ECF No. 48.) Defendant did not file a reply, and its motion remains pending.

did not recall "telling Ms. Lenkiewicz that she needed to identify major life activities[.]" ( Ex. 13, Patterson Dep. 128:17–19; *see also* SoF ¶ 70.)  The RA Branch's responses to Lenkiewicz's requests for a status update did not ask Lenkiewicz to identify any major life activities.  (*See, e.g.*, Ex. 14, Cumber Dep. 80:5–81:18 ("Q. In your email, do you ask Ms. Lenkiewicz to identify any major life activities that are limited by any impairments? A. No.").)  Nor did HUD ever "ask[] Plaintiff's physicians to identify which major life activities were limited by her impairments." (Ex. 4, Pl.'s Request for Admission No. 11.)[6]  HUD also never asked Lenkiewicz to identify other treating physicians or sign releases to speak with those physicians.  (SoF ¶ 67.)

At some point in the summer of 2011, HUD denied Lenkiewicz's December 2010 request by checking "Disapproved" on the HUD 1000.  (Ex. 20, Def.00263.)  Inexplicably, the denial was backdated to December 22, 2010—the date of her request.  (SoF ¶ 83.)  HUD never informed Lenkiewicz that her request had been denied, notwithstanding that Dr. Allen had recommended denying Lenkiewicz's request in mid-February.  (*See* SoF ¶ 84; Ex. 20, Def.00301, Def.00306, Def.00264.)

Other HUD employees' requests for telework as a reasonable accommodation were not met with such skepticism.  Of the 130 such requests received by HUD during Lenkiewicz's employment, 110 were granted, and 90 were granted *without any referral to FOH*.  (SoF ¶ 60.) Those 90 requests for telework accommodations that did not involve medical review were granted with justifications bearing striking resemblance to Lenkiewicz's impairments, including asthma, respiratory issues, chronic fatigue syndrome, anxiety, and osteoarthritis.  (*Id.*)  HUD did not suggest a temporary or provisional accommodation while medical review was ongoing.  (SoF ¶ 97.)

---

[6] *See supra* note 5.

19

K.  HUD Procedures Intended to Ensure Meaningful Consideration of
Accommodation Requests Were Misunderstood, Misapplied, or Violated.

It is no accident that each and every one of Lenkiewicz's requests for reasonable

accommodation suffered the same fate.  Lenkiewicz was denied accommodations because her

supervisors refused to promote the decision of Lenkiewicz's requests in good faith and, along

with RA Branch employees, violated HUD's procedures for processing requests for reasonable

accommodation.

HUD's procedures are set forth in Handbook 7855.1, Procedures for Providing

Reasonable Accommodation for Individuals with Disabilities dated April 2003 ("Procedures").

(*See* Ex. 20, Def.00001 – Def.00091; *see also* SOF ¶ 17.)  The Procedures instruct, among other

things, that supervisors like Cole and Lewis are "responsible for receiving and reviewing

requests for reasonable accommodations, engaging in interactive communication, assessing

essential job functions, requesting pertinent medical documentation, if appropriate, and

whenever possible, approving reasonable accommodation requests."  (Ex. 20, Def.00021,

Def.00022; *see also* SoF ¶¶ 19–21.)  The record shows that Cole and Lewis, as Lenkiewicz's

supervisors, utterly failed to perform these and other duties set forth in HUD's Procedures.

*First*, in denying Lenkiewicz's request for a printer months after the request was made,

Lewis suggested that Lenkiewicz renew her request "under reasonable accommodations

guidelines" by submitting Form 1000.  (Def.00646; *see also* SOF ¶ 31.)  HUD's Procedures do

not require an employee to submit this form in order for a verbal request to be considered "under

reasonable accommodations guidelines."  What they do require, however, is that the supervisor

receiving the request complete and submit Form 1000 *on the employee's behalf* if the employee

does not do so herself.  (Ex. 20, Def.00027.)  Lewis never submitted Form 1000 for Lenkiewicz.

(*See* SoF ¶¶ 31, 90.)

20

*Second*, Lenkiewicz's supervisors ignored the procedure requiring them to give Lenkiewicz a written decision explaining why the request had been denied and to forward the decision up the chain for further review.  For each request that was not granted, Lewis was required to "document, in writing, his/her reasons for not approving the request prior to forwarding it to the second-line supervisor," but Lewis never did so.  (Ex. 20, Def.00021; *see* SoF ¶ 91.)  On receiving a request that was not granted by the first-level supervisor, Cole, as second-level supervisor, was "responsible for notifying the individual, in writing, of the status of his/her request, and ensuring that all of the completed request forms, supporting documentation and decision are submitted to the POH [Principal Organization Head] within twelve (12) business days of the reasonable accommodation request."  (Ex. 20, Def.00022.)  This never occurred.  Indeed, Cole denied that she had "any responsibilities with regard to handling a request for reasonable accommodation" and was not even aware that Lenkiewicz had submitted written accommodation requests.  (Ex. 17, Cole Dep. 14:18–21; SoF ¶ 93.)

*Third*, HUD never scheduled a Reasonable Accommodations Committee ("RAC") to review Lenkiewicz's accommodation requests after they had been denied.  (*See* Ex. 20, Def.00023 – Def.00024; SoF ¶¶ 34, 42, 53, 82.)  A RAC serves as a final decision-maker on requests that are not granted.  (*Id.*)  Patterson testified that when Dr. Allen recommended denying Lenkiewicz's December 2010 request, "the Reasonable Accommodations Branch at that point was required to schedule a RAC."  (Ex. 13, Patterson Dep. 117:4–7.)  Despite internal communications suggesting a RAC would be convened, it was not.  (Ex. 20, Def.00291.)

*Fourth*, Lenkiewicz's supervisors failed to communicate with her and others at HUD regarding Lenkiewicz's accommodation requests.  (SoF ¶¶ 67–74.)  The RA Branch had "problems trying to reach Ms. Lewis … to discuss the case" and "wasn't getting any return calls

or Emails from her."  (Ex. 13, Patterson Dep. 160:21–161:9; *see also id.* 179:10–12 ("Q. To your

recollection, was it difficult to get in touch with Ms. Lewis?  A. Yes.").)  Lewis and Cole also

had information relevant to Lenkiewicz's requests for reasonable accommodation yet did not

share that information with anyone in the RA Branch or in FOH.  They failed to send RA Branch

(i) a copy of Lewis's absence phone log, which documented the reasons for Lenkiewicz's

absences, (ii) the numerous doctors' notes Lenkiewicz submitted in support of her requests for

leave, (iii) contact information for Lenkiewicz's pulmonologists, or (iv) Lenkiewicz's position

description.  (*See* SoF ¶¶ 67–74.)

    L.    <u>Flaws in HUD's Procedures for Reasonable Accommodation Caused</u>
              <u>Lenkiewicz's Requests to Languish.</u>

        Although many of the Procedures serve to ensure that accommodation requests are

meaningfully considered and decided, there are several respects in which the Procedures set

well-intentioned employees like Lenkiewicz up to fail, particularly where (as here) the

employee's supervisors decline to engage in the process.

        *First*, HUD does not ensure that employees are adequately trained on its Procedures.

HUD leaves employees to "look for [their] own training" on handling reasonable

accommodation requests.  (Ex. 13, Patterson Dep. 203:3–204:2.)  Neither Lewis nor Cole had

even seen the Procedures before their respective depositions in this case.  (Ex. 16, Lewis Dep.

29:1–5; Ex. 17, Cole Dep. 40:16–41:8.)  Lewis mistakenly believed it was the RA Branch, and

not supervisors like her, that was "responsible for having the appropriate knowledge of [HUD's

policies] and counseling managers."  (Ex. 16, Lewis Dep. 30:11–19.)  As a result, HUD's

employees misunderstand the agency's Procedures.  For example, Patterson testified that

supervisors receiving requests are "not required" to fill out a HUD 1000 if an employee verbally

requests an accommodation (Ex. 13, Patterson Dep. 25:6–13), which is contrary to the

Procedure's directive that "[i]f the requesting individual fails to complete Form HUD-1000, the person who receives the request *must* complete the form based on information received, on behalf of the requesting individual."  Def.00020 (emphasis added).)  Lewis similarly misunderstood what HUD's Procedures required when an employee does not submit Form 1000. (*See* Ex. 16, Lewis Dep. 70:11–16 ("Q.  Did you ever fill out a HUD 1000 form for her requesting a printer?  A.  No, I did not.  Q.  Why didn't you do that?  A.  I was not aware that it was my responsibility to do that.").)

*Second*, HUD leaves it to RA Branch employees like Patterson, who lack medical training, to determine whether a request and supporting documentation identify "major life activities" and whether to refer a request to FOH for medical review.  (*See* Ex. 13, Patterson Dep. 33:16–20, 101:12–18.)  These RA Branch employees are not qualified to evaluate medical evidence.  (*See* Ex. 13, Patterson Dep. 135:8–14; *id.* 230:12–14.)  HUD's Procedures do not even require a requesting employee to identify which major life activity is affected by a claimed disability when making a request.  (Ex. 20, Def.00024 – Def.00027, Def.00068 – Def.00069.)

*Third*, although HUD's Procedures require processing requests and providing accommodations within a certain timeframe, the Procedures also include a delay-inducing exception that swallows that time limit whenever a request is referred to medical review.  (*See* Ex. 20, Def.00037, Def.00039; Ex. 13, Patterson Dep. 36:11–13, 37:13–15.)  HUD's Procedures set the "Maximum Time for Processing Request" at 30 days.  (Ex. 20, Def.00037.)  But this time limit can be suspended indefinitely when there are "extenuating circumstances."  (*Id.*, Def.00037, Def.00039.)  Under the Procedures, "extenuating circumstances" include pending medical review or evaluation of medical documentation.  (*Id.*, Def.00039.)  Thus, HUD's Procedures allow for indefinite delay whenever the RA Branch decides medical review is

23

warranted, and that delay can be triggered by the RA Branch failing to identify a major life activity on Form 1000.  (*See* Ex. 13, Patterson Dep. 33:16–20.)  Medical review typically takes "[a]nywhere from six to three, four months[,]" but there is no time limit for completing medical review.  (*Id.* 36:11–13.)

*Fourth*, the process in HUD's Procedures dictating who must decide reasonable accommodation requests "was a little ambiguous[.]"  (Ex. 14, Cumber Dep. 28:5–29:2, 42:21–43:9; *see* SoF ¶ 85.)  HUD's Procedures state that the "decision-maker" for a reasonable accommodation request can be either the employee's supervisor (Cole or Lewis) or the Disability Program Manager (Cumber).  (Ex. 20, Def.00037.)  The Procedures lack any provision holding one of those individuals accountable for deciding a reasonable accommodation request.  (*See* Ex. 13, Patterson Dep. 185:12–186:20.)

The lack of accountability resulting from this flaw in HUD's Procedures is exemplified by the agency's inability to identify *who* denied Lenkiewicz's December 2010 accommodation request.  (*See* SoF ¶ 86.)  The agency's position has changed throughout the case.  First, in its Answer, HUD admitted "that Vicky Lewis denied this request."  (Answer ¶ 26 (ECF No. 21).).  Then, in its responses to Lenkiewicz's interrogatories, HUD stated that "that it mistakenly attributed to Vicky Lewis the denial of Plaintiff's formal request for a reasonable accommodation" and added that "the Reasonable Accommodation Office denied Plaintiff's request" without stating *who* in the RA Branch denied it.  (Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 6.)  Next, Patterson testified during her deposition that it was FOH, and not the RA Branch, who denied the request.  (*See* Ex. 13, Patterson Dep. 116:6–117:3 ("Q. Does that mean FOH is denying the telework request? … THE WITNESS: Yes."), *id.* 164:18–20 ("Q. … You said it was denied. Who denied it?  A. FOH.").)  Dr. Allen protested that FOH does not

"decide requests." (Ex. 15, Allen Dep. 35:11–16.)  After Lenkiewicz served another interrogatory unambiguously asking HUD to "[i]dentify … the person(s) who denied the request," HUD failed to do so, instead responding by reiterating Dr. Allen's recommendation and adding that "Yolanda Patterson … closed Plaintiff's file and *ceased processing* her request on August 12, 2011."  (Ex. 6, Def.'s Resp. to Pl.'s Interrogatory No. 20 (emphasis added).)  The matter came full circle when Cumber testified that Lenkiewicz's request was denied by "the supervisor," *i.e.*, Vicky Lewis.  (Ex. 14, Cumber Dep. 85:5–8.)

M.  Lenkiewicz's Supervisors Knew She Was Disabled, Yet Fired Her for Absences
Caused by Her Disabilities

HUD had notice that Lenkiewicz was disabled.  Several HUD employees (including her supervisors) acknowledged that she was disabled.  Rather than work with her to find a suitable accommodation, Lenkiewicz's supervisors terminated her.

Patterson wrote in a June 22, 2011 note to herself: "***Based on medical documentation, employee does have a disability*** but no major life activities were documented."  (Ex. 20, Def.00288 (emphasis added).)  In her deposition, Patterson clarified that, by writing "employee does have a disability," she was referring to the fact that Lenkiewicz "had a degenerative joint disease multijoint condition with thyroid."  (Ex. 13, Patterson Dep. 180:18–181:9.)  In acknowledging that Lenkiewicz "does have a disability," Patterson was "using the definition of disability listed under the ADA[.]"  (*Id.*, Patterson Dep. 226:16–227:3.)  The ADA defines disability as "a physical or mental impairment that substantially limits one or more *major life activities* of such individual."  42 U.S.C. § 12102(1) (emphasis added).

Lewis had firsthand knowledge of Lenkiewicz's disabilities.  Lewis' phone logs reflect, among other things, that Lenkiewicz reported having to miss work on many occasions due to breathing and musculoskeletal problems, as well as doctor's appointments involving treatment of

25

those conditions.  (Ex. 22, LENK_0345 – LENK_0350.)  Lewis received no fewer than *six* FMLA requests from Lenkiewicz seeking time off due to lower extremity injuries.  (*See* SoF ¶ 66.)  Lewis also received a worker's compensation application in June 2011 in which Lenkiewicz stated that "[a]s a sufferer of chronic obstruction pulmonary disease COPD, when taken out of the office environment condition(s) improve significantly."  (Ex. 22, LENK_0051.) Lewis suggested that Lenkiewicz "retire under disability[.]"  (Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; *see also* Ex. 18, Lenkiewicz Dep. 138:17–139:4; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2.)   Lewis' suggestion of disability retirement is corroborated by her handwritten notes, where she wrote, in reference to Lenkiewicz, "Disab[ility] retirement.  No end in sight."  (Ex. 22, LENK_0630; *see also* Ex. 16, Lewis Dep. 153:4–154:1.)

In response to Lewis' denial of her request for approval of sick leave for December 10, 2010, Lenkiewicz emailed Lewis, quoting under the heading "Americans with Disabilities Act" two paragraphs from the U.S. Department of Justice's web page titled "A Guide to Disability Rights Laws."  (*Compare* Ex. 22, LENK_0723 *with* U.S. Dep't of Justice, *A Guide to Disability Rights Laws* (July 2009), *available at* http://www.ada.gov/cguide.htm.)  Lewis forwarded Lenkiewicz's email to Cole without comment.  (Ex. 22, LENK_0723.)

Ultimately, the agency terminated Lenkiewicz due to her absences.  (Ex. 17, Cole Dep. 21:13–17; 152:6–11; Ex. 16, Lewis Dep. 42:12–17.)  In the letter finalizing Lenkiewicz's termination, Cole acknowledged that Lenkiewicz had "raised medical reasons that impact [her] ability to report and/or perform work" but suggested "disability retirement" in lieu of an accommodation.  (Ex. 23, LENK_0922.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  The movant bears the initial burden of showing the absence of genuine issues of material fact by "citing to particular materials in the record[.]"  Fed. R. Civ. P. 56(c)(1)(A); *accord Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The non-movant cannot avoid summary judgment by adducing evidence that is "merely colorable" or "not significantly probative[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  Rather, the non-movant must demonstrate that "the evidence is such that a reasonable jury could return a verdict" for it.  *Id.* at 248.

A motion for summary judgment also may be granted in part, thereby narrowing the issues for trial.  Federal Rule of Civil Procedure 56(g) provides: "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact … that is not genuinely in dispute and treating the fact as established in the case."

## ARGUMENT

Lenkiewicz brings a single claim against HUD under section 501 of the Rehabilitation Act of 1973, which mandates that "federal employers must act affirmatively on behalf of disabled individuals."  *Loya v. Sebelius*, 840 F. Supp. 2d 245, 258 (D.D.C. 2012) (Lamberth, C.J.) (citing and summarizing 29 U.S.C. § 791(b)); *accord Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993) ("Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result.").  Federal agencies like HUD must "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified … employee with a disability, unless [the agency] can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  29 C.F.R. § 1630.9(a); *accord Loya*, 840 F. Supp. 2d at 258.

The undisputed facts establish each element of Lenkiewicz's Rehabilitation Act claim.  Moreover, the record leaves no room for dispute that HUD fell far short of its obligation to

engage in a good-faith interactive process to find suitable accommodations for Lenkiewicz's

disabilities.  Finally, HUD has failed even to plead, much less prove, the affirmative defense of

undue hardship.  For these reasons, Lenkiewicz is entitled to judgment as a matter of law on her

claim that HUD violated the Rehabilitation Act.

## I.   The Undisputed Material Facts Establish Each Element of Plaintiff's Rehabilitation Act Claim as a Matter of Law.

It is settled in this district that, "[t]o establish a prima facie case of discrimination under

the Rehabilitation Act for an employer's failure to reasonably accommodate a disability," a

plaintiff must prove:

> (1) that [she] was an individual who had a disability within the
> meaning of the statute; (2) that the employer had notice of [her]
> disability; (3) that with reasonable accommodation [she] could
> perform the essential functions of the position; and (4) that the
> employer refused to make the accommodation.

Mem. Op. & Order at 5, *Lenkiewicz v. Castro*, No. 13-cv-261 (D.D.C. Jan. 20, 2015) (ECF No.

49) (hereinafter "Jan. 20 Op.") (quoting *Loya*, 840 F. Supp. 2d at 258).[7]  The uncontroverted

evidence establishes each of these elements beyond dispute.

### A.   Lenkiewicz Was Disabled.

It is undisputed that, throughout her employment at HUD, Lenkiewicz was a "person

with a disability" within the meaning of the Rehabilitation Act.  (*See* SoF ¶¶ 6–16.)  A

"disability" is defined as a "physical or mental impairment that substantially limits one or more

---

[7] As this Court recognized in its January 20 Opinion, "the standards used in assessing a
Rehabilitation Act claim are the same as those applicable to certain provisions of the ADA 'as
[they] relate to employment.'"  Jan. 20 Op. at 5 n.2 (quoting 29 U.S.C. § 794(d)).  Consequently,
"'[r]egulations drafted to determine an employer's liability under the … ADA likewise govern
liability determinations in employment-discrimination suits under the Rehabilitation Act'
applicable to federal agencies."  *Id.* (quoting *Edwards v. EPA*, 456 F. Supp. 2d 72, 97 (D.D.C.
2006)).

of the major life activities of such individual[.]"  29 C.F.R. § 1630.2(g)(1)(i); *compare* 42 U.S.C.

§ 12102(1)(A) (nearly identical definition under ADA statute).  In the wake of the ADA

Amendments Act of 2008, the implementing regulations clarify that "'[s]ubstantially limits' is

not meant to be a demanding standard" and "shall be *construed broadly* in favor of *expansive*

*coverage*, to the maximum extent permitted by the terms of the ADA[.]"  29 C.F.R. §

1630.2(j)(1)(i) (emphasis added).  Lenkiewicz was disabled for the following three reasons.

    *First*, Lenkiewicz was disabled by reason of her chronic respiratory impairments.  (*See*

SoF ¶¶ 10–15.)  Lenkiewicz's COPD with chronic bronchitis is a "physiological disorder or

condition … affecting" her "respiratory" system.  29 C.F.R. § 1630.2(h)(1).  This respiratory

disorder substantially limits (i) the major life activity of "breathing" and (ii) the "operation" of

her "respiratory" functions.  *See* 29 C.F.R. § 1630.2(i)(ii).  Dr. Schwartz confirmed Lenkiewicz's

COPD diagnosis and explained that, "combined with her musculoskeletal impairments and her

obesity, Ms. Lenkiewicz's respiratory impairments (namely her COPD) limited her ability to

breathe."  (Ex. 11, Schwartz Rep. ¶ 23.)  Dr. Schwartz further stated that commuting by Metro to

HUD headquarters, moving around the workplace, and being exposed to airborne irritants

(including mold) worsened Lenkiewicz's breathing impairments.  (*See id.* ¶¶ 19, 23–24.)

    *Second*, Lenkiewicz was disabled by reason of her chronic orthopedic impairments.  (*See*

SoF ¶¶ 7, 9, 13.)  Lenkiewicz's degenerative joint disease was a "physiological disorder or

condition … affecting" her "musculoskeletal" system.  *See* 29 C.F.R. § 1630.2(h)(1).  This

musculoskeletal disorder substantially limits the major life activities of "performing manual

tasks," "walking," "lifting," and "bending," as well as the "operation" of her "musculoskeletal"

functions.  *See* 29 C.F.R. § 1630.2(*i*)(ii).  Orthopedic specialist Dr. Eric Dawson explained that

"Ms. Lenkiewicz's musculoskeletal impairments severely limited her ability to perform manual

tasks and even walk" and that "whenever she exerted herself physically beyond a certain

threshold, Ms. Lenkiewicz would frequently experience pain, swelling, and spasms in her joints,

which in turn limited her ability to concentrate and think."  (Ex. 10, Dawson Rep. ¶ 18.)

*Third*, Lenkiewicz was disabled by reason of her temporary orthopedic injuries.  (See

SoF ¶¶ 8–9, 13, 15.)  Lenkiewicz's broken right foot and torn right meniscus were each plainly a

"physiological disorder or condition … affecting" her "musculoskeletal" system and

substantially limiting the major life activities of performing manual tasks and walking.  *See* 29

C.F.R. § 1630.2(h)(1).

HUD cannot point to any contrary evidence.  HUD did not proffer a medical expert to

dispute the amply supported opinions of Dr. Dawson and Dr. Schwartz that Lenkiewicz suffered

from physical impairments substantially limiting many major life activities.  HUD did not even

take the depositions of Lenkiewicz's medical experts.  Thus, the one-sided record in this case

establishes that Lenkiewicz is a person with a disability within the meaning of the Rehabilitation

Act.  *See Bragdon v. Abbott*, 524 U.S. 624, 641 (1998) (affirming determination on summary

judgment that ADA plaintiff was disabled based on undisputed evidence that her HIV

substantially limited the major life activity of reproduction).

B.  <u>HUD Had Notice of Plaintiff's Disabilities.</u>

It is undisputed that HUD had notice of each of these three types of disabilities.

*First*, HUD had notice of Lenkiewicz's chronic orthopedic disabilities.  (*See* SoF ¶¶ 56–

57, 66.)  Lenkiewicz's December 2010 request cited "debilitating arthritis" as one of two

"hindering disabilities."  (Ex. 22, LENK_0055.)  The medical documentation received by HUD

in support of that request included a note diagnosing Lenkiewicz with "a severe multi joint

condition[.]"  (Ex. 20, Def.00197.)  Dr. Shammas told Dr. Allen that "[t]ravel is difficult" for

Lenkiewicz and that he "has seen [Lenkiewicz] for many years all related to complains of her

joint [*sic*] including elbow, knee, neck & low back." (Ex. 20, Def.00180.) Lenkiewicz reported

needing to be excused from work on many occasions because of joint pain and swelling. (*See*

Ex. 22, LENK_0347 – LENK_0350.)

     *Second*, HUD had notice of Lenkiewicz's chronic respiratory disabilities. (*See* SoF ¶¶

56, 65–66.) FOH's records of Lenkiewicz's treatment included a note from Dr. Koul diagnosing

her with bronchitis and COPD. (*See* Ex. 25, FOH_0005.) During a visit to FOH in August

2010, Lenkiewicz's respiratory distress was so severe that, at FOH's urging, Lenkiewicz was

hospitalized. (*See* Ex. 25, FOH_0003 – FOH_0004, FOH_0006.) She had also been

hospitalized for breathing distress in early 2009, and she informed HUD of her hospitalization.

(Ex. 18, Lenkiewicz Dep. 69:7–24, 120:4–8, 126:18–127:13.) Lenkiewicz described her "COPD

with chronic bronchitis" as one of two "hindering disabilities" on the December 2010 Form

1000. (Ex. 22, LENK_0055.) She also submitted a report from Dr. Cabalar diagnosing her with

"COPD" with "chronic bronchitis." (Ex. 28, SHA_0080.)

     Lenkiewicz's supervisors had firsthand knowledge of Lenkiewicz's breathing difficulties.

(*See* SoF ¶¶ 44, 66, 74, 79, 87.) Lenkiewicz told Lewis that she was concerned about toxic mold

in HUD headquarters and was having breathing problems. (Ex. 18, Lenkiewicz Dep. 131:1–10.)

Lewis received telephone messages and notes documenting Lenkiewicz's absences due to

breathing problems. (*See* Ex. 22, LENK_0347 – LENK_0350.) Lenkiewicz sent Lewis a

worker's compensation application where Lenkiewicz complained that "when returning to work

I suffer from chronic bronchitis, respiratory infections, and the inability to breathe[.]" (Ex. 22,

LENK_0049, LENK_0051.) Lewis even saw Lenkiewicz gasping for air and clutching her chest

during a meeting where Lenkiewicz begged Lewis for an accommodation. (Ex. 2, Pl.'s Resp. to

Def.'s Interrogatory No. 6.) In May 2011, Lenkiewicz told Lewis that she would not return to

the office until HUD did something to address her breathing problems. (*See* Ex. 18, Lenkiewicz

Dep. 165:9–167:6.)

*Third*, HUD had notice of Lenkiewicz's temporary orthopedic injuries (*i.e.*, a broken foot

and torn meniscus). (*See* SoF ¶¶ 30, 36–37, 40, 66.) Lenkiewicz submitted a note from Dr.

Dawson indicating that her broken foot "incapacitates her from walking or standing for

prolonged periods" and "has increased her pain and stress level[.]" (Ex. 23, LENK_0782.)

Lenkiewicz's disabilities based on these injuries were obvious to others, including her

supervisors. Lewis testified that Lenkiewicz "was using a scooter, so I believe that was during

the time she had a knee injury." (Ex. 16, Lewis Dep. 58:19–59:4; *see also id.* 68:19–69:6.)

Lewis acknowledged receiving FMLA request forms related to these disabilities; Lenkiewicz

submitted no fewer than *six* of these forms requesting FMLA leave. (*See id*. 91:18–108:13.)

HUD acknowledged multiple times that Lenkiewicz was disabled before terminating her.

(*See* SoF ¶¶ 16, 69, 72, 79, 88.) For example, Patterson believed that Lenkiewicz's

"degenerative joint disease" and "multijoint condition" constituted a disability. (*See* Ex. 20,

Def.00288, Ex. 13, Patterson Dep. 180:18–181:9.) Lewis suggested to Lenkiewicz that she

could "retire under disability[.]" (Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; *see also*

Ex. 22, LENK_0630.) Also, Cole acknowledged that Lenkiewicz "raised medical reasons that

impact [her] ability to report and/or perform work" and suggested "disability retirement" in lieu

of an accommodation. (Ex. 23, LENK_0922.) HUD therefore cannot deny that it was aware of

Lenkiewicz's disabilities. *See Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d

1011, 1021 (8th Cir. 2000) (employer's awareness that the employee "was not performing her

job to expectations" was evidence that the employer was "apprised" of disability).

C. <u>With a Reasonable Accommodation, Plaintiff Could Have Performed the
Essential Functions of a FOIA Specialist or Other Position at HUD.</u>

The undisputed facts establish that a reasonable accommodation—if HUD had granted
one—would have allowed Lenkiewicz to perform the essential functions of the FOIA Specialist
position or any of the many other positions at HUD for which she was qualified.

In the uncontroverted opinion of vocational rehabilitation specialist Dr. Schroeder,
Lenkiewicz "has the skills, experience, and expertise necessary to perform the essential functions
of the FOIA Specialist position at HUD" and she "was and remains capable of performing those
essential functions and was qualified for that position, notwithstanding her disabilities." (Ex. 12,
Schroeder Rep. ¶ 27; *see also* SoF ¶ 3–5.)

Any of the reasonable accommodations Lenkiewicz requested—including a printer, a
parking space, relocation, and telework—would have enabled her to perform the essential
functions of the FOIA Specialist position. (*See* SoF ¶¶ 13, 24–25, 28, 38, 51.) The
uncontroverted medical expert testimony confirms that accommodations reducing Lenkiewicz's
physical activity or relocating her from HUD headquarters would have removed the barriers that
made it difficult for her to do her job. Dr. Dawson explained that "accommodations that reduced
Ms. Lenkiewicz's level of physical activity would have reduced the severity of her
musculoskeletal impairments and therefore reduced her pain, spasms, and swelling, which in turn
would have improved Ms. Lenkiewicz's ability to concentrate and think." (Ex. 10, Dawson Rep.
¶ 20.) With respect to her respiratory impairments, Dr. Schwartz explained that these sorts of
accommodations would have "reduced the severity of her breathing impairments and improved
her ability to breathe, which in turn would have made it easier for Ms. Lenkiewicz to concentrate
and think." (Ex. 11, Schwartz Rep. ¶ 25.)

33

All four of the accommodations Lenkiewicz requested were reasonable as a matter of law. *See Solomon v. Vilsack*, 763 F.3d 1, 10 (D.C. Cir. 2014) ("[I]t is rare that any particular type of accommodation will be unreasonable as a matter of law[.]"). One of the ways in which the Rehabilitation Act "demands a great deal from federal employers in the way of accommodation" is that the Act "in appropriate cases … requires an agency to consider work at home[.]" *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) (citing *Langon v. Dep't of Health & Human Servs.*, 959 F.2d 1053, 1060 (D.C. Cir. 1992)). The systems used by FOIA Specialists at HUD were conducive to telework at least as early as August 2011, when Lenkiewicz was still employed at HUD, and were capable of being used for reviewing documents, inputting redactions, tracking FOIA requests, and other functions related to a FOIA Specialist's work remotely by any authorized user with an Internet connection as early as 2009. (*See* SoF ¶ 78.)

Lenkiewicz could have been accommodated in other ways. (*See* SoF ¶ 81.) One possibility was reassignment to another position at HUD. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) ("If the employee is unable to perform his job, with or without accommodation, the employer must consider reassignment as one form of accommodation.").[8] Dr. Schroeder opined without contradiction that Lenkiewicz "was and remains qualified for a wide range of positions at HUD[.]" (Ex. 12, Schroeder Rep. ¶ 24.) Lenkiewicz's supervisors considered reassignment but refused to grant it. (*See* SoF ¶ 79.)

---

[8] *See also Cravens*, 214 F.3d at 1017, 1018 (collecting cases and holding that "the definition of 'qualified individual with a disability' includes a disabled employee who cannot do his or her current job, but who desires and can perform, with or without reasonable accommodation, the essential functions of a vacant job within the company to which he or she could be reassigned"); *accord Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998) (en banc) ("An employee seeking reassignment to a vacant position is thus within the definition [of 'qualified individual with a disability'] if, with or without reasonable accommodation, she can perform the essential functions of the employment position to which she seeks reassignment.").

D. HUD Ignored or Denied *Every One* of Lenkiewicz's Accommodation Requests.

It is undisputed that HUD never granted *any* of Plaintiff's many requests for reasonable accommodation. (SoF ¶¶ 23, 31, 41, 52, 83.) Nor did HUD ever propose any viable alternative accommodations. The only alternative it ever suggested—that Lenkiewicz ask a HUD contractor to shuttle papers to and from a shared printer—was not workable. (SoF ¶ 33.) HUD ignored or denied every single one of Lenkiewicz's other requests for reasonable accommodations and never suggested viable alternatives to the accommodations Lenkiewicz proposed. Instead, after failing to accommodate her disabilities, HUD terminated Lenkiewicz due to absences and performance issues caused by those disabilities, which "amounts to a discharge solely because of the disabilities." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995).

## II.    The Undisputed Material Facts Establish that HUD Failed to Engage in a Good-Faith Interactive Process with Lenkiewicz to Find an Accommodation.

How can it be that an indisputably disabled employee who requested specific accommodations for years never received a single accommodation—or even a meaningful counteroffer? The answer is clear from the record: her supervisors had no interest in working with her in good faith to find an appropriate accommodation, and HUD's RA Branch employees simply failed to do their jobs. HUD failed to engage in the interactive process as a matter of law.

Once an employee requests accommodation for a disability, the agency must "initiate an informal, interactive process with the qualified individual with a disability in need of accommodation." 29 C.F.R. § 1630.2(*o*)(3), *quoted in Morris v. Jackson*, 994 F. Supp. 2d 38, 45 (D.D.C. 2013). "The interactive process is the key mechanism for facilitating the integration of disabled employees into the workplace." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000), *judgment vacated on other grounds*, 535 U.S. 391 (2002). "[A]n employer's participation in this process is mandatory, and that it is triggered by a disabled employee's request for a

reasonable accommodation." *EEOC v. Yellow Freight Sys.*, No. 98cv2270, 2002 WL 31011859, at *23 (S.D.N.Y. Sept. 9, 2002).  The employer should "explore 'what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 169 (E.D.N.Y. 2002) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999) (en banc)).  As part of the interactive process, the employer should adopt a "problem solving approach" by taking the following steps:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
>
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
>
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. app. § 1630.  "Employers who reject this core process must face liability when a reasonable accommodation would have been possible." *Barnett*, 228 F.3d at 1116.

A.  <u>HUD Was Required to Engage in a Good-Faith Interactive Process with Lenkiewicz.</u>

As a matter of law, Lenkiewicz triggered HUD's obligation to engage in the interactive process by satisfying her "initial duty to inform [HUD] of a disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803–04 (7th Cir. 2005).  In 2009, Lenkiewicz suffered from the obvious disability of a broken foot when she requested a printer and a parking space.  As the disabled

employee had done in *Sears*, Lenkiewicz submitted a "doctor's note[]" from Dr. Dawson

"disclosing her diagnosis and limitations," and she "requested a specific accommodation" in the

form of a parking space.  *See id.* at 803.  In addition, Lenkiewicz cited breathing difficulties in

support of her request for relocation to the portals building.  And, in requesting telework,

Lenkiewicz clearly "indicate[d] to the employer that she has a disability and desires an

accommodation" (*see id.*at  803–04) by submitting HUD's own form for requesting reasonable

accommodations, including the December 2010 form citing "hindering disabilities" of "COPD

with chronic bronchitis" and "debilitating arthritis" and attaching medical evidence of those

impairments (*see* Ex. 22, LENK_0055 – LENK_0059).

      Because each of Lenkiewicz's requests for reasonable accommodation "makes clear that

[she] wants assistance for [] her disability," HUD was required to engage in the interactive

process with respect to each of those requests.  *Lee v. Dist. of Colum.*, 920 F. Supp. 2d 127, 136

(D.D.C. 2013) (citation omitted); *see also Cravens*, 214 F.3d at 1021 (employee's request for

"assistance in locating an available position within the company" triggered obligation "to initiate

an interactive process with her to determine the appropriate reasonable accommodation");

*Humphrey v. Memorial Hospital Assoc.*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("Once an

employer becomes aware of the need for accommodation, that employer has a mandatory

obligation under the ADA to engage in an interactive process with the employee to identify and

implement appropriate reasonable accommodations."); *Faison v. Vance-Cooks,* 896 F. Supp. 2d

37 at 62 (D.D.C. 2012) (same).

      Even if HUD perceived some deficiency in the medical documentation accompanying

Lenkiewicz's requests, it nonetheless had a continuing obligation to engage in the interactive

process.  HUD was required to "ask for clarification" if it did not have all of the information it

wanted. *Sears*, 417 F.3d at 804 ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."); *accord Faison*, 896 F. Supp. 2d at 62–63 ("Even if the GPO reasonably believed that Faison's requests for limited hours and reassignment were unnecessary, the GPO was still required to engage in an interactive process with [Faison] to design an accommodation that was reasonable." (citation and quotation marks omitted)); *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41 (D.D.C. 2011) ("Once the employer knows of the disability and the employee's desire for accommodations, 'it makes sense to place the burden on the employer to request additional information that the employer believes it needs.'" (quoting *Taylor*, 184 F.3d at 315)).

**B.** <u>Undisputed Evidence Establishes that HUD Acted in Bad Faith and Hindered the Interactive Process.</u>

Once an employee triggers an employer's obligation to engage in the interactive process, the employer "must make a reasonable effort to explore the accommodation possibilities with the employee." *Hendricks-Robinson*, 154 F.3d at 693. Where, as here, "the interactive process breaks down, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility' to the culpable party." *Woodruff*, 777 F. Supp. 2d at 42 (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000)). An employer bears responsibility for "hinder[ing]" the interactive process when:

> the employer knows about the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 862–63 (8th Cir. 2006) (upholding jury verdict that employer failed to engage in the interactive process in good faith). Undisputed evidence establishes that this is exactly what happened here.

Consistent with the regulatory guidance, HUD should have followed a four-step process as part of a "problem-solving" approach. 29 C.F.R. app. § 1630. The agency should have "determine[d]" the essential functions of the FOIA Specialist position (step 1), "ascertain[ed]" how reasonable accommodation would help Lenkiewicz "overcome" her "job-related limitations" (step 2), "assess[ed] the effectiveness" of potential accommodations (step 3), and "select[ed] and implement[ed]" the "most appropriate" accommodation (step 4). *Id.* The agency never followed *any* of these steps. For Lenkiewicz's 2009 requests for relocation or telework, HUD simply ignored the request. For Lenkiewicz's requests for a printer and parking space, HUD refused the accommodation as unavailable without further explanation. And for Lenkiewicz's December 2010 accommodation request, HUD second-guessed Lenkiewicz's complaints of job-related limitations and treated her medical documentation to an unusual level of scrutiny. (*See* SoF ¶ 60.)

The hallmark of an employer's good-faith engagement in the interactive process is helping the employee find an accommodation that suits both parties. The closest HUD ever came to helping Lenkiewicz in this way—suggesting that she rely on a busy contractor to retrieve documents from a far-away printer months after Lenkiewicz had requested a printer— was still nowhere close enough. The uncontroverted evidence establishes that HUD did not help Lenkiewicz overcome her limitations and find effective accommodations. Worse, the uncontroverted evidence also establishes that the agency ignored procedures intended to facilitate interactive communication, dismissed obvious evidence of Lenkiewicz's job-related limitations, disbelieved Lenkiewicz's claims of disability, needlessly delayed decision on her requests, misled her about the status of her requests, denied her accommodations that had readily been granted to others, and terminated her for problems caused by her disabilities.

In at least nine different respects, HUD hindered the interactive process.

*First*, HUD violated its own Procedures in handling Lenkiewicz's reasonable accommodation requests.  Lenkiewicz's supervisors failed to submit Form 1000 for requests for a printer, a parking space, or relocation, nor did they submit the necessary paperwork explaining why the requests were denied.  (SoF ¶¶ 32, 34, 42, 53, 90, 92.)  No RAC was ever held or even scheduled to review any of Lenkiewicz's requests.  (SoF ¶¶ 34, 42, 53, 82.)  HUD altogether ignored Lenkiewicz's request for relocation and her 2009 request for telework.  (SoF ¶¶ 52, 55.)  And it denied Lenkiewicz's December 2010 request without telling her.  (SoF ¶ 84.)  Her supervisors withheld critical information from the RA Branch, including Lenkiewicz's position description, phone logs and doctor's notes indicating her reasons for medically related absences, FMLA request forms signed by her doctors, and the fact that she had been out of the office since at least May 2011.  (SoF ¶¶ 66, 74.)  The RA Branch had difficulty getting in touch with Lenkiewicz's supervisors.  (SoF ¶¶ 74, 87.)  In these and other respects, as Dr. Schroeder opined, HUD failed to adhere to best practices for federal agencies for engagement in the interactive process with disabled employees.  (SoF ¶¶ 7, 74–75.)

*Second*, HUD never evaluated the essential functions of the FOIA Specialist position, much less whether Lenkiewicz could have performed those essential functions with reasonable accommodation.  *See Barnett*, 228 F.3d at 1115 ("The interactive process requires that employers analyze job functions to establish the essential and nonessential job tasks.").  Neither Dr. Allen nor anyone in the RA Branch was ever provided with a description of the FOIA Specialist position or a list of the activities that could be performed from home.  (*See* SoF ¶¶ 63, 73.)

*Third*, HUD arbitrarily insisted that Lenkiewicz's December 2010 request for accommodation in the form of telework be referred to FOH for medical review.  HUD does not

require medical review for all, or even most, requests for reasonable accommodation in the form of telework. (SoF ¶ 30.) Of 130 such requests, 90 were granted *without* medical review; in many of these cases, the employees' conditions resembled Lenkiewicz's impairments. (*Id.*)

*Fourth*, HUD pigeonholed the medical review of Lenkiewicz's December 2010 telework request. HUD did not give Dr. Allen such relevant medical evidence as FOH's treatment notes, Lewis' phone logs, Lenkiewicz's FMLA forms, or contact information for her other physicians. (SoF ¶¶ 66, 74.) HUD followed Dr. Allen's recommendation based on whether there was "need for telework" (Ex. 20, Def.00266), notwithstanding that "the language of section 501 of the Rehabilitation Act and its implementing regulations do not require a showing of 'necessity.'" *Loya*, 840 F. Supp. 2d at 260.

*Fifth*, HUD adopted the nonsensical position that Lenkiewicz's documentation of "physical impairments" was somehow not enough to show limitation of a major life activity or to justify accommodating her. (*See* SoF ¶ 16.) HUD reasonably could have inferred, based on the documentation that it had, that Lenkiewicz's respiratory impairments limited the major life activity of breathing and that her orthopedic impairments limited the major life activities of performing manual tasks and walking. But HUD never drew such inferences or asked for the information it supposedly lacked. (SoF ¶¶ 69–72.) *See Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1286 (7th Cir. 1996) ("Another example of the breakdown in the interactive process is FWCS' failure simply to inquire of Bultemeyer or his psychiatrist about what he needed to be able to work."). In any event, there is no evidence that the outcome of the process would have been any different had Lenkiewicz submitted additional medical documentation.

*Sixth*, HUD never reconciled Dr. Allen's conclusion about the supposed lack of "medical basis" for telework with the fact that Lenkiewicz had indisputably documented "physical

impairments" and complained that health problems were interfering with her job performance. (*See* SoF ¶¶ 16, 61–62.)  HUD refused to take Lenkiewicz's complaints at face value, and after Dr. Allen recommended denying her December 2010 request, HUD made no attempt to determine what prompted Lenkiewicz to seek reasonable accommodation or why Lenkiewicz was having problems at work.  (*See* SoF ¶¶ 69, 71, 75–76.)  HUD also did not press Dr. Allen to explain why he disregarded the recommendation of Dr. Shammas that Lenkiewicz be permitted to telework.  *See Schmidt v. Solis*, 891 F. Supp. 2d 72, 90–91 (D.D.C. 2012) ("continued yet unwarranted skepticism of" employee was evidence of employer's bad faith).

*Seventh*, as weeks turned to months, HUD allowed FOH's medical review to drag on without giving Lenkiewicz a temporary accommodation.  *See Schmidt*, 891 F. Supp. 2d at 90–91 (concluding that the employer's "delay in issuing [the employee] a workable accommodation constituted bad faith with regards to the interactive accommodation process").  Lenkiewicz did her part by periodically seeking updates from the RA Branch and reminding them of her immediate need for an accommodation.  (*See* SoF ¶ 68.)  She even asked if additional documentation was necessary.  (*See id.*)

*Eighth*, HUD ignored or denied Lenkiewicz's requests for reasonable accommodations without proposing workable alternative accommodations.  "An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives."  *Sears*, 417 F.3d at 806; *see also Barnett*, 228 F.3d at 1116 (reversing grant of summary judgment for employer who "rejected all three of [the employee's] proposed reasonable accommodations and offered no practical alternatives").[9]

---

[9] HUD should have proposed "reassignment in another position" as one of several "potential forms of accommodation[,]" but it never did.  *Carr*, 23 F.3d at 530 (citing *Langon*, 959 F.2d at

*Ninth*, rather than accommodate her, HUD terminated Lenkiewicz based on absences that resulted from the agency's failure to reasonably accommodate her disabilities.  (Ex. 23, LENK_0922; SoF ¶ 88.)  *See Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) ("Failing to discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action against an injured employee may demonstrate a lack of good faith."); *Cutrera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process … by preemptively terminating the employee before an accommodation can be considered or recommended.").  HUD thereby "tried to take hasty advantage of what it saw as an opportunity to rid itself of a problem, a disabled employee." *Bultemeyer*, 100 F.3d at 1286.

In the end, a reasonable factfinder simply could not conclude that an employer engaged in a good-faith interactive process with an employee requesting reasonable accommodation where, as here, it is undisputed that the employer:

- Deviated from best practices for engagement in the interactive process;

- Failed to ask the employee for further information that could have remedied what the employer perceived as a deficiency in the employee's request;

- Adopted policies and procedures that do not hold decision-makers accountable and allow indefinite delay whenever medical review is involved;

- Repeatedly violated its own policies and procedures for handling reasonable accommodation requests;

- Insisted on a medical review process that was not required of all, or even most, employees who had requested the same accommodation the employee sought;

---

1060).  Nor did HUD help Lenkiewicz find vacancies.  *See Aka*, 156 F.3d at 1304 n.27 (an employer has a "corresponding obligation to help [an employee] identify appropriate job vacancies (since [an employee] can hardly be expected to hire detectives to look for vacancies)").

- Focused medical review narrowly on the need for the particular accommodation requested, not properly on what accommodations might help the employee;

- Withheld relevant information from the persons facilitating that medical review;

- Failed to grant or even to consider any temporary accommodations, even while medical review was ongoing;

- Never proposed alternative accommodations, except to suggest that the employee simply ask another employee for help;

- Failed to ensure that supervisors promptly and adequately communicate with others involved in handling reasonable accommodation requests;

- Refused to ask the employee or her physicians what might improve her productivity;

- Completely disregarded multiple, properly submitted verbal and written accommodation requests;

- Denied the remainder of the employee's accommodation requests, even when the employee's disabilities were obvious;

- Did not tell the employee that her last and final reasonable accommodation request was denied; and

- Terminated the employee for absences caused by the disabilities for which the employee sought reasonable accommodation.

Kafka could hardly have written it better. *See Schmidt*, 891 F. Supp. 2d at 91 ("Thus, the entire process to which Schmidt and the DOL itself were subjected was unnecessary, unjustified, and vindictive, rather being an interactive joint effort to find a reasonable accommodation.")

## III.   HUD Does Not Plead or Otherwise Assert that Accommodating Lenkiewicz Would Have Imposed an Undue Hardship.

Lenkiewicz is entitled to summary judgment that accommodating her would not have imposed an undue hardship on HUD. Undue hardship "is an affirmative defense" to a Rehabilitation Act claim. *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007); *see* 29 C.F.R. § 1630.15. HUD does not plead this affirmative defense in its Answer, and nowhere in its discovery responses does HUD assert undue hardship as a reason why it refused to accommodate

Lenkiewicz.  *See Howard v. Gray*, 821 F. Supp. 2d 155, 165 (D.D.C. 2011).  There is no

evidence that HUD has ever "considered," much less decided, *any* of the five factors involved in

"determining whether an accommodation would impose an undue hardship."  29 C.F.R. §

1630.2(p)(2).  HUD even admits that "it did not identify an undue hardship that would result

from accommodating Plaintiff."  (Answer ¶ 51 (ECF No. 21).)  Because HUD has not asserted

undue hardship as an affirmative defense, nothing stands in the way of granting summary

judgment for Lenkiewicz on her Rehabilitation Act claim.

## CONCLUSION

Plaintiff respectfully requests that this Court enter summary judgment in her favor and

promptly hold a pretrial conference with the parties, at which a trial on compensatory damages

and all appropriate equitable and injunctive relief will be scheduled.

## ORAL ARGUMENT REQUESTED

Pursuant to Local Civil Rule 7(f), Plaintiff respectfully requests an oral hearing on her

summary judgment motion.

Respectfully submitted,

*/s/ J. Wells Harrell*
J. Wells Harrell (D.C. Bar No. 995368)
Evan E. North (D.C. Bar No. 995360)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6181
wharrell@bsfllp.com
enorth@bsfllp.com

Dated: March 4, 2015                    *Attorneys for Plaintiff Denise Lenkiewicz*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DENISE L. LENKIEWICZ**, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Civil Action No. 13-0261 (RCL) |
| | ) |
| **JULIÁN CASTRO**, | ) |
| Secretary, U.S. Department of | ) |
| Housing & Urban Development, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Plaintiff Denise Lenkiewicz submits the following statement of undisputed material facts in support of her motion for summary judgment.  Headings are included only for the reader's convenience and are not intended as independent statements of fact.  As used in this statement, "Ex." refers to an exhibit to the Declaration of J. Wells Harrell in Support of Plaintiff's Motion for Summary Judgment, dated March 4, 2015.

## **Lenkiewicz Was Qualified**

1.      Lenkiewicz was employed as a Freedom of Information Act ("FOIA") Specialist, job series GS-0301, by the U.S. Department of Housing and Urban Development ("HUD" or the "agency") from October 2008 until November 2011.  Lenkiewicz worked in HUD's Office of the Executive Secretariat.  HUD is a federal agency that has continuously employed more than 500 individuals since October 2008.  Answer ¶ 1 (ECF No. 21); Ex. 20, Def.00250, Def.00244; Ex. 23, LENK_0920 – LENK_0923; Ex. 6, Def.'s Resp. to Pl.'s RFA No. 5.

2.      Lenkiewicz's workstation was on the 10th floor of the HUD headquarters building in downtown Washington, DC.  Ex. 20, Def.00094, Def.00106; Ex. 16, Lewis Dep. 166:19–167:21, 183:5–7; Ex. 18, Lenkiewicz Dep. 194:8–10.

3.      Before joining HUD, Lenkiewicz had been a federal employee for more than 19 years, including more than 10 years as a Paralegal Specialist at the U.S. Department of Commerce.  Answer ¶ 9 (ECF No. 21); Ex. 20, Def.00251 – Def.00253.

4.      As a FOIA Specialist at HUD, Lenkiewicz was responsible for researching and analyzing the contents of HUD records to determine whether disclosure was proper under FOIA. It was Lenkiewicz's job to review FOIA requests, assign those requests to a responding office, and redact responsive documents.  Answer ¶ 7 (ECF No. 21); Ex. 6, Def.'s Resp. to Pl.'s Interrogatory No. 11; Ex. 20, Def.00703 – Def.00706.

5.      Lenkiewicz was qualified for the FOIA Specialist position at HUD.  Answer ¶ 48 (ECF No. 21); Ex. 16, Lewis Dep. 38:5–9, 38:18–22; Ex. 12, Schroeder Rep. ¶¶ 27, 30–31; Ex. 20, Def.00251 – Def.00253.

**Lenkiewicz Was Disabled**

6.      Throughout her employment at HUD, Lenkiewicz suffered from physical impairments. Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.

7.      One of Lenkiewicz's physical impairments was degenerative joint disease affecting her knees, spine, feet, and other joints.  Degeneration of the tissues in these joints caused inflammation, numbness, spasms, pain, and instability.  Ex. 10, Dawson Rep. ¶ 16; Ex. 28, SHA_0075, SHA_0080; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Ex. 24, DAW_0001 – DAW_0016.

8.      Lenkiewicz also suffered from other orthopedic impairments during her employment at HUD, including a broken right foot and a torn meniscus.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Ex. 28, SHA_0063; Ex. 24, DAW_0001, DAW_0006.

9.      Lenkiewicz's orthopedic impairments substantially limited her ability to perform manual tasks, walk, stand, lift, bend, and engage in other physical activity.  These impairments made even short intervals of walking and light lifting difficult for Lenkiewicz.  Ex. 10, Dawson Rep. ¶¶ 8, 18; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Ex. 18, Lenkiewicz Dep. 190:8–13.

10.     Another of Plaintiff's physical impairments was chronic obstructive pulmonary disease ("COPD") with chronic bronchitis, which substantially limited her ability to breathe.  Ex. 28, SHA_0076; Ex. 11, Schwartz Rep. ¶¶ 9, 21–22; Ex. 27, OMA_0001 – OMA_0002; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4.

11.      Lenkiewicz's COPD with chronic bronchitis made her susceptible to sudden bouts of respiratory distress.  She occasionally missed work due to lung infections.  She sometimes had extreme difficulty breathing in HUD headquarters and even required hospitalization on at least one occasion.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 1; Ex. 18, Lenkiewicz Dep. 69:7–24, 120:4–8, 123:12–23, 125:14–18, 126:21–127:18, 136:24–137:25, 138:8–139:4; Ex. 26, KOUL_0001; Ex. 22, LENK_0250; Ex. 23, LENK_0798, LENK_0739; Ex. 25, FOH_0005, FOH_0011.

12.      Lenkiewicz struggled to take in the necessary amount of oxygen and expel the necessary amount of carbon dioxide.  As a result, her breathing impairments would become more severe after even short periods of light to moderate physical activity.  Ex. 11, Schwartz Rep. ¶¶ 20, 23.

13.      Lenkiewicz's commute by Metro between her home and her workstation at HUD headquarters required her to walk for extended periods.  Lenkiewicz's workday routine also involved walking between her workstation and other parts of HUD headquarters to retrieve files, make copies, and attend meetings.  The walking involved in Lenkiewicz's daily commute and work routine would often leave her fatigued, short of breath, and in pain.  Ex. 10, Dawson Rep. ¶¶ 14, 18, 20; Ex. 11, Schwartz Rep. ¶¶ 15, 21, 23, 25; Ex. 28, SHA_0066, SHA_0073 – SHA_0074; Ex. 18, Lenkiewicz Dep. 138:14–139:4, 190:8–13.

14.      Lenkiewicz's breathing impairments were made worse by the presence of airborne pollutants such as mold.  Lenkiewicz's symptoms were consistent with exposure to mold at her workplace; they worsened when she spent time at HUD headquarters and improved when she spent time away from it.  Ex. 11, Schwartz Rep. ¶¶ 19, 24; Ex. 26, KOUL_0001; Ex.

18, Lenkiewicz Dep. 123:12–23, 136:24–137:25; Ex. 22, LENK_0051; Ex. 2, Pl.'s Resp. to

Def.'s Interrogatory No. 1.

  15. The pain, fatigue, and shortness of breath that Lenkiewicz suffered as a result of

her orthopedic and breathing impairments substantially limited her ability to concentrate and

think.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Ex. 10, Dawson Rep. ¶¶ 8, 18; Ex. 11,

Schwartz Rep. ¶¶ 9, 23; Ex. 28, SHA_0074; Ex. 24, DAW_0001 – DAW_0016; Ex. 26,

KOUL_0001.

  16. HUD acknowledged that Lenkiewicz was disabled.  Ex. 13, Patterson Dep.

180:18–181:9, 226:16–227:3; Ex. 20, Def.00288; Ex. 16, Lewis Dep. 24:21-25:12, 91:2-5; Ex.

22, LENK_0630; Ex. 23, LENK_0922; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2; Ex. 18,

Lenkiewicz Dep. 138:8–139:4.

**HUD Had Procedures for Processing and Deciding Reasonable Accommodation Requests**

  17. HUD's procedures for processing and deciding employees' requests for

reasonable accommodation are set forth in Handbook 7855.1, Procedures for Providing

Reasonable Accommodation for Individuals with Disabilities dated April 2003 ("Procedures").

HUD's Procedures are intended, among other things, to establish procedures for submitting to

and responding to requests for reasonable accommodation and to designate responsibility to

certain persons in the reasonable accommodation process.  Ex. 20, Def.00001 – Def.00091; Ex.

14, Cumber Dep. 46:11–47:14.

  18. One of the ways in which HUD employees can request reasonable

accommodation is by completing and submitting HUD Form 1000, which is the standard form

HUD uses for requesting reasonable accommodation.  HUD's Procedures provide that

employees may request reasonable accommodation verbally and without submitting Form 1000.

HUD's Procedures also request that, for record keeping purposes only, the employee document

4

the request using Form 1000.  HUD's Procedures *do not require* the employee to document a request using Form 1000.  However, if a requesting employee does not document a request using Form 1000, the supervisor, manager, or human resource specialist receiving the request *is required* complete the form on behalf of the requesting individual.  Ex. 20, Def.00027, Def.00068; Ex. 14, Cumber Dep. 21:19–22:17.

19.     Under HUD's Procedures, the immediate supervisor is responsible for receiving and reviewing requests for reasonable accommodations, engaging in interactive communication, assessing essential job functions, requesting pertinent medical documentation, if appropriate, and whenever possible, approving reasonable accommodation requests.  Ex. 20, Def.00021; Ex. 14, Cumber Dep. 96:2–97:2; Ex. 16, Lewis Dep. 32:13–33:15; Ex. 13, Patterson Dep. 194:1–195:5.

20.     Under HUD's Procedures, if the immediate supervisor cannot approve a reasonable accommodation request, she must forward the request to the second-line supervisor for review and approval within seven business days.  The immediate supervisor must document, in writing, her reasons for not approving the request prior to forwarding it to the second-line supervisor.  The reasons must be documented on HUD Form 11600, a form entitled "Denial of Request for Reasonable Accommodation."  The immediate supervisor must also notify the employee, fill out the appropriate sections of Form 1000 and Form 11600, and submit those forms to the Disability Program Manager.  Ex. 20, Def.00021, Def.00068 – Def.00071; Ex. 14, Cumber Dep. 97:3–14.

21.     Under HUD's Procedures, the second-line supervisor is responsible for receiving and reviewing requests for reasonable accommodations, engaging in interactive communication, assessing essential job functions, requesting pertinent medical documentation, if appropriate, and

whenever possible, approving reasonable accommodation requests.  Ex. 20, Def.00022; Ex. 13, Patterson Dep. 197:2–198:9.

22.     Under HUD's Procedures, if a request for reasonable accommodation is denied, the request is reviewed by a Reasonable Accommodation Committee ("RAC"), on which the Disability Program Manager serves as chairperson.  The RAC will review the reasonable accommodation request, any supporting medical documentation, and the written justification for denying the requested accommodation.  Based on this information provided, the RAC will vote to determine whether to approve or deny the request, and the Disability Program Manager will inform the individual of the RAC's final decision.  The RAC issues its decisions in writing.  The decision of a request becomes final once the RAC has reviewed and provided an official memo to the employee.  Ex. 20, Def.00023 – Def.00024; Ex. 14, Cumber Dep. 29:5–17, 43:10–44:17, 85:13–20; Ex. 13, Patterson Dep. 48:22–49:14, 51:17–21, 117:4–7.

**Lenkiewicz Requested Accommodations Many Times, To No Avail**

23.     Beginning in late 2009, Lenkiewicz submitted multiple requests for reasonable accommodation to HUD, including for a printer at her workstation, a parking space near HUD headquarters, relocation to the HUD portals building, and telework.  She submitted written requests to the agency's Reasonable Accommodations Branch ("RA Branch") on two occasions. Not one of these requests was granted.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 1–3, 9.

24.     Had they been granted, the reasonable accommodations Lenkiewicz requested would have enabled Lenkiewicz to do her job with less physical activity and exertion, which would have improved her ability to breathe and reduced her pain and fatigue.  Ex. 10, Dawson Rep. ¶ 20; Ex. 11, Schwartz Rep. ¶ 25; Ex. 12, Schroeder Rep. ¶ 33; Ex. 28, SHA_0075; Ex. 26, KOUL_0001; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory Nos. 3, 9.

25.     By improving Lenkiewicz's ability to breathe and reducing her pain and fatigue, any of the reasonable accommodations Lenkiewicz requested would have enabled her to perform the essential functions of the FOIA Specialist position.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory Nos. 1, 3; Ex. 10, Dawson Rep. ¶¶ 9, 20; Ex. 11, Schwartz Rep. ¶¶ 10, 25; Ex. 12, Schroeder Rep. ¶¶ 30–34.

26.     HUD never identified an undue hardship that would have resulted from accommodating Lenkiewicz's disabilities, nor did HUD ever tell Lenkiewicz that accommodating her disabilities would constitute an undue hardship.  HUD does not plead undue hardship as an affirmative defense.  Answer ¶ 51 (ECF No. 21); Ex. 4, Pl.'s Request for Admission No. 5.[1]

**Lenkiewicz's Request for a Printer at Her Workstation Was Denied**

27.     After Lenkiewicz broke her right foot in August 2009, she requested that a spare, unused printer be moved to her workstation so that she would not have to walk to retrieve printed documents.  Answer ¶ 17 (ECF No. 21); Ex. 28, SHA_0063; Ex. 16, Lewis Dep. 58:14–18; Ex. 18, Lenkiewicz Dep. 111:18–112:24; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

28.     A printer at or near her workstation would have reduced the amount Lenkiewicz had to walk while in the office.  It also would have permitted her to print documents without risking a fall or delaying the healing process in her foot and meniscus, as well as sparing her the pain of walking on an injured foot and with inflamed joints and reducing her level of physical

---

[1] Defendant failed to serve a timely response to Plaintiff's Request for Admission Nos. 5–12, which therefore are deemed admitted under Fed. R. Civ. P. 36(a)(3).  By motion on December 10, 2014, Defendant sought (1) permission to withdraw these admissions and (2) a *nunc pro tunc* extension of the deadline to validate its otherwise untimely service of responses.  (ECF No. 47). Plaintiff filed a memorandum in opposition to the motion on December 29, 2014.  (ECF No. 48). Defendant did not file a reply, and the motion remains pending.

activity generally.  Ex. 10, Dawson Report ¶ 20; Ex. 11, Schwartz Report ¶ 25; Ex. 12,

Schroeder Report ¶ 33; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3, 9.

29.     Lenkiewicz made a verbal request for a printer to her first-level supervisor, Vicky

Lewis.  Lewis remained Lenkiewicz's first-level supervisor throughout Lenkiewicz's

employment at HUD.  Answer ¶¶ 1, 17 (ECF No. 21); Ex. 18, Lenkiewicz Dep. 111:18–112:24.

30.     In connection with her request for a printer, Lenkiewicz sought assistance from

Deborah Rizzo, who at the time was the head of HUD's RA Branch.  On September 11, 2009,

Lenkiewicz sent an email to Rizzo with the subject line "Reasonable Accommodations" and

wrote that her broken foot was making it difficult for her to maneuver at the office.  She also

noted that she had "given up on parking."  On September 22, 2009, Lenkiewicz wrote Rizzo

again, stating that she was still in need of guidance as to reasonable accommodation options.  In

this email, she suggested that a printer at her workstation would help reduce the pain, physical

strain, and mobility problems associated with her injury.  Ex. 21, DEF.EMAIL.0006,

DEF.EMAIL.0073.

31.     On or about December 7, 2009, Lewis informed Lenkiewicz that Lenkiewicz's

request for a printer had been denied.  Lewis suggested that Lenkiewicz submit Form 1000.

Answer ¶ 17 (ECF No. 21); Ex. 20, Def.00646; Ex. 18, Lenkiewicz Dep. 113:12–20; Ex. 2, Pl's.

Resp. to Def.'s Interrogatory No. 3.

32.     Lewis did not document Lenkiewicz's printer request using Form 1000.  Lewis

was not aware that HUD's Procedures require a supervisor who receives a request to complete

and submit Form 1000 on the employee's behalf if the employee does not do so.  Ex. 20,

Def.00020, Def.00027; Ex. 14, Cumber Dep. 22:15–17, 42:1–6; Ex. 16, Lewis Dep. 70:11-72:17;

Ex. 18, Lenkiewicz Dep. 227:18–228:5, 232:13–16.

33.     On or around December 2009, Lewis also suggested that Lenkiewicz ask a HUD contractor to retrieve print jobs.  This suggestion struck Lenkiewicz as unworkable because the contractor was only available intermittently, the process would be cumbersome, and Lenkiewicz was uncomfortable imposing on the contractor, who already was very busy.  Answer ¶ 17 (ECF No. 21); Ex. 18, Lenkiewicz Dep. 113:12–20, 225:6–25; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

34.     A Form 11600 for the denial of Lenkiewicz's printer request was never completed.  The printer request was never forwarded to Lenkiewicz's second-level supervisor, Dr. Dolores Cole, for review.  No RAC was convened to make a final decision on the printer request.  *See* Ex. 17, Cole Dep. 51:21–54:3, 61:16–18.

**Lenkiewicz's Request for a Parking Space at HUD Headquarters Was Denied, But HUD Granted Similar Requests to Other Employees**

35.     Shortly after breaking her right foot in August 2009, Lenkiewicz also requested that she be given a parking space at or near HUD headquarters.  Lenkiewicz made this request to Lewis.  Ex. 18, Lenkiewicz Dep. 100:14–104:13, 224:9–19; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

36.     At the time of Lenkiewicz's parking request, Lewis knew that Lenkiewicz's leg was swollen and that Lenkiewicz used assistive devices (including, at various times, crutches and a scooter) to walk.  Ex. 18, Lenkiewicz Dep. 101:3–10; Ex. 16, Lewis Dep. 51:20–53:3, 58:14–59:4, 68:19–22.

37.     In support of her parking request, Lenkiewicz submitted medical documentation to Lewis that included a note from Dr. Eric Dawson recommending that Lenkiewicz be given parking privileges and that her walking or standing be minimized.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 5; Ex. 23, LENK_0782; Ex. 18, Lenkiewicz Dep. 101:14–102:11, 103:6–16.

38.     A parking space at or near HUD headquarters would have reduced the number of steps Lenkiewicz had to take during her commute.  It also would have reduced the severity of her respiratory and orthopedic impairments and therefore reduced her pain, spasms, and swelling, which, in turn, would have improved Lenkiewicz's ability to concentrate and think.  Ex. 10, Dawson Rep. ¶ 20; Ex. 11, Schwartz Rep. ¶ 25; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

39.     Lewis did not grant Lenkiewicz's request for a parking space.  Instead, Lewis directed Lenkiewicz to request a parking space from HUD's Mail and Transportation Branch, who told Lenkiewicz that there were no parking spaces available.  Cole had been given a parking space by filling out a form after she injured herself at home.  Ex. 16, Lewis Dep. 74:8–18; Ex. 18, Lenkiewicz Dep. 102:3–104:13; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2; Ex. 17, Cole Dep. 80:13–81:7 .

40.     In connection with her request for a parking space, Lenkiewicz again sought assistance from Rizzo and offered to submit doctor's notes.  Lenkiewicz periodically sought updates from Rizzo on the status of the request.  Lenkiewicz emailed Rizzo on December 7, 2009, concerning her request for "temporary handicap parking."  She wrote that she had "an updated doctor's note requesting parking and physical accommodations."  Three days later, Lenkiewicz wrote to Rizzo again to request a status update, noting that she "hadn't heard from anyone on the parking."  Ex. 21, DEF.EMAIL.0077, DEF.EMAIL.0078.

41.     Lenkiewicz's request for a parking space was denied.  Ex. 18, Lenkiewicz Dep. 103:6–16; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory Nos. 2–3.

42.     Lewis never completed a Form 1000 to document or forward Lenkiewicz's request a parking space, nor did she complete a Form 11600 to document the denial of Lenkiewicz's request for parking.  The parking request was never forwarded to Cole for her

review.  No RAC was convened to make a final decision on the parking request.  *See* Ex. 16, Lewis Dep. 75:1–9; Ex. 17, Cole Dep. 77:16–78:7.

**Lenkiewicz's Request for Relocation to a Different Building Was Ignored**

43.    Sometime in 2009, Lenkiewicz asked Lewis for Lenkiewicz's workstation to be relocated to the HUD office located in the "portals" building.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; Ex. 18, Lenkiewicz Dep. 131:11–13.

44.    Lenkiewicz requested a transfer to the portals building because she was experiencing frequent breathing problems at work and believed that something in HUD headquarters was making her sick.  Ex. 18, Lenkiewicz Dep. 131:1–10.

45.    On May 18, 2011, Lenkiewicz informed Lewis that she was concerned about toxic mold in the HUD office.  Answer ¶ 30 (ECF No. 21); Ex. 18, Lenkiewicz Dep. 193:13–16; Ex. 16, Lewis Dep. 159:20–161:6.

46.    Lewis did not submit a request for mold inspection until she noticed a smell in her office getting stronger and wanted her own office inspected.  Ex. 21, DEF.EMAIL.0057.

47.    Testing of the tenth floor of the HUD headquarters building, where Lenkiewicz's workstation was located, revealed the presence of mold.  Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 8; Ex. 20, Def.00092 – Def.00094.

48.    In an October 5, 2011 report titled "Indoor Air Quality and Mold Investigation Report," the Federal Occupational Health Service ("FOH") stated that many areas of the tenth floor—including Lenkiewicz's workstation and Lewis' office—tested positive for mold, including *Stachybotrys*.  A report published on HUD's website describes *Stachybotrys* as a "very toxic mold … that produces toxins that may cause … serious health effects[.]"  FOH's report found that air circulation on this floor was poor and that many supply air diffusers were blocked. FOH's report recommended, among other things, cleaning and modifying the ventilation system

11

as necessary to ensure adequate air circulation.  Ex. 20, Def.00092 – Def.00171; Ex. 1, Def.'s

Resp. to Pl.'s Interrogatory No. 8; Micro Ecologies, Inc., *Micro Ecologies, Inc. Mold Clean-up*

*Guidelines for Residents* (2000), *available at* http://www.hud.gov/offices/lead/library/hhi/

4G_microecologiesInc.pdf.

49.     The first time Cole saw FOH's air-quality report was during her deposition in this

litigation.  Cole and Lewis had been incorrectly told by someone else at HUD that there was no

mold, contrary to the findings of FOH's report.  Ex. 17, Cole Dep. 106:11–18, 108:22–109:8,

118:14–119:8; Ex. 16, Lewis Dep. 166:2–18.

50.     HUD did not advise Lenkiewicz of the results of air-quality tests of the tenth floor

of the HUD headquarters building until FOH's report was produced in this litigation.  HUD

temporarily relocated the Office of the Executive Secretariat to a different floor and replaced the

entire ventilation system on the tenth floor of HUD headquarters.  The only record of HUD

having attempted to inform Lenkiewicz of this temporary relocation is an email Lewis sent to

Lenkiewicz's HUD email address while Lenkiewicz was out of the office.  Human resources

specialist Michaela Bratten had suggested sending the email to Lenkiewicz's personal email

address.  Lewis did not do so.  HUD had Lenkiewicz's personal email address.  Ex. 17, Cole

Dep. 116:5–22; Ex. 16, Lewis Dep. 179:10–21, 190:2–16; Ex. 22, LENK_0649; Ex. 21,

DEF.EMAIL.0067, DEF.EMAIL.0082 –Def.EMAIL.0089, DEF.EMAIL.0221.

51.     Relocation to a different office would have allowed Lenkiewicz to continue

working without being exposed to mold and other airborne irritants, which worsened her

breathing difficulties.  Relocation would have improved her ability to breathe.  Ex. 2, Pl.'s Resp.

to Def.'s Interrogatory No. 1, 9; Ex. 11, Schwartz Rep. ¶¶ 19, 24; Ex. 26, KOUL_0001; Ex. 22,

LENK_0051; Ex. 18, Lenkiewicz Dep. 130:18–131:10, 136:24–137:25, 193:13–194:7.

52.     Lenkiewicz's request to be relocated to another building was ignored.  *See* Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

53.     No one at HUD completed a Form 1000 to document Lenkiewicz's request for relocation.  No one at HUD completed a Form 11600 to document the denial of Lenkiewicz's relocation request.  The relocation request was never forwarded to Cole for her review.  No RAC was convened to make a final decision on the relocation request.  Ex. 18, Lenkiewicz Dep. 125:14–126:14; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

## In December 2009, Lenkiewicz Submitted a Request for Accommodation in the Form of Telework That HUD Ignored

54.     In late 2009, Lenkiewicz requested reasonable accommodation in the form of telework by submitting a Form 1000.  In December 2009, Rizzo assisted Lenkiewicz in completing the Form 1000.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; Ex. 21, DEF.EMAIL.0006, DEF.EMAIL.0077, DEF.EMAIL.0079; Ex. 18, Lenkiewicz Dep. 108:21–111:11.

55.     Neither Rizzo nor anyone else at HUD responded to Lenkiewicz's 2009 request for accommodation in the form of telework.  HUD misplaced Lenkiewicz's Form 1000 and has not produced it in this litigation.  HUD did produce other documentary evidence of the request, such as a January 19, 2010, email from Lenkiewicz noting that (1) Rizzo had assisted Lenkiewicz in submitting requests for reasonable accommodations in the form of parking or telework and (2) the requests had been pending for more than a month.  Ex. 21, DEF.EMAIL.0077, DEF.EMAIL.0079; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

## In December 2010, Lenkiewicz Submitted Another Written Request for Accommodation in the Form of Telework

56.     On December 22, 2010, Lenkiewicz submitted a written request for reasonable accommodation to allow her to telework several days per week.  She submitted a Form 1000 and

supporting medical documentation in person to Yolanda Patterson, an employee with HUD's RA

Branch.  On Form 1000, Lenkiewicz cited "2 hindering disabilities; COPD with chronic

bronchitis, and debilitating arthritis."  She listed "dizziness, fatigue, joint pain w/ swelling,

confusion which are made worse by workplace stresses," explaining that she had fallen into the

file cabinet at her workstation twice and was experiencing depression due "to the inability to

keep up with work in current situation."  Answer ¶ 26 (ECF No. 21); Ex. 22, LENK_0055.

57.     In support of her December 22, 2010 request, Lenkiewicz submitted a recent note

from Dr. Sameer Shammas, who recommended telework due to Lenkiewicz's "severe multi-joint

condition."  Dr. Shammas' note listed "dizziness, fatigue, and multi joint pain" and

recommended "light duty only due to fatigue and dizziness."  Lenkiewicz also submitted a note

from Dr. Michael Williams, who was treating Lenkiewicz for a possible endocrine system issue

and recommended that Lenkiewicz "start working from home immediately."  HUD also received

a report from Dr. Imelda Cabalar diagnosing Lenkiewicz with COPD and degenerative joint

disease and noting that x-rays showed arthritis in Lenkiewicz's spine and right knee.  Ex. 22,

LENK_0057 – LENK_0058; Ex. 20, Def.00194 – Def.00202, Def.00276 – Def.00279;  Ex. 28,

SHA_0079 – SHA_0080.

**HUD Consulted with Federal Occupational Health on Lenkiewicz's December 2010 Request**

58.     HUD's RA Branch forwarded Lenkiewicz's December 22, 2010 request to FOH

for medical review.  In its cover letter, HUD's RA Branch sought FOH's assistance "to help …

evaluate medical information for the purpose of determining if the employee should be given an

accommodation which would allow her to telework."  Ex. 20, Def.00195 – Def.00196; Ex. 13,

Patterson Dep. 64:16-19, 135:8-14.

59.     One purpose of the medical review process is to identify potential
accommodations that may be appropriate for an employee, even if the employee requested a
specific accommodation.  At times, employees have a functional impairment but might not know
what form of accommodation might be best.  Ex. 14, Cumber Dep. 23:2–7.

60.     During the time Lenkiewicz was employed at HUD, the agency did not require
medical review by FOH for most employee requests for telework as an accommodation.  Of the
130 such requests HUD received during Lenkiewicz's tenure, 110 were granted, and 90 were
granted without any referral to FOH.  Those 90 requests for telework as an accommodation that
did not involve medical review were granted based on justifications that included asthma,
respiratory issues, chronic fatigue syndrome, anxiety, and osteoarthritis.  Ex. 20, Def.02954 –
Def.02968.

61.     FOH assigned Dr. James Allen to consult with HUD's RA Branch on
Lenkiewicz's request.  When Dr. Allen conducts a medical review of an employee's request for
reasonable accommodation, he is typically asked to determine whether the employee's disability
gives rise to a substantial limitation of a major life activity.  HUD's RA Branch asked Dr. Allen
to determine whether there was any medical basis for Lenkiewicz's request to telework.  It is
unusual for an agency to ask Dr. Allen to recommend whether a particular accommodation
should be provided.  Dr. Allen is not specially trained in selecting reasonable accommodations.
Ex. 20, Def.00177 – Def.00178; Ex. 15, Allen Dep. 34:2–5, 34:13–17, 43:2–17, 73:6–7, 128:17–
129:6, 134:14–21.

62.     Dr. Allen offered a recommendation on telework as an accommodation in
response to HUD's specific question about telework.  He responded that, in his opinion, there

was no "medical basis" for Lenkiewicz to telework.  Ex. 20, Def.00177 – Def.00178; Ex. 15,

Allen Dep. 43:2–17, 128:17–129:6, 134:14–21.

63.     Dr. Allen did not have access to all of the information pertinent to Lenkiewicz's

request.  When HUD consults FOH on a request, HUD's practice is to provide FOH with the

requesting employee's position description.  HUD did not provide Lenkiewicz's position

description to FOH in connection with Lenkiewicz's December 22, 2010 request.  Ex. 13,

Patterson Dep. 46:9–14, 156:8–18; Ex. 14, Cumber Dep. 36:2–5.

64.     In addition, HUD did not forward a copy of Lenkiewicz's completed Form 1000

to FOH.  Dr. Allen was not aware that Lenkiewicz sought reasonable accommodation on the

basis of the "hindering disabilities" of "COPD with chronic bronchitis" and "debilitating

arthritis[,]" which Lenkiewicz listed on Form 1000.  Ex. 15, Allen Dep. 150:7–21; Def.00177.

65.     Lenkiewicz, from time to time during her employment at HUD, sought treatment

from FOH physicians.  Dr. Allen did not take into account those treatment notes, which included

a note with contact information from Dr. Moti Koul, one of Lenkiewicz's treating pulmonary

specialists.  Ex. 15, Allen Dep. 150:7–21; Ex. 20, Def.00177; Ex. 25, FOH_0001 – FOH_0011.

66.     Lenkiewicz, from time to time during her employment at HUD, submitted

doctor's notes to excuse her absences.  Lewis kept logs of phone calls where Lenkiewicz

reported being absent for work.  On at least six occasions, Lenkiewicz requested unpaid leave

under the Family and Medical Leave Act of 1993 ("FMLA") by submitting a Form WH-380

signed by a doctor.  Dr. Allen did not take into account these doctor's notes, phone calls, or WH-

380 forms.  Ex. 15, Allen Dep. 150:7–21; Ex. 20, Def.00177;  Ex. 22, LENK_0345 –

LENK_0350, LENK_0758 – LENK_0762; Ex. 23, LENK_0768 – LENK_0771, LENK_0734 –

LENK_0736, LENK_0801 – LENK_0804, LENK_0806 – LENK_0808, LENK_0809 –

LENK_0811.

## HUD Failed To Communicate with Lenkiewicz Concerning Her December 2010 Accommodation Request

67.    While Lenkiewicz's December 22, 2010 request was pending, HUD did not ask

Lenkiewicz to submit additional medical documentation or identify other physicians who could

provide input on Lenkiewicz's conditions.  The RA Branch did not ask for this information

because Lenkiewicz's request was being reviewed by FOH, and Lenkiewicz had consented to

have FOH communicate directly with her physicians.  Ex. 14, Cumber Dep. 82:7–14; Ex. 9, Pl.'s

Supp. Resp. to Def.'s Interrogatory No. 6.

68.    Lenkiewicz believed she had submitted sufficient medical documentation to

support her December 22, 2010 request.  Lenkiewicz expected that her doctors would share

relevant information about her medical conditions and history.  Lenkiewicz contacted HUD's

RA Branch on multiple occasions to ensure no additional documentation was required to decide

her request.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 1; Ex. 9, Pl.'s Supp. Resp. to Def.'s

Interrogatory No. 6; Ex. 18, Lenkiewicz Dep. 147:9–15, 182:1–19, 185:11–19, 187:1–15; Ex. 21,

DEF.EMAIL.0081 – DEF.EMAIL.0089, DEF.EMAIL.0092 – DEF.EMAIL.0095,

DEF.EMAIL.0099 – DEF.EMAIL.102, DEF.EMAIL.0104 – DEF.EMAIL.0106; Ex. 20,

Def.00306 – Def.00309, Def.00315 – Def.00328.

69.    HUD never asked Lenkiewicz to identify any major life activities limited by her

impairments.  Patterson did not ask Lenkiewicz to identify a major life activity even though, in

Patterson's view, Lenkiewicz's documentation was insufficient to establish that a major life

activity was affected.  Ex. 14, Cumber Dep. 80:5–81:18; Ex. 13, Patterson Dep. 123:15–124:1,

126:1–14, 128:17–19.

70.     HUD's Procedures state that an employee does not have to identify which major life activity is affected by a claimed disability when making a request.  When the RA Branch reviews an accommodation request, it determines whether a physical impairment is identified. When a requesting individual does not identify a major life activity, the RA Branch will not draw inferences from other information and will not make any other effort to identify a major life activity.  Ex. 20, Def.00025 – Def.00026; Ex. 13, Patterson Dep. 35:11–16, 36:3–8, 64:16–19, 101:12–18.

71.     If an employer lacks certain information necessary to decide a reasonable accommodation request, it is a best practice to request that information from the employee and thereby enable the employee to address any deficiencies.  Ex. 12, Schroeder Rep. ¶ 44.

72.     Employees in HUD's RA Branch who reviewed Lenkiewicz's request failed to ask basic questions of Lenkiewicz or her doctors that would have been relevant to a determination of whether Lenkiewicz's disabilities substantially limited one or more major life activities.  For example, Patterson never asked for clarification of Dr. Shammas' observation that "[t]ravel is difficult" even though she did not understand what Dr. Shammas meant.  Patterson also construed statements in Lenkiewicz's medical documentation in nonsensical ways to avoid the conclusion that Lenkiewicz's major life activities were limited.  For example, Patterson concluded that "difficulty traveling" does not describe a limitation on a major life activity because it is unclear whether "traveling" pertains to walking.  Similarly, Patterson did not interpret the words "light duty" to pertain to physical activity.  Ex. 13, Patterson Dep. 81:20–82:2, 84:7–13, 219:8–14.

73.     When an employee submits a request for reasonable accommodation, HUD's RA Branch asks the requesting employee's supervisor to provide it with a copy of the employee's

position description.  When telework is requested as an accommodation, the RA Branch will also

request a statement of what duties can and cannot be performed from home.  Lenkiewicz's

supervisors never provided the RA Branch with a description of her position, even though the

RA Branch requested it.  Ex. 13, Patterson Dep. 133:2–5, 156:19–157:2, 172:5–14, 174:1–2.

74.     Lewis also did not send HUD's RA Branch a copy of her absence phone log,

which documented the reasons for Lenkiewicz's absences, or the numerous doctors' notes

Lenkiewicz submitted in support of her requests for leave.  At various times, Lenkiewicz gave

Lewis doctors' notes to excuse her absences from work; in addition to other accommodations,

some of these notes recommended that she work from home for part of each week.  Lewis did

not provide these notes to HUD's RA Branch, nor did Lewis inform anyone at the RA Branch

that Lenkiewicz was out of the office after May 2011.  Lewis had been aware of Lenkiewicz's

breathing problems since Lenkiewicz's first week on the job, when Lenkiewicz was absent with

bronchitis.  Lewis did not provide the RA Branch with this information, which the RA Branch

expects a supervisor to do.  Lewis also possessed contact information for Lenkiewicz's

pulmonologists (Dr. Moti Koul and Dr. Abbas Omais) that was not provided to the RA Branch.

Employees in the RA Branch had difficulty reaching Lewis to discuss Lenkiewicz's request.

Patterson did not get return calls or emails from Lewis.  Answer ¶ 13 (ECF No. 21); Ex. 22,

LENK_0049 – LENK_0054; Ex. 14, Cumber Dep. 87:16–19; Ex. 13, Patterson Dep. 28:4–9,

157:3–158:2, 160:21–161:9, 179:10–12; Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10; Ex. 20,

Def.00289.

75.     After Dr. Allen concluded that there was no "medical basis" to permit Lenkiewicz

to telework, HUD did not consider whether an accommodation should nonetheless be granted to

improve Lenkiewicz's well-being and job performance.  As a matter of best practice, an

employer engages with an employee seeking accommodation by, among other things, following its own procedures governing denials and considering whether the request should be granted for reasons other than medical necessity.  Ex. 12, Schroeder Rep. ¶¶ 44–45.

76.     As a matter of best practices, accommodations are regularly made for a variety of reasons beyond medical necessity.  HUD can and does grant accommodations to employees notwithstanding insufficient medical documentation so long as Jackie Cumber (as the chief of the RA Branch and the Disability Program Manager under HUD's Procedures) or a supervisor approves the request.  HUD did not consider Lenkiewicz's productivity and comfort in connection with her reasonable accommodation requests.  Ex. 13, Patterson Dep. 175:18–176:2; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2; Ex. 12, Schroeder Rep. ¶¶ 44–45.

77.     Lenkiewicz's second-level supervisor, Cole, has not required other HUD employees to submit medical documentation when they seek some minor accommodations, such as a cushion or certain equipment.  Cole herself received a parking space by filling out a form when she had difficulty walking after falling in her home.  Ex. 17, Cole Dep. 39:17–40:14, 80:13–81:7.

78.     Lenkiewicz could have performed the essential functions of the FOIA Specialist position via telework with occasional visits to the office.  By 2009, FOIA Specialists processed FOIA requests electronically using HUD's FOIA Management System, known as FMS2 or FOIAXpress.  FMS2 is a web-based platform that is accessed from an internet browser.  Through FMS2, even as it existed in 2009, FOIA Specialists could receive FOIA requests and review and redact potentially responsive documents.  Lenkiewicz could have performed tasks such as email and phone calls from home as well.  HUD never told Lenkiewicz before this litigation that telework would have been infeasible or impossible.  Ex. 9, Pl.'s Supp. Resp. to Def.'s

Interrogatory No. 3; Ex. 18, Lenkiewicz Dep. 93:18–95:4; Ex. 21, DEF.EMAIL.0024,

DEF.EMAIL.0032, DEF.EMAIL.0035, DEF.EMAIL.0174, DEF.EMAIL.0185; Ex. 20,

Def.02933 – Def.02934, Def.02936 –Def.02940, Def.02950 – Def.02953.

79.     HUD never offered Lenkiewicz an alternative accommodation to telework.  It is

the normal practice of the RA Branch to propose alternative accommodations, but the RA

Branch did not do so.  Lewis and Cole were asked to consider "detailing" Lenkiewicz to another

HUD department, but they refused the suggestion.  Lewis had the authority and discretion to

grant some accommodation for Lenkiewicz; she did not do so because she did not think she was

"required" to do so.  In a January 2011 meeting between Lewis and Lenkiewicz, Lewis

suggested to Lenkiewicz that she retire under disability.  This meeting took place while

Lenkiewicz's December 2010 request was pending.  During the meeting, Lenkiewicz was

sweating, clutching her chest, and complaining of severe breathing problems.  Ex. 2, Pl.'s Resp.

to Def.'s Interrogatory Nos. 1–3; Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; Ex. 21,

DEF.EMAIL.0054; Ex. 16, Lewis Dep. 200:21–6, 224:4–20, 226:20–227:2; Ex. 13, Patterson

Dep. 53:16–19; Ex. 12, Schroeder Rep. ¶ 44; Ex. 22, LENK_170.

80.     Reasonable accommodations other than telework were available and would have

allowed Lenkiewicz to work with less physical exertion.  Any accommodation that would have

reduced Lenkiewicz's level of physical activity also would have reduced the severity of

Lenkiewicz's musculoskeletal impairments as well as her pain, spasms, and swelling, which, in

turn, would have improved Lenkiewicz's ability to concentrate and think.  Ex. 10, Dawson Rep.

¶ 20; Ex. 12, Schroeder Rep. ¶ 33; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

81.     HUD did not determine whether Lenkiewicz could satisfactorily perform another

job.  Lenkiewicz was qualified for other positions at HUD, including positions in the GS-0301

job series.  Ex. 20, Def.00251 – Def.00253, Def.00699 – Def.00702; Ex. 12, Schroeder Rep. ¶¶ 46–47, 49–52.

82.     Despite internal communications suggesting a RAC would be convened, a RAC was never held for Lenkiewicz's request.  Ex. 20, Def.00291.

**Someone at HUD Denied Lenkiewicz's December 2010 Request**

83.     When Plaintiff's December 22, 2010, request was eventually denied, the denial was inexplicably backdated to the date of her request.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 1; Ex. 20, Def.00263, Def.00294.

84.      HUD never informed Lenkiewicz that her December 22, 2010 request had been denied.  Ex. 6, Def.'s Resp. to Pl.'s Request for Admission No. 8.[2]

85.     HUD's Procedures allow the agency's employees to avoid taking responsibility for denying a request for reasonable accommodation.  Under HUD's Procedures, the "decision-maker" for a reasonable accommodation request can be either the employee's supervisor or the Disability Program Manager.  HUD cannot identify who served as the decision-maker for Lenkiewicz's December 22, 2010 request.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3; Ex. 20, Def.00037; Ex. 13, Patterson Dep. 185:12–186:20.

86.     There is no agreement among HUD employees about who denied Lenkiewicz's December 22, 2010 request.  The denial is variously attributed to Lewis, HUD's RA Branch, and FOH.  The agency initially attributed the denial to Lewis, but it now attributes the denial to the RA Branch.  Employees in the RA Branch disagree: Cumber, the head of the RA Branch, attributes the denial to Lewis, while Patterson attributes the denial to FOH.  Lewis attributes the denial to the RA Branch or FOH.  *See* Ex. 1, Def.'s Resp. to Pl.'s Interrogatory Nos. 3, 6; Ex.

---

[2] *See supra* n.1.

16, Lewis Dep. 127:11–12, 138:2–10; Ex. 13, Patterson Dep. 116:6–117:3, 164:18–20; Ex. 14, Cumber Dep. 85:5–8.

87.     In May 2011, after Lenkiewicz informed Lewis that she was concerned about toxic mold in the HUD office, Lenkiewicz's breathing problems had become so severe that she could not endure working in the HUD headquarters building without a reasonable accommodation.  By that time, Lenkiewicz was convinced that HUD was not handling her requests for reasonable accommodation in good faith.   Lenkiewicz thought she had submitted sufficient medical documentation to support her December 2010 request.  Lenkiewicz thought HUD would not grant her a reasonable accommodation under any circumstances, whether she submitted more medical documentation or otherwise.  So, in May 2011, Lenkiewicz told Lewis that she would not return to the office until HUD did something to address her breathing problems.  Answer ¶ 30 (ECF No. 21); Ex. 18, Lenkiewicz Dep. 165:9–167:6, 193:13–16; Ex. 16, Lewis Dep. 159:20–161:6; Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 9.

88.     After Lenkiewicz's December 22, 2010 request for accommodation was denied, Lewis and Cole terminated Lenkiewicz because of excessive absences and performance issues. In the Notice of Proposed Removal, Cole acknowledged that Lenkiewicz had raised medical reasons that affected her ability to report to work and perform work.  Ex. 17, Cole Dep. 21:13–17, 152:6–11; Ex. 16, Lewis Dep. 42:12–43:11; Ex. 23, LENK_0920 – LENK_0923; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2; Ex. 21, DEF.EMAIL.0070.

**HUD Failed to Follow Its Own Procedures in Handling Lenkiewicz's Requests**

89.     HUD employees, including HUD employees in the RA Branch, either misunderstand or ignore many of HUD's Procedures.  HUD employees in the RA Branch do not use the Procedures very often in handling reasonable requests.  Lewis and Cole were unaware of

the Procedures at the time Lenkiewicz submitted her requests for reasonable accommodation. Ex. 13, Patterson Dep. 206:9–13; Ex. 16, Lewis Dep. 28:19–29:5; Ex. 17, Cole Dep. 40:16–41:8.

90.     On multiple occasions, Lewis did not follow HUD's Procedures when she failed to ensure that Form 1000 was completed and submitted to document Lenkiewicz's verbal requests for accommodation.  For the requests Lenkiewicz made directly to Lewis, Lewis never filled out a Form 1000 on Lenkiewicz's behalf.  Lewis admitted that this procedure was not followed after Lenkiewicz requested a printer.  Ex. 13, Patterson Dep. 25:6–13; Ex. 17, Cole Dep. 94:8–18, 100:1–21; Ex. 16, Lewis Dep. 72:15–17.

91.     As Lenkiewicz's immediate supervisor, HUD's Procedures required Lewis to document, in writing, her reasons for not approving each of Lenkiewicz's accommodation requests before forwarding it to Cole, Lenkiewicz's second-line supervisor.  Lewis did not follow this procedure.  Ex. 20, Def.00021; Ex. 13, Patterson Dep. 196:2–14, 196:20–197:1; Ex. 16, Lewis Dep. 73:19-22.

92.     Cole denied that she had any responsibilities with regard to handling a request for reasonable accommodation.  However, as Lenkiewicz's second-line supervisor, HUD's Procedures required Cole to (i) document the reasons for not granting an accommodation, (ii) notify Lenkiewicz of the decision, (iii) complete Form 11600, and (iv) submit the forms to the Disability Program Manager, who convenes the RAC for a final decision.  Ex. 13, Patterson Dep. 198:10–200:5; Ex. 17, Cole Dep. 14:18–21.

93.     Cole never found out about Lenkiewicz's broken foot and torn meniscus.  Cole never saw the HUD 1000 form of December 22, 2010.  Cole was not even aware that Lenkiewicz had submitted a written accommodation request.  Cole first saw some of Lenkiewicz's medical

documentation only after Lewis "was looking at taking some action," *i.e.*, disciplinary action, against Lenkiewicz.  Ex. 17, Cole Dep. 29:20–30:11, 34:1–11, 44:2–11, 46:5–10.

**HUD's Written Procedures Set Up Applicants To Fail**

94.     Decisions whether to refer to medical review are made by personnel in the RA Branch who admit they are not qualified to evaluate medical evidence.  HUD leaves RA Branch employees to look for their own training on the proper handling of reasonable accommodation requests.  Patterson admits that she is not qualified to evaluate whether medical documentation shows a functional limitation.  Patterson does not even know the definition of "disability" under the Americans with Disabilities Act.  Ex. 13, Patterson Dep. 64:16–19, 101:12–18, 135:8–14, 182:1–6, 203:3–204:2, 230:12–14.

95.     HUD's Procedures state that HUD will process requests for reasonable accommodation and, where appropriate, provide accommodation, in a prompt, fair, and efficient manner.  Nonetheless, HUD's Procedures allow for indefinite delay whenever the RA Branch decides medical review is warranted.  According to the Procedures, where "extenuating circumstances" are present, the "supervisor must notify the individual in writing of the reason for the delay, and the approximate date on which a decision, or provision of the reasonable accommodation, is expected.  Any further developments or changes should also be communicated promptly to the individual by the supervisor."  Extenuating circumstances apparently include an outstanding request for medical information or an ongoing evaluation of that information.  Medical review typically takes anywhere from three to six months, but there is no time limit for completing a medical review.  Ex. 20, Def.00037, Def.00039; Ex. 13, Patterson Dep. 36:11–13, 37:13–15.

96.     HUD's delay and ultimate refusal to grant an accommodation to Lenkiewicz caused her to suffer shortness of breath, pain, and fatigue as a result of physical overexertion.

25

Without accommodation, Lenkiewicz could not perform her job as a FOIA Specialist without suffering frequent shortness of breath, fatigue, and pain.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 9.

      97.    HUD sometimes grants temporary accommodations to employees before medical documentation is received or while medical review is underway.  Lenkiewicz did not receive any temporary accommodations.  Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

      98.    Lewis could have granted Lenkiewicz a temporary accommodation.  Under the Procedures, a supervisor may serve as "decision maker" for job-performance-related requests, including those that can be granted at no cost.  Job-performance-related reasonable accommodations include, but are not limited to, adjusted work schedules, alternative formatted materials, assistive devices, or job restructuring.  Ex. 20, Def.00037; Ex. 13, Patterson Dep. 173:12–21, 225:3–6; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory Nos. 1–3, 9.

Respectfully submitted,

*/s/ J. Wells Harrell*           .
J. Wells Harrell (D.C. Bar No. 995368)
Evan E. North (D.C. Bar No. 995360)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6181
wharrell@bsfllp.com
enorth@bsfllp.com

Dated: March 4, 2015        *Attorneys for Plaintiff Denise L. Lenkiewicz*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DENISE L. LENKIEWICZ**, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 13-0261 (RCL) |
| **JULIÁN CASTRO**, | ) |
| Secretary, U.S. Department of | ) |
| Housing & Urban Development, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

## DECLARATION OF J. WELLS HARRELL IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, J. Wells Harrell, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the bar of this Court, an attorney at Boies, Schiller & Flexner

LLP, and counsel for Plaintiff Denise L. Lenkiewicz in the above-captioned action.  I submit this

declaration in support of Plaintiff's Motion for Summary Judgment, dated March 4, 2015.

Pursuant to Local Civil Rule 5.4(f), personally identifying information has been redacted from

all exhibits attached to this declaration.

2.      Attached as Exhibit 1 is a true and correct copy of Defendant's Response to

Plaintiff's First Set of Interrogatory Requests, Requests for Production of Documents, and

Requests for Admission, dated August 7, 2014.

3.      Attached as Exhibit 2 is a true and correct copy of Plaintiff's Response to

Defendant's First Set of Interrogatories and Requests for Production of Documents, dated

September 11, 2014.

4.      Attached as Exhibit 3 is a true and correct copy of Plaintiff Denise Lenkiewicz's Second Set of Requests for Production of Documents and Things to Defendant Shaun Donovan, dated October 1, 2014.

5.      Attached as Exhibit 4 is a true and correct copy of Plaintiff Denise Lenkiewicz's Second Set of Requests for Admission to Defendant Shaun Donovan, dated October 1, 2014.

6.      Attached as Exhibit 5 is a true and correct copy of Plaintiff Denise Lenkiewicz's Second Set of Interrogatories to Defendant Shaun Donovan, dated October 1, 2014.

7.      Attached as Exhibit 6 is a true and correct copy of Defendant's Response to Plaintiff's Second Set of Interrogatory Requests, Requests for Production of Documents, and Requests for Admissions, dated November 24, 2014.

8.      Attached as Exhibit 7 is a true and correct copy of Defendant's Supplemental Responses to Plaintiff's Second Set of Discovery Requests, dated December 8, 2014.

9.      Attached as Exhibit 8 is a true and correct copy of Defendant's Second Supplemental Responses to Plaintiff's Second Set of Discovery Requests, dated December 31, 2014.

10.     Attached as Exhibit 9 is a true and correct copy of Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, dated January 9, 2015.

11.     Attached as Exhibit 10 is a true and correct copy of the Declaration of Eric G. Dawson, M.D., dated January 9, 2015, which is accompanied by the Opening Expert Report of Eric G. Dawson, M.D.

12.     Attached as Exhibit 11 is a true and correct copy of the Declaration of Alan R. Schwartz, M.D., dated January 9, 2015, which is accompanied by the Opening Expert Report of Alan R. Schwartz, M.D.

13.     Attached as Exhibit 12 is a true and correct copy of the Declaration of Fredric K. Schroeder, Ph.D., dated January 9, 2015, which is accompanied by the Opening Expert Report of Fredric K. Schroeder, Ph.D.

14.     Attached as Exhibit 13 is a true and correct copy of the transcript from the deposition of Yolanda Patterson in this case, which took place on September 17, 2014.

15.     Attached as Exhibit 14 is a true and correct copy of the transcript from the deposition of Jackie Pomaa Cumber in this case, which took place on January 7, 2015.

16.     Attached as Exhibit 15 is a true and correct copy of the transcript from the deposition of James William Allen in this case, which took place on October 28, 2014.

17.     Attached as Exhibit 16 is a true and correct copy of the transcript from the deposition of Vicky J. Lewis in this case, which took place on October 23, 2014.

18.     Attached as Exhibit 17 is a true and correct copy of the transcript from the deposition of Dr. Dolores W. Cole in this case, which took place on September 19, 2014.

19.     Attached as Exhibit 18 is a true and correct copy of the transcript from the deposition of Denise L. Lenkiewicz in this case, which took place on October 29, 2014.

20.     Attached as Exhibit 19 is a true and correct copy of the transcript from the deposition of Sammer B. Shammas, M.D. in this case, which took place on October 30, 2014.

21.     Attached as Exhibit 20 is a true and correct copy of a selection of documents produced by Defendant in discovery bearing the "Def." bates prefix.  These documents appear in numerical order and range from Def.00001 to Def.02968.

22.     Attached as Exhibit 21 is a true and correct copy of a selection of documents produced by Defendant in discovery.  Although they were produced in native format without bates stamps, Plaintiff affixed bates stamps to these documents using the "DEF.EMAIL." prefix. These documents appear in numerical order and range from DEF.EMAIL.0006 to DEF.EMAIL.0221.

23.     Attached as Exhibit 22 is a true and correct copy of a selection of documents produced by Plaintiff in discovery bearing the "LENK_" bates prefix.  These documents appear in numerical order and range from LENK_0049 to LENK_0762.

24.     Attached as Exhibit 23 is a true and correct copy of a selection of documents produced by Plaintiff in discovery bearing the "LENK_" bates prefix.  These documents appear in numerical order and range from LENK_0768 to LENK_0923.

25.     Attached as Exhibit 24 is a true and correct copy of a selection of documents produced by Plaintiff in discovery bearing the bates stamps DAW_0001 to DAW_0016.

26.     Attached as Exhibit 25 is a true and correct copy of documents produced by Plaintiff in discovery bearing the bates stamps FOH_0001 to FOH_0011.

27.     Attached as Exhibit 26 is a true and correct copy of a document produced by Plaintiff in discovery bearing the bates stamp KOUL_0001.

28.     Attached as Exhibit 27 is a true and correct copy of a document produced by Plaintiff in discovery bearing the bates stamp OMA_0001 to OMA_0002.

29.     Attached as Exhibit 28 is a true and correct copy of a selection of documents produced by Plaintiff in discovery bearing the bates stamps SHA_0063 to SHA_0080.

*       *       *

4

I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 4, 2015                    */s/ J. Wells Harrell*                          _
Washington, DC                               J. Wells Harrell