# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DENISE L. LENKIEWICZ**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-0261 (RCL) |
| | ) | |
| **JULIÁN CASTRO**, | ) | ORAL ARGUMENT REQUESTED |
| Secretary, U.S. Department of | ) | |
| Housing & Urban Development, | ) | |
| | ) | |
| *Defendant*. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.    Lenkiewicz Is an "Individual with a Disability" Under the Rehabilitation
      Act. ........................................................................................................................... 1

      A.   HUD Proposes an Evidentiary Restriction That Is Contrary to Controlling
           Authority and Unsupported by Any Authority. ......................................... 3

      B.   Lenkiewicz Clearly Had a "Disability" Under the Proper Definition. ...................... 7

      C.   The Opinions of Dr. James Allen, an FOH Consultant, Are Inadmissible,
           Unreliable, and Irrelevant. ........................................................................ 10

      D.   HUD Distorts Other Record Evidence of Lenkiewicz's Disabilities. .................... 12

      E.   The Information in HUD's Possession Substantiates that Lenkiewicz Was
           Disabled. .................................................................................................... 13

II.   It Was HUD, Not Lenkiewicz, That Failed to Engage in the Interactive
      Process in Good Faith. ......................................................................................... 16

      A.   The Parties' Communications (and HUD's Lapses Therein) Demonstrate
           Lenkiewicz's Good Faith as Much as HUD's Bad Faith. ...................................... 18

      B.   HUD's Remaining Excuse Fails as a Matter of Law. ............................................. 29

III.  HUD Has Failed to Show that Accommodating Lenkiewicz Would Have
      Imposed an Undue Hardship. ............................................................................... 30

      A.   HUD's Attempt to Cure Its Deficient Pleading on Summary Judgment Is
           Procedurally Improper. ............................................................................... 30

      B.   HUD Has Failed to Establish Undue Hardship. ....................................................... 31

      C.   HUD's Failure to Show that *Any* Accommodation Would Have Imposed an
           Undue Hardship Precludes Summary Judgment Against Lenkiewicz. ................... 35

IV.   Lenkiewicz Exhausted Her Administrative Remedies with Respect to Each of
      HUD's Violations of the Rehabilitation Act. ..................................................... 36

      A.   The 45-Day Counseling Period Is Not a Jurisdictional Requirement and
           Therefore May Be Waived. ........................................................................ 38

      B.   HUD Failed to Plead or Prove that Administrative Remedies Were Untimely
           Exhausted. .................................................................................................. 42

i

   C.   HUD Waived Any Defense as to the 45-Day Counseling Period. .......................... 43

   D.   At the Least, HUD's Denial of These Requests Evidences a Pattern of
        Denying Accommodations and Disregarding the Interactive Process. ................... 44

**CONCLUSION** ...................................................................................................... **45**

**ORAL ARGUMENT REQUESTED** ................................................................... **46**

# TABLE OF AUTHORITIES

## CASES

*Arbaugh v. Y&H Corp.*, 546 U.S. 392 (2006) .......................................................................... 39, 40

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) ................................................................ 17

*Boos v. Runyon*, 201 F.3d 178 (2d Cir. 2000) ................................................................................ 41

*Bowden v. United States*, 106 F.3d 433 (D.C. Cir. 1997) ........................................ 40, 41, 43, 44

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ........................................................................................ 3

*Branson v. West*, No. 97cv3538, 1999 WL 311717 (N.D. Ill. May 11, 1999) ............................ 29

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ..................................................................... 6

*Bultemeyer v. Ft. Wayne Comm'ty Schs.*, 100 F.3d 1281 (7th Cir. 1996) ................................... 22

*Butler v. White*, No. 11cv574, 2014 WL 4436301 (D.D.C. Sept. 8, 2014) .................................. 31

*Cobel v. Zalazar*, 816 F. Supp. 2d 10 (D.D.C. 2011) ................................................................... 41

*Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894 (D.C. Cir. 1998) ...................................... 5

*Desmond v. Mukasey*, 530 F.3d 944 (D.C. Cir. 2008) .................................................................. 14

*Doak v. Johnson*, 19 F. Supp. 3d 259 (D.D.C. 2014) ................................................................... 42

*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) ............................................... 5, 30

*Ellison v. Napolitano*, 901 F. Supp. 2d 118 (D.D.C. 2012) ......................................................... 42

*Faison v. Vance-Cooks*, 896 F. Supp. 2d 37 (D.D.C. 2012) ................................................... 40, 44

*Flemmings v. Howard Univ.*, 198 F.3d 857 (D.C. Cir. 1999) ......................................................... 7

*Fortune v. Holder*, 767 F. Supp. 2d 116 (D.D.C. 2011) ............................................................... 39

*Goonan v. Federal Reserve Bank of N.Y.*, 916 F. Supp. 2d 470 (S.D.N.Y. 2013) ...................... 29

*Green v. Am. Univ.*, 647 F. Supp. 2d 21 (D.D.C. 2009) ............................................................. 3, 4

*Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339 (D.C. Cir. 1997) .................. 31

*Hodges v. District of Columbia*, 959 F. Supp. 2d 148 (D.D.C. 2013) ...................................... 7, 29

*Horton v. Potter*, 369 F.3d 906 (6th Cir. 2004) ....................................................................... 41, 43

*Howard Town Ctr. Developer, LLC v. Howard Univ.*, No. CV 13-1075, 2013 WL 6671748 (D.D.C. Dec. 19, 2013) ............................................ 34

*Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151 (E.D.N.Y. 2002) ............................................ 17

*Johnson v. Runyon*, 47 F.3d 911 (7th Cir. 1995) ............................................ 41

*Johnson–Parks v. D.C. Chartered Health Plan*, 806 F. Supp. 2d 267 (D.D.C. 2011) ................ 44

*Kapche v. Holder*, 677 F.3d 454 (D.C. Cir. 2012) ............................................ 3

*Koch v. Shapiro*, 777 F. Supp. 2d 86 (D.D.C. 2011) ............................................ 39, 42

*Kraus v. Presidio Trust Facilities Div. / Res. Mgmt. Branch*, 572 F.3d 1039 (9th Cir. 2009) ............................................ 41

*Langdon v. Dep't of Health & Hum. Servs.*, 959 F.2d 1053 (D.C. Cir. 1992) ............................................ 3

*Lee v. District of Columbia*, 920 F. Supp. 2d 126 (D.D.C. 2013) ............................................ 5

*Leiterman v. Johnson*, No. CV-13-394, 2014 WL 3708040 (D.D.C. July 28, 2014) ................ 36

*Lloyd v. Chao*, 240 F. Supp. 2d 1 (D.D.C. 2002) ............................................ 44

*Loya v. Sebelius*, 840 F. Supp. 2d 245 (D.D.C. 2012) ............................................ 1, 4, 5

*Mahoney v. Donovan*, 824 F. Supp. 2d 49 (D.D.C. 2011) ............................................ 41

*Marshall v. Fed. Express Corp.*, 130 F.3d 1095 (D.C. Cir. 1997) ............................................ 44

*Marshall v. Potter*, 634 F. Supp. 2d 66 (D.D.C. 2009) ............................................ 6

*Martin v. District of Columbia*, --- F. Supp. 3d ---, 2015 WL 294723 (D.D.C. 2015) ................ 6

*McNair v. Dist. of Colum.*, 11 F. Supp. 3d 10 (D.D.C. 2014) ............................................ 18

*Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567 (S.D.N.Y. 2008) ................ 26

*Noon v. IBM*, No. 12-CIV-4544, 2013 WL 6504410 (S.D.N.Y. Dec. 11, 2013) ................ 36

*Nurriddin v. Bolden*, 674 F. Supp. 2d 64 (D.D.C. 2009) ............................................ 43, 44

*Pantazes v. Jackson*, 366 F. Supp. 2d 57 (D.D.C. 2005) ............................................ 18

*Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60 (D.D.C. 2009) ............................................ 39, 42

*Porter v. Jackson*, 668 F. Supp. 2d 222 (D.D.C. 2009) ............................................ 42

*Ragsdale v. Holder*, 668 F. Supp. 2d 7 (D.D.C. 2009) ............................................ 42

*Ramsey v. Moniz*, --- F. Supp. 3d ---, 2014 WL 5778521 (D.D.C. Nov. 6, 2014) ........................ 41

*Saba v. U.S. Department of Agriculture*, 26 F. Supp. 3d 16 (D.D.C. 2014) ................................. 42

*Safari Club Int'l v. Jewell*, No. 14cv670, 2014 WL 7367007 (D.D.C. Dec. 26, 2014) ................. 6

*Scarborough v. Natsios*, 190 F. Supp. 2d 5 (D.D.C. 2002) ...................................................... 6

*Serio v. New Wisc. Servs.*, No. 04cv970, 2006 WL 2435077 (E.D. Wis. Aug. 22, 2006) ...................................................................................................................................... 22

*Spinelli v. Goss*, 446 F.3d 159 (D.C. Cir. 2006) .................................................................... 38

*Stewart v. St. Elizabeth's Hosp.*, 589 F.3d 1305 (D.C. Cir. 2010) .......................................... 7

*Suvada v. Gordon Flesch Co.*, No. 11cv7892, 2013 WL 5166213 (N.D. Ill. Sept. 13, 2013) ....................................................................................................................................... 5

*Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591 (4th Cir. 2012) ................................................... 44

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) .............................................. 17

*Taylor v. Rice*, 451 F.3d 898 (D.C. Cir. 2006) .................................................................... 34

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ............................................................. 35

*Vinewood Capital LLC v. Dar Al-Maal Al-Islami Trust*, 541 F. App'x 443 (5th Cir. 2013) ...................................................................................................................................... 34

*Wilson v. MVM, Inc.*, 475 F.3d 166 (3d Cir. 2007) ............................................................... 40

*Woodruff v. LaHood*, 777 F. Supp. 2d 33 (D.D.C. 2011) .............................................. 3, 4, 17

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007) ............................................................. 31

*Zeigler v. Potter*, 510 F. Supp. 2d 9 (D.D.C. 2007) .............................................................. 6

*Zeigler v. Potter*, 641 F. Supp. 2d 25 (D.D.C. 2009) ........................................................... 6

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982) ................................................. 40, 41

## STATUTES & REGULATIONS

29 C.F.R. § 1614.105(a) ...................................................................................................... 37, 39

29 C.F.R. § 1614.203(b) ............................................................................................................ 1

29 C.F.R. § 1614.604(c) ........................................................................................................... 37

29 C.F.R. § 1630.15 ........................................................................................ 30

29 C.F.R. § 1630.2 (h)(1) ........................................................................... 7, 8, 9

29 C.F.R. § 1630.9(a) ..................................................................................... 3

29 C.F.R. app. § 1630 .................................................................................... 17

29 U.S.C. § 791(f) ......................................................................................... 1

29 U.S.C. § 794a ........................................................................................... 39

29 U.S.C. § 794a(a)(1) ........................................................................ 36, 37, 42

42 U.S.C. § 12111(10)(A) ..................................................................... 34, 35

42 U.S.C. § 12112(b)(5)(A) ........................................................................... 3

42 U.S.C. § 2000e-5(d) .................................................................................. 39

## PRELIMINARY STATEMENT

In seeking summary judgment, the U.S. Department of Housing and Urban Development ("HUD" or the "agency") mimics the attitudes that drove its denial of every request for reasonable accommodation by Plaintiff Denise L. Lenkiewicz.  The agency disregards its own obligations under the Rehabilitation Act while demanding that others exceed the Act's requirements.  It withholds relevant information while maintaining that other evidence must be strictly construed.  And it refuses to accept responsibility for its own mistakes while blaming the victims of those mistakes.  Even if genuine fact issues preclude summary judgment in *Lenkiewicz's* favor, HUD's cross-motion must be denied.

## ARGUMENT

**I.    Lenkiewicz Is an "Individual with a Disability" Under the Rehabilitation Act.**

To sustain her Rehabilitation Act claim, Lenkiewicz must show that she is a "qualified individual with a disability."[1]  In support of her own motion for summary judgment, Lenkiewicz submitted (among other evidence) reports from two medical experts, who both concluded that Lenkiewicz did, in fact, suffer from physical impairments substantially limiting several life activities.  HUD nonetheless disputes that Lenkiewicz had a "disability" within the meaning of the Rehabilitation Act.  To be sure, HUD never argues that Lenkiewicz *lacked* a disability.  It does not address the substance of Lenkiewicz's expert reports or any other medical evidence, except the selective evidence considered by its own declared expert.  And it "does not dispute

---

[1] As this Court has noted, "[t]he regulatory provisions applicable to the Americans with Disabilities Act supply the standards used to determine whether a federal agency has violated section 501 of the Rehabilitation Act."  *Loya v. Sebelius*, 840 F. Supp. 2d 245, 258 n.13 (D.D.C. 2012).  *Accord* 29 U.S.C. § 791(f); 29 C.F.R. § 1614.203(b).

that Plaintiff had physical impairments." (Pl. Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.)[2] Instead, HUD argues that Lenkiewicz is not an "individual with a disability" because she supposedly "failed to **provide** any evidence showing she suffered an impairment that specifically limits one or more major life activit[ies]." (Def. Br. at 30 (emphasis added).)

One might ask: "provide" to whom? The answer becomes clear as HUD proceeds to argue that evidence of Lenkiewicz's actual disabilities is *inadmissible* unless it was *provided to the agency* in support of an accommodation request. In other words, HUD maintains that the determination of whether Lenkiewicz had a "disability" under the Rehabilitation Act is based *solely* on evidence submitted contemporaneously to HUD. (*See* Def. Br. at 30.)

HUD's position is plainly wrong. Worse, it is frivolous. There is no basis in law supporting HUD's notion that the "disability" element of a Rehabilitation Act claim may be shown only through evidence submitted to the employer. HUD attempts to invent an evidentiary restriction that is wholly absent from the statute, appears nowhere in the implementing regulations, and, to Plaintiff's knowledge, has never been recognized by any federal court. This baseless rule would be unavailing in any event, as the documentation Lenkiewicz submitted to the agency in support of her accommodation requests—by itself—raises a genuine issue of material fact as to whether Lenkiewicz had a "disability" within the meaning of the statute.

---

[2] "Def. Br." refers to Defendant's Memorandum in Support of its Motion for Summary Judgment dated March 6, 2015 (ECF No. 57). "Pl. Br." refers to Plaintiff's Memorandum of Law in Support of her Motion for Summary Judgment that Defendant Violated the Rehabilitation Act dated March 4, 2015 (ECF No. 56). "Pl. SoF" refers to Plaintiff's Statement of Undisputed Material Facts in Support of Her Motion for Summary Judgment dated March 4, 2015 (ECF No. 56). "Pl. Ex." refers to an exhibit to the Declaration of J. Wells Harrell in Support of Plaintiff's Motion for Summary Judgment dated March 4, 2015 (ECF No. 56). "Pl. Opp'n Ex." refers to an exhibit to the Declaration of J. Wells Harrell in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment dated March 27, 2015.

A. <u>HUD Proposes an Evidentiary Restriction That Is Contrary to Controlling
Authority and Unsupported by Any Authority.</u>

HUD's proposed evidentiary restriction is nowhere to be found in the text of the

Rehabilitation Act, ADA, or their implementing regulations.  In deciding whether a plaintiff is a

"qualified individual with a disability," the Supreme Court and the D.C. Circuit freely consider

evidence of disability without regard to whether that evidence was submitted to the employer.

*See, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 640–42 (1998) (citing empirical studies and

statistical evidence in support of its conclusion that the plaintiff's "HIV infection is a physical

impairment which substantially limits a major life activity, as the ADA defines it"); *Kapche v.

Holder*, 677 F.3d 454, 462–63 (D.C. Cir. 2012) (crediting trial testimony from employee and

expert as to the effect of the employee's diabetes on his everyday life, from which "a jury could

reasonably conclude that [his] diabetes and treatment regimen therefor 'substantially limit[]' his

major life activity of eating and that [he] is therefore disabled within the meaning of the act");

*Langdon v. Dep't of Health & Hum. Servs.*, 959 F.2d 1053, 1059 (D.C. Cir. 1992) (recognizing

that under the statute, regulations, and case law, "there was no absolute requirement that

employees provide 'medical evidence' with respect to an accommodation claim").[3]

It is true that an employer is required to accommodate "*known* physical or mental

limitations" of an "otherwise qualified … employee with a disability[.]"  29 C.F.R. § 1630.9(a)

(emphasis added); *see also* 42 U.S.C. § 12112(b)(5)(A).  Courts recognize, however, that the

inquiry into whether limitations were "known" is wholly separate from the inquiry into whether

---

[3] Other courts in this district follow suit.  *See Woodruff v. LaHood*, 777 F. Supp. 2d 33, 39–41 &
n.5 (D.D.C. 2011) (rejecting defendant's argument that it was not "aware of several of the
plaintiff's purported ailments"); *Green v. Am. Univ.*, 647 F. Supp. 2d 21, 28 (D.D.C. 2009) ("It is
the impairment itself, not the medical diagnosis of the condition, that determines whether a
particular ailment qualifies as an impairment under the Act.").

the employee has a "disability."  That is why a plaintiff must show "that the employer had notice of her disability" as an independent element of a Rehabilitation Act claim.  *Loya v. Sebelius*, 840 F. Supp. 2d 245, 258 (D.D.C. 2012) (Lamberth, C.J.) (citation and alteration omitted).  Indeed, this notice element would become wholly superfluous if, as HUD insists, the only admissible evidence of disability is evidence submitted to the employer; the disability element would swallow the notice element.

HUD's proposed evidentiary restriction cannot be squared with other aspects of the law governing failure-to-accommodate claims.[4]  For example, because notice "need not be precise," a Rehabilitation Act plaintiff can satisfy this element by showing that the employer was "sufficiently on notice of the existence and nature of the disability."  *Green v. Am. Univ.*, 647 F. Supp. 2d 21, 33 (D.D.C. 2009) (citation omitted).  To require submission of medical documentation *proving* a substantial impairment of a particular major life activity would be incongruous with the well-accepted principle in this circuit that "'no great refinement of the concept of notice is needed, beyond the bedrock requirement of an adequate, prior alert to the defendant of the plaintiff's disabled status[.]'"  *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 40 (D.D.C. 2011) (quoting *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 898 (D.C. Cir.

---

[4] Nor can HUD's proposed evidentiary restriction be squared with this Court's January 20 Memorandum Opinion and Order granting Lenkiewicz's motion *in limine* to preclude the agency's expert witness from testifying that there was "no medical justification for [Lenkiewicz's] request for accommodation[.]"  Jan. 20 Op. at 4 (quoting ECF No. 45-1 at 3).  HUD had argued that this opinion addressed what the agency called "the central issue before the Court," namely "did Plaintiff submit sufficient evidence of a disability resulting in a substantial limitation of a major life activity."  (ECF No. 45 at 1.)  In response, Lenkiewicz argued—and this Court agreed—that "'medical justification' is not an element of a Rehabilitation Act claim."  Jan. 20 Op. at 4 (citing Pl.'s Reply Br., ECF No. 46 at 10–13).

1998)).[5]  Moreover, HUD's proposed evidentiary restriction would give employers perverse incentives to ignore reasonable accommodation requests altogether, contravening settled law that employers "cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005).

　　*Lee v. District of Columbia* illustrates how the disability and notice elements can be satisfied where the employee has not submitted *any* medical documentation to the employer.  In *Lee*, the employer argued that notice was lacking because the employee "did not provide any written documentation of his disease[.]"  920 F. Supp. 2d 126, 127 (D.D.C. 2013).  The employee had done little more than "[tell] his coworkers about his diabetes informally[.]"  *Id.* Accepting that this was sufficient notice, the court reasoned that "no formal or written documentation is required" to satisfy the notice element.  *Id.*  The court quoted from *Loya*: "the employee's request for a reasonable accommodation 'does not have to be in writing … or formally invoke the magic words "reasonable accommodation" as long as it makes clear that the employee wants assistance for his or her disability.'"  *Id.* (quoting *Loya*, 840 F. Supp. 2d at 259 n.14) (citation and punctuation marks omitted).  The lack of medical documentation submitted to the employer did not stop the court from concluding that "[a] reasonable jury could [] find that Mr. Lee was disabled within the meaning of the Americans with Disabilities Act."  *Lee*, 920 F. Supp. 2d at 135 (denying summary judgment for employer).

---

[5] "[T]he law requires very little of the employee to trigger the employer's duty to engage in the interactive process; all that is required is that the employee notify the employer of her disability." *Suvada v. Gordon Flesch Co.*, No. 11cv7892, 2013 WL 5166213, at *6 (N.D. Ill. Sept. 13, 2013).  *See also Sears*, 417 F.3d at 803 ("The ADA imposes on an employee the 'initial duty to inform the employer of a disability.'  This initial duty, however, requires at most that the employee indicate to the employer that she has a disability and desires an accommodation." (internal citation omitted)).

*None* of the cases HUD cites makes any distinction between evidence submitted to the employer and other evidence of disability.  (*See* Def. Br. at 31–32.)  In most of those cases, summary judgment was granted for the employer because the employee did not adduce sufficient evidence of disability, regardless which evidence was submitted to the employer and which was not.  *See Marshall v. Potter*, 634 F. Supp. 2d 66, 71–72 & n.5 (D.D.C. 2009) ("[T]here is *no* evidence to indicate that her knee injury was anything more than a temporary condition[.]"); *Zeigler v. Potter*, 641 F. Supp. 2d 25, 29 (D.D.C. 2009) (citing *Zeigler v. Potter*, 510 F. Supp. 2d 9, 17 (D.D.C. 2007) (finding of disability foreclosed by admission from plaintiff's physician that plaintiff's impairment had "no significant impact on his major life activities")); *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 21–23 (D.D.C. 2002) (concluding, without mentioning which evidence was submitted to the employer, that a reasonable jury could not find a substantial limitation of walking or working based on evidence that was "vague" or not in the record).  Some cases were cited in error.[6]  And in one case, contrary to HUD's parenthetical summary, the court **rejected** the employer's argument that the employee "lacked a 'disability' as a matter of law."  *Martin v. District of Columbia*, --- F. Supp. 3d ---, 2015 WL 294723, at *12 (D.D.C. 2015) (concluding based on doctor's recommendations to limit certain activity that "there remains a dispute of material fact as to whether carpal tunnel syndrome is a 'disability'").

HUD has cited no case—and Lenkiewicz has found none—that so much as suggests that evidence not submitted to the employer can or should be disregarded when analyzing the disability element of a Rehabilitation Act claim.  It is simply immaterial whether the

---

[6] There was no mention of a Rehabilitation Act, ADA, or similar disability-related claim in either *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002), or *Safari Club Int'l v. Jewell*, No. 14cv670, 2014 WL 7367007 (D.D.C. Dec. 26, 2014).

documentation Lenkiewicz submitted to the agency conclusively proved that she was disabled.[7]

HUD's baseless evidentiary restriction should be rejected.

   B.  <u>Lenkiewicz Clearly Had a "Disability" Under the Proper Definition.</u>

      In her own motion for summary judgment, Lenkiewicz submitted overwhelming

evidence that she suffered from several physical impairments that substantially limited many

major life activities.  Indeed, HUD "does not dispute that Plaintiff had physical impairments."

(Pl. Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.)  HUD even acknowledges that under the

ADA Amendments Act of 2009 (the "ADAAA"),[8] "'substantially limits' is 'not meant to be a

demanding standard,' 29 C.F.R. § 1630.2(j)(1)(i), and shall be construed 'to require a degree of

functional limitation that is lower than the standard' that predated the ADAAA, *id.* §

1630.2(j)(1)(iv)."  (Def. Br. at 23.)   The record so clearly establishes that Lenkiewicz was an

"individual with a disability" that she is entitled to summary judgment in *her* favor on the

disability element of her claim.  (*See* Pl. Br. at 28–30.)

      The analysis of Lenkiewicz's disabilities properly begins with the well-supported and

uncontroverted opinions of two medical experts: pulmonary specialist Alan Schwartz, M.D., and

---

[7] This is not a case where there is any dispute that "the plaintiff-employee has requested an accommodation which the defendant-employer has denied."  *Compare Flemmings v. Howard Univ.*, 198 F.3d 857, 861–62 (D.C. Cir. 1999) (no denial where the only accommodation request was "a medical leave of absence, which accommodation Howard readily granted").  Nor is this a case where the employer had not been notified of the employee's disability.  *Compare Stewart v. St. Elizabeth's Hosp.*, 589 F.3d 1305, 1308 (D.C. Cir. 2010) (the employee "acknowledge[d] that she did not inform any of her supervisors of her disability before" quitting and otherwise appeared not to be disabled).

[8] Elsewhere in its brief, HUD argues whether Lenkiewicz was "substantially limited" (*see* Def. Br. at 28–29) based on interpretations of that term that Congress expressly rejected by enacting the ADAAA.  Because Lenkiewicz's accommodation requests occurred well after the ADAAA's effective date of January 1, 2009, the disability element of Lenkiewicz's claim must be analyzed under the ADAAA and cases applying that statute's definition of "disability."  *See Hodges v. Dist. of Colum.*, 959 F. Supp. 2d 148, 154 (D.D.C. 2013).

orthopedic specialist Eric Dawson, M.D.  These experts considered a wide range of evidence, including scores of treatment notes and the results of testing of Lenkiewicz's functional capabilities, such as lung function.  Each expert personally examined Lenkiewicz.  Both concluded that Lenkiewicz had impairments substantially limiting several major life activities.

Dr. Schwartz focused on Lenkiewicz's respiratory impairments.  He confirmed that Lenkiewicz has COPD, which "is a respiratory disease that makes breathing difficult" by causing "limited" airflow.  (Pl. Ex. 11, Schwartz Rep. ¶ 19.)  He explained that "COPD can cause not only physical symptoms such as coughing, wheezing, shortness of breath, and chest tightness, but also mental symptoms such as fatigue that result from reduced oxygenation of the brain and increased concentration of carbon dioxide in the bloodstream."  (*Id.*)  Dr. Schwartz further explained that shortness of breath and fatigue "can be particularly severe in overweight individuals" like Lenkiewicz, who "cannot breathe enough given their weight, severely limiting the level of physical activities their bodies can handle[.]"  (*Id.* ¶ 20.)  As a result, "physical exertion that would be considered light to moderate for healthy adults nonetheless strained Ms. Lenkiewicz's respiratory system" such that her respiratory impairments "would increase in severity after even short periods of physical exertion[.]"  (*Id.* ¶ 23.)  A pulse-oximetry test performed by Dr. Schwartz on Lenkiewicz confirmed that even short periods of walking can cause "a precipitous drop in oxygen level[.]"  (*Id.* ¶ 21.)  Dr. Schwartz also opined that "airborne irritants such as mold can worsen symptoms of COPD."  (*Id.* ¶ 19.)

Based on this information, Dr. Schwartz concluded that Lenkiewicz's pulmonary impairments (including COPD) "substantially limited her ability to breathe."  (Pl. Ex. 11, Schwartz Rep. ¶ 9; *see also id.* ¶ 23.)  Dr. Schwartz's opinions establish that Lenkiewicz's COPD is a "physiological disorder or condition … affecting" her "respiratory" system (*see* 29

C.F.R. § 1630.2 (h)(1)) and substantially limiting the major life activity of "breathing" and the "operation" of her "respiratory" functions (*see* 29 C.F.R. § 1630.2 (i)(ii)).  Lenkiewicz's respiratory impairments therefore were a "disability" under the Rehabilitation Act.

Dr. Dawson focused on Lenkiewicz's orthopedic impairments.  Having treated Lenkiewicz for years and reviewed other medical records, Dr. Dawson diagnosed Lenkiewicz with a host of orthopedic conditions, including "bilateral tricompartmental osteoarthritis in both knees, degenerative spinal discopathy at multiple levels (including cervical and lumbar), planar fasciitis, and polyarthralgia in multiple joints."  (Pl. Ex. 10, Dawson Rep. ¶ 16.)  In other words, Dr. Dawson explained, "the tissues in Ms. Lenkiewicz's knee joints, around the heel of her foot, and along her spine have a tendency to become inflamed and thereby cause her numbness, spasms, and pain."  (*Id.*)  Moreover, "[d]egeneration of several ligaments in Ms. Lenkiewicz's knees [] also introduced instability into the joint, making walking difficult."  (*Id.*)  As a result, "[a]ny physical activity beyond short intervals of walking (less than 100 feet) and light lifting from the waist up of less than 10 pounds would be difficult for Ms. Lenkiewicz given her musculoskeletal impairments."  (*Id.* ¶ 18.)

In Dr. Dawson's opinion, Lenkiewicz's orthopedic impairments (including degenerative joint disease) "substantially limited her ability to perform manual tasks, walk, stand, lift, bend, and engage in other physical activity."  (Pl. Ex. 10, Dawson Rep. ¶ 8; Pl.  SoF ¶ 9.) Lenkiewicz's degenerative joint disease was therefore a "physiological disorder or condition … affecting" her "musculoskeletal" system (*see* 29 C.F.R. § 1630.2 (h)(1)) and substantially limiting the major life activities of "performing manual tasks," "walking," "lifting," and "bending," as well as the "operation" of her "musculoskeletal" functions (*see* 29 C.F.R. § 1630.2

(*i*)(ii).  In addition to the disability based on respiratory impairments, Lenkiewicz's orthopedic impairments therefore were another "disability" under the Rehabilitation Act.

Dr. Schwartz and Dr. Dawson also opined that the symptoms caused by Lenkiewicz's pulmonary and orthopedic impairments (including pain, fatigue, and shortness of breath) "limited her ability to concentrate and think."  (Pl. Ex. 10, Dawson Rep. ¶ 8; Pl. Ex. 11, Schwartz Rep. ¶ 9; *see also* Pl. SoF ¶ 15.)  Dr. Dawson explained that "whenever she exerted herself physically beyond a certain threshold, Ms. Lenkiewicz would frequently experience pain, swelling, and spasms in her joints, which in turn limited her ability to concentrate and think."  (Pl. Ex. 10, Dawson Rep. ¶ 18.)  Thus, Lenkiewicz's respiratory and orthopedic impairments also substantially limited the major life activities of "concentrating" and "thinking."

C.  The Opinions of Dr. James Allen, an FOH Consultant, Are Inadmissible, Unreliable, and Irrelevant.

Rather than engage the opinions of Lenkiewicz's medical experts, HUD relies on the opinions of Dr. James Allen, the FOH consultant whose opinions prompted HUD to deny Lenkiewicz's December 2010 request.  Dr. Allen's opinions are unavailing for several reasons.

*First*, HUD failed to follow the procedural steps necessary for Dr. Allen to offer expert testimony.  Dr. Allen did not provide an expert report, contrary to Fed. R. Civ. P. 26(a)(2)(B).  Further, he was disclosed only as a *rebuttal* witness.  Yet Dr. Allen never even read the expert reports of Dr. Schwartz or Dr. Dawson, much less attempt to rebut their opinions.  Additionally, HUD never disclosed that Dr. Allen would opine whether Lenkiewicz's physical impairments substantially limited a major life activity.  HUD's Rule 26 expert disclosure stated that Dr. Allen "will testify regarding the information provided in support of Plaintiff's reasonable accommodation request and whether it was *sufficient to act upon the request*."  (ECF No. 38-2.)

Even if Dr. Allen were qualified to offer this opinion, the *medical* opinions on which HUD relies fall well outside the scope of HUD's expert disclosure.

*Second*, Dr. Allen's opinions are based on insufficient information to be reliable.  By his admission, Dr. Allen based his opinions solely on (i) the documentation HUD provided and (ii) his conversations with two of Lenkiewicz's physicians, Dr. Sameer Shammas and Dr. Michael Williams.  Dr. Allen did not consider any records from Lenkiewicz's treating pulmonary specialists (Dr. Moti Koul and Dr. Abbas Omais), any records from Dr. Dawson, any treatment notes from Dr. Shammas, or FOH's own records—all of which were considered by Lenkiewicz's medical experts.  Dr. Allen never conducted an in-person examination of Lenkiewicz; Dr. Schwartz and Dr. Dawson both did (the latter having also treated Lenkiewicz for years).  Dr. Allen also dismissed certain evidence of Lenkiewicz's disabilities, such as her pain and fatigue, simply because that evidence was not "objective[.]"  (*See* Pl. Ex. 15, Allen Dep. 123:9–124:8.) Dr. Allen even dismissed Dr. Shammas' recommendation that Lenkiewicz be permitted to work from home based on Dr. Allen's unsupported speculation that "Lenkiewicz asked the doctor [Dr. Shammas] to say, please write something that tells them I have a severe multijoint condition." (Pl. Ex. 15, Allen Dep. 153:14–154:8.)  Dr. Allen's opinions therefore are too unreliable to help the factfinder or this Court decide what facts and inferences are supported by the full record.

*Third*, Dr. Allen's opinion on the sufficiency of the documentation submitted is irrelevant.  Dr. Allen never opined that Lenkiewicz was *not* disabled.  He merely concluded that any disability Lenkiewicz may have had was not evident to him based on the narrow universe of information he considered.  (*See* Def. Br. at 16 (characterizing Dr. Allen's opinion as: "he did not have sufficient medical documentation to determine Plaintiff's functional limitations and

whether they limited a major life activity").)  Dr. Allen's opinions therefore do not contradict or even cast doubt on the fact that Lenkiewicz actually was disabled.

> D.  <u>HUD Distorts Other Record Evidence of Lenkiewicz's Disabilities.</u>

Contrary to HUD's suggestion, neither Dr. Shammas nor Dr. Williams gave Lenkiewicz a clean bill of health.  Dr. Shammas never changed his diagnosis of degenerative joint disease or his recommendation that Lenkiewicz should be allowed to telework.  As for Dr. Williams, his statements to Dr. Allen—even if they were not inadmissible hearsay—merely indicated that any diagnostic tests on Lenkiewicz's thyroid could be performed "on an outpatient basis" and thus did not require inpatient treatment.  (*See* Pl. Ex. 15, Allen Dep. 168:21–170:7.)  Dr. Williams knew hardly anything about Lenkiewicz's medical conditions anyway.  He saw Lenkiewicz for the first time *after* she had submitted her December 2010 request.  He was narrowly focused on a possible endocrine issue, which, unlike COPD and joint disease, was not cited as a basis for any accommodation requests.  (*See* Pl. Ex. 20, Def.00276 – Def.00279.)  There is no evidence Dr. Williams was even aware of Lenkiewicz's COPD and joint disease.

HUD tries to extract irrelevant and misleading inferences from a December 30, 2010 rheumatology evaluation by Dr. Imelda Cabalar.  HUD calls this report "the objective medical evaluation" (Def. Br. at 13) even though Dr. Cabalar never purported to evaluate whether Lenkiewicz was functionally limited in any way.  Dr. Cabalar's observations about Lenkiewicz's joints focused on "range of motion," "effusion," and "tenderness," not functionality.  (Pl. Ex. 28, SHA_0079 – SHA_0080.)  There is no indication that Dr. Cabalar tested Lenkiewicz's ability to lift or walk; Dr. Cabalar simply did not evaluate how Lenkiewicz's joint disease functionally limited her.  HUD's characterization of Dr. Cabalar's report as a "full medical report" (Def. Br.

at 30) is therefore inaccurate.[9]  Regardless, Dr. Cabalar's report confirmed Lenkiewicz's

diagnoses of "COPD," "chronic bronchitis," and "degenerative joint disease[.]"  (*See* Pl. Ex. 28,

SHA_0079 – SHA_0080.)  It is ultimately immaterial whether Dr. Cabalar's report—in isolation

and without regard to other evidence—is conclusive proof of an orthopedic disability.  Other

evidence is appropriately considered in determining that Lenkiewicz was disabled.

Moreover, Dr. Cabalar had prepared another report ten days prior, on December 20,

2010, that puts her December 30 report in context and supplies further evidence of Lenkiewicz's

disabilities.  (*See* Pl. Ex. 28, SHA_0075 – SHA_0076.)  According to the December 20 report,

Lenkiewicz "complain[ed] of pain on her hands, knees and back."  (*Id.* SHA_0075.)  Unlike the

December 30 report, the physical examination documented in the December 20 report found

"tenderness" in various joints, including "shoulders," "elbows," "hips," "the left knee," "cervical

spine," and "the lumbosacral area[.]"  (*Id.* SHA_0076)  Critically, Dr. Cabalar in her December

20 report notes that "[j]oint pains are apparently worse with activity."  (*Id.* SHA_0075.)

Lenkiewicz's joints were less tender during the subsequent December 30 examination because

Lenkiewicz had taken off work almost every day between the December 20 examination and the

December 30 examination.  (*See* Pl. Opp'n Ex. 2, Def.00517 (showing full-day leave taken every

workday between December 20 and December 30).)

E.   The Information in HUD's Possession Substantiates that Lenkiewicz Was
     Disabled.

Even if HUD were correct that the only admissible evidence of disability is evidence

submitted to the employer—and it is not—HUD does not dispute that Lenkiewicz's temporary

---

[9] HUD also fails to mention that, according to one of its own employees, Dr. Cabalar's report
identified at least two functional limitations, namely that Lenkiewicz "feel[s] tired" and "has no
strength."  (Pl. Ex. 13, Patterson Dep. 88:5–90:14.)

orthopedic impairments of a broken foot and torn meniscus were disabilities within the meaning of the Rehabilitation Act.[10]  Nor does HUD "dispute that Plaintiff had physical impairments[.]" (Pl. Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.)  As to Lenkiewicz's chronic respiratory and orthopedic impairments, there is, at a minimum, a genuine fact issue whether the documentation Lenkiewicz submitted showed a substantial limitation of a major life activity. *See Desmond v. Mukasey*, 530 F.3d 944, 956–57 (D.C. Cir. 2008) ("[W]hether Desmond's sleeplessness 'necessarily qualif[ies]' as a substantial limitation is beside the point on summary judgment.  At this stage, the only question is what a reasonable jury could conclude.") (internal citation omitted, alteration in original).

*First*, Lenkiewicz's December 2010 request cited "debilitating arthritis" as one of two "hindering disabilities."  (Pl. Ex. 22, LENK_0055.)  The medical documentation received by HUD in support of that request included a note diagnosing Lenkiewicz with "a severe multi joint condition[.]"  (Pl. Ex. 20, Def.00197.)  Dr. Shammas told Dr. Allen that "[t]ravel is difficult" for Lenkiewicz and that he "has seen [Lenkiewicz] for many years all related to complains of her joint [*sic*] including elbow, knee, neck & low back."  (*Id.* Def.00180.)  Dr. Cabalar's report diagnosed Lenkiewicz with "degenerative joint disease of the lumbar spine and the right knee[.]" (*See* Pl. Ex. 28, SHA_0080.)  One can reasonably infer from this information alone that Lenkiewicz's "severe multi joint condition," which resulted in pain, swelling, and difficulty traveling, substantially limited the major life activities of walking and performing manual tasks.

---

[10] Lenkiewicz's disabilities based on these injuries were obvious to others, including her supervisors.  Lewis testified that Lenkiewicz "was using a scooter, so I believe that was during the time she had a knee injury."  (Pl. Ex. 16, Lewis Dep. 58:19–59:4; *see also id.* 68:19–69:6.) Lewis acknowledged receiving FMLA request forms related to these disabilities; Lenkiewicz submitted no fewer than *six* of these forms requesting FMLA leave.  (*See id*. 91:18–108:13.)

(*See* Pl. Ex. 19, Shammas Dep. 17:25–18:8 (testifying that the condition is associated with "a high possibility of having problem[s] with [] mobility").)

*Second*, Lenkiewicz's December 2010 request cited "COPD" as the other of two "hindering disabilities." (Pl. Ex. 22, LENK_0055.)  Dr. Cabalar's December 30 report confirmed the diagnosis of "COPD" with "chronic bronchitis." (Pl. Ex. 28, SHA_0080.)  FOH's records included a note from Dr. Koul diagnosing her with bronchitis and COPD. (*See* Pl. Ex. 25, FOH_0005.)  During a visit to FOH in August 2010, Lenkiewicz's respiratory distress was so severe that, at FOH's urging, Lenkiewicz was hospitalized. (*See* Pl. Ex. 25, FOH_0003 – FOH_0004, FOH_0006.)  Even Dr. Allen agrees that COPD is a "serious" and even "life-threatening condition." (Pl. Ex. 15, Allen Dep. 157:22–158:11.)  He also testified that individuals with "very severe" cases of COPD will experience "shortness of breath" and "limitations with walking"—which Lenkiewicz experienced. (*Id.* 139:15–140:3.)  Dr. Allen even testified that the "shortness of breath and a productive cough" noted in Dr. Cabalar's December 30 report "[c]learly … could be due to early COPD." (*Id.* 159:2–5.)  Thus, from just this information alone, it is reasonable to infer that Lenkiewicz's respiratory impairments substantially limited her ability to breathe.

The firsthand knowledge of Lenkiewicz's supervisors corroborates that Lenkiewicz's breathing was substantially limited. (*See* Pl. SoF ¶¶ 44, 66, 74, 79, 87.)  Lenkiewicz told Lewis that she was concerned about toxic mold in HUD headquarters and was having breathing problems. (Pl. Ex. 18, Lenkiewicz Dep. 131:1–10.)  Lenkiewicz had been hospitalized for breathing distress in early 2009, and she informed HUD of her hospitalization. (*Id.* 69:7–24, 120:4–8, 126:18–127:13.)  Lewis received telephone messages and notes documenting Lenkiewicz's absences due to breathing problems. (*See* Pl. Ex. 22, LENK_0347 – LENK_0350;

15

Pl. Opp'n Ex. 4, DEF.EMAIL.0222; Pl. Opp'n Ex. 5, LENK_0591.)  Lenkiewicz sent Lewis a

worker's compensation application where Lenkiewicz complained that "when returning to work

I suffer from chronic bronchitis, respiratory infections, and the inability to breathe[.]"  (Pl. Ex.

22, LENK_0049, LENK_0051.)  Lewis even saw Lenkiewicz gasping for air and clutching her

chest during a meeting where Lenkiewicz begged Lewis for an accommodation.  (Pl. Ex. 9, Pl.'s

Supp. Resp. to Def.'s Interrogatory No. 6.)  In May 2011, Lenkiewicz told Lewis that she would

not return to the office until HUD did something to address her breathing problems.  (*See* Pl. Ex.

18, Lenkiewicz Dep. 165:9–167:6.)  HUD offers no reason why Lenkiewicz should have

"requested" (Def. Br. at 34) that HUD consider information already in its possession.

    If nothing else, it is fatal to HUD's position that several agency employees ***believed that

Lenkiewicz was disabled*** based on the information available to them.  Patterson wrote in a June

22, 2011 note to herself: "***Based on medical documentation, employee does have a disability***[.]"

(Pl. Ex. 20, Def.00288 (emphasis added).)  Patterson believed that Lenkiewicz's "degenerative

joint disease" and "multijoint condition" constituted a disability.  (*See* Pl. Ex. 20, Def.00288; Pl.

Ex. 13, Patterson Dep. 180:18–181:9.)  Lewis suggested to Lenkiewicz that she could "retire

under disability[.]"  (Pl. Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; *see also* Pl. Ex.

22, LENK_0630; Pl. Ex. 16, Lewis Dep. 153:4–154:1.)  Cole acknowledged that Lenkiewicz

"raised medical reasons that impact [her] ability to report and/or perform work" and suggested

"disability retirement" in lieu of an accommodation.  (Pl. Ex. 23, LENK_0922.)  HUD's

acknowledgement that Lenkiewicz was disabled is evidence enough that she, in fact, was.

## II.    It Was HUD, Not Lenkiewicz, That Failed to Engage in the Interactive Process in Good Faith.

    HUD's failure to engage in the interactive process in good faith with Lenkiewicz

precludes summary judgment in its favor.  As further explained in Lenkiewicz's motion, an

employer is liable for failure to accommodate when it does not take basic steps to "explore what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 169 (E.D.N.Y. 2002) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999) (en banc)).  An employer should adopt a "problem solving approach[.]"  29 C.F.R. app. § 1630.  In other words, the employer must *seek to understand* the employee's request and the reasons why employee seeks accommodation.  That is the essence of the interactive process, and "[e]mployers who reject this core process must face liability when a reasonable accommodation would have been possible."  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000), *judgment vacated on other grounds*, 535 U.S. 391 (2002).  *See Woodruff*, 777 F. Supp. 2d at 41 ("Once the employer knows of the disability and the employee's desire for accommodations, 'it makes sense to place the burden on the employer to request additional information that the employer believes it needs.'") (quoting *Taylor*, 184 F.3d at 315).

Rather than take a problem-solving approach or engage with Lenkiewicz in good faith, HUD was interested only in checking boxes one at a time, as the evidence shows.  For most of Lenkiewicz's employment at HUD, the agency repeatedly stymied her attempts to secure an accommodation.  Despite multiple requests over several years, HUD never reasonably accommodated her.  There was nothing "minor" about the "issues with the process[.]" (Def. Br. at 41.)  Lenkiewicz in her own motion discussed "at least nine different respects" in which "HUD hindered the interactive process," which included violating scores of its own procedures, strictly construing Lenkiewicz's medical documentation, and failing to grant or even consider a temporary accommodation.  (*See* Pl. Br. at 38–44.)  From this evidence alone, a reasonable jury

17

could—and as Lenkiewicz argues in her motion, must—conclude that (i) HUD "was responsible for the breakdown in communication" by not engaging in good faith, and (ii) HUD thereby "prevented … affording reasonable accommodations to Plaintiff in a timely manner." *McNair v. Dist. of Colum.*, 11 F. Supp. 3d 10, 16 (D.D.C. 2014) (denying employer's motion).

HUD's defense of its conduct in the interactive process reduces to two arguments.  First, HUD maintains that the many months of back-and-forth between the parties regarding Lenkiewicz's December 2010 telework request somehow show its good faith and her lack thereof.  Second, HUD asserts that it proposed an alternative on one occasion months after Lenkiewicz's first request for accommodations.  A close examination of the full record shows that neither argument has any merit.

A. <u>The Parties' Communications (and HUD's Lapses Therein) Demonstrate Lenkiewicz's Good Faith as Much as HUD's Bad Faith.</u>

HUD's failures to communicate with Lenkiewicz about reasonable accommodation are so numerous that HUD does not come close to addressing all of them.  It is well established that "the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of a[] violation." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (denying summary judgment for HUD where "a jury could view HUD as the party responsible for the nine-month delay in communicating to plaintiff about the need for paperwork").  For example, HUD makes no attempt to excuse the fact that it ignored Lenkiewicz's 2009 requests for relocation away from HUD headquarters (*see* Pl. SoF ¶¶ 43–53) and telework (*see* Pl. SoF ¶¶ 54–55).  HUD even admits that Lenkiewicz's supervisors failed to provide HUD's Reasonable Accommodations ("RA") Branch with Lenkiewicz's position description, a necessary step in medical review.  (Def. Br. at 41.)  These reasons alone foreclose summary judgment for HUD.

Lenkiewicz's early attempts to communicate with HUD about reasonable

accommodation show her frustration in the face of HUD's obstinacy.  One of the earliest

attempts came on September 11, 2009, when Lenkiewicz wrote to Deborah Rizzo, who was then

the head of the RA Branch.  After mentioning her failed attempt to obtain an unused printer for

her desk as a temporary accommodation for her broken foot, Lenkiewicz asked:

> ***How does one go about getting any accommodations when they're trying
> to come to work, without having to go through a long drawn out process
> which in the end makes the issue null and void?***  This is the first place in
> 20 years that while having an injury nobody has stepped forward to ask if I
> need anything and/or offered anything to make life easier.

(Pl. Ex. 21, DEF.EMAIL.0073.)  Rizzo did not respond.  Lenkiewicz emailed Rizzo eleven days

later, once again pleading for help:

> I'm still in need of guidance as to reasonable accommodation options, and
> how to go about it.  ***I figure by getting a printer to help with the problems
> of having to jump up and down on this broken foot would be a start.***
> Normally by Wednesday it's all that I can bear as far as pain, in fact by
> Friday of last week it affected the syatic [*sic*] nerve on my left leg, and
> therefore I stayed home. ***The Wednesday before that I stopped to talk to
> Cynthia O'Conner with tears rolling down my face from pain.***

(*Id.* (emphasis added).)  Again, Rizzo did not respond.  These emails and HUD's lack of

responses to them were harbingers of the problems that would plague Lenkiewicz's December

2010 telework request.

A careful review of the record demonstrates that HUD failed to engage with Lenkiewicz

in good faith following the December 2010 request, despite her repeated, often exasperated

overtures.  In particular, tracing the parties' communications from beginning to end paints a

vivid picture of an employee becoming increasingly sick, desperate, and frustrated by her

employer's steadfast refusal to grant her an accommodation or tell her what she needs to do to

get one, and of an employer that misunderstood what it was legally required to do.  *Rowe v. City

& Cnty. of San Francisco*, 186 F. Supp. 2d 1047, 1053 (N.D. Cal. 2002) (employer's summary-

judgment motion denied where "a reasonable jury could conclude that plaintiff was not responsible for the breakdown in the interactive process and that defendant should have more effectively communicated with plaintiff and [her doctor]").

Lenkiewicz's final request for accommodation came on December 22, 2010, when she submitted a "HUD 1000 form and medical doc[ument]s" during a meeting with RA Branch employee Yolanda Patterson.  (Pl. Ex. 20, Def.00261; *see also id.* Def.00263; Pl. Ex. 22, LENK_0055.)  HUD asked for more documentation, and on January 5, 2011, Lenkiewicz emailed RA Branch employee Patriece Paige, "authoriz[ing] Mr. William Maurer, HUD Ombudsman/ADR Representative, to convey, share, release information on [her] behalf concerning [her] medical condition, and work status as he knows."  (Pl. Ex. 21, DEF.EMAIL.0081.)  That same day, Lenkiewicz submitted a note from Dr. Williams recommending that she "start working from home immediately" and a release authorizing the agency to speak with Dr. Williams.  (*See* Pl. Ex. 20, Def.00200, Def.00202, Def.00261.)  After Dr. Cabalar completed her December 30, 2010 rheumatology evaluation of Lenkiewicz, she prepared a report that Dr. Shammas sent on January 10, 2011.  (*See* Pl. Ex. 20, Def.00265.)

As of January 5, 2011, the agency knew that, according to Lenkiewicz, her "hindering disabilities" were making it difficult, if not impossible, for her "to keep up with work in [her] current situation."  (Pl. Ex. 22, LENK_0055.)  The agency knew that Lenkiewicz wanted accommodations for her disabilities.  And the agency knew that Lenkiewicz wanted her accommodation request "expedite[d]."  (*Id.*)  Yet, the agency did not grant Lenkiewicz's request. It did not even *consider*, much less provide, a temporary accommodation.  What ensued was not a genuine effort by the agency to "identify which accommodation might be best."  (Pl. Ex. 14, Cumber Dep. 22:18–23:7.)   Instead, the agency made Lenkiewicz's request for accommodation

contingent on a medical review process that was not required of the *vast majority* of employees whose requests for telework were granted.  (*See* Pl. SoF ¶ 60.)

Worse still, after Dr. Allen sent a letter on January 10, 2011, stating that he "can give no medical basis for this employee's need for telework" (Pl. Ex. 20, Def.00266), the agency began *withholding* information about the medical review process, even as Lenkiewicz sought status updates and offered to provide additional information.  On January 11, 2011, Lenkiewicz emailed Paige, telling her that, apart from the "information … provided by the two treating physicians, Dr. Shammas, and Dr. Williams," Lenkiewicz was "not sure what else [she] can get that will facilitate [her] case[.]"  (Pl. Ex. 21, DEF.EMAIL.0083.)  Paige responded, asking Lenkiewicz to "allow us at least 30 days" for her "request to be processed[.]"  (Pl. Ex. 21, DEF.EMAIL.0082.)  Paige did not mention Dr. Allen's January 10 letter or any of the opinions in it.  Lenkiewicz replied on January 14, 2011, referring to her first request for telework that Rizzo had helped her submit but ultimately ignored: "The reason I'm keeping vigilance and making sure it's nothing on my end that I'm not getting done, is ***I'm still awaiting a response on my Reasonable Accommodation request from December 2009***."  (*Id.* (emphasis added).)

The agency continued withholding Dr. Allen's letter and opinions from Lenkiewicz as days turned into weeks.  On January 21, 2011, Lenkiewicz, using her personal email address, told Paige: "I need to know if I need to revisit the doctor for any additional paperwork before the end of the month[.] … ***Let me know if I need to get anything else from the doctor as I will***."  (Pl. Ex. 21, DEF.EMAIL.0085 (emphasis added).)  Weeks later, on February 14, 2011, Lenkiewicz again used her personal email account to send this email to Paige:

> I sent Mr. Maurer an email this morning as to the status of the accommodation request.  I understand he is out today and ***I'm in a bind as I need to find out when I will have an income of some sort. It's been***

> **over a month since submitting my request, and haven't heard**
> **anything**[.]

(Pl. Ex. 21, DEF.EMAIL.0088 (emphasis added).)  Paige responded the next day that Cumber "is

currently reviewing Ms. Lenkiewicz's case," but once again, she did not mention Dr. Allen's

January 10 letter or his opinions.  Lenkiewicz replied within minutes: "Thank you so much, **let**

**me know if anything else is needed**."  (*Id.*, DEF.EMAIL.0087 (emphasis added).)

    The agency eventually allowed information about Dr. Allen's opinions to trickle out, but

they kept Lenkiewicz in the dark about what *specifically* was missing.[11]  When Paige emailed

Lenkiewicz on February 16, 2011, she told Lenkiewicz that FOH was "unable to obtain all of the

information they needed" and "is going to reassess and provide us with a complete report once

you have been evaluated by Dr. Williams."  (Pl. Ex. 21, DEF.EMAIL.0092.)  Paige's email did

not mention what "information" was "needed" by FOH.  (*Id.*)  Paige did not ask Lenkiewicz to

submit additional information; she asked no questions at all.  Within hours, Lenkiewicz

responded, understandably frustrated by the lack of progress on her request:

> I just came from Dr. Williams['] office, and he spoke to FOH, in fact the
> last time I was in there (1/19) he told me they called him, he mentioned it
> again today, so **not sure what the problem** may **be**? In fact I came from 2
> appointments today, I wanted to update Dr. Williams on another doctor
> that I am seeing, and treatment (**have additional paperwork, but no one
> has responded to the first papers filed**). …
>
> I'm not sure what it is, but **there is something flawed in the
> system, when someone is able to work from home, and then are
> unable to because of bureaucratic paper work, which I've asked
> over and over "what do I need to do?" or lack of knowledge of
> the system that allows them to keep functioning.**

---

[11] *See Serio v. New Wisc. Servs.*, No. 04cv970, 2006 WL 2435077, at *8 (E.D. Wis. Aug. 22,
2006) ("Where notice is ambiguous as to the precise nature of the disability or desired
accommodation, but it is sufficient to notify the employer that the employee may have a
disability that requires accommodation, the employer must ask for clarification.") (citing
*Bultemeyer v. Ft. Wayne Comm'ty Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

(Pl. Ex. 21, DEF.EMAIL.0099 (emphasis added).)  Paige did not respond.

On February 18, 2011, Dr. Allen sent Cumber a letter "recommend[ing that the] agency decline the employee's request for telework." (Pl. Ex. 20, Def.00264.)  According to Patterson, this letter from Dr. Allen "mean[t] that [Lenkiewicz's] request has been denied" and therefore "required [HUD] to schedule a RAC," which stands for "Reasonable Accommodations Committee." (Pl. Ex. 13, Patterson Dep. 116:6–117:7.)  Yet, when Lenkiewicz emailed Cumber on March 15, 2011 asking for a status update—nearly a month after Dr. Allen's February 18 letter—Cumber's response never mentioned that Dr. Allen had recommended *denying* the request altogether. (*See* Pl. Ex. 21, DEF.EMAIL.0105 – DEF.EMAIL.0106.)  Instead, Cumber gave this opaque characterization in her March 16, 2011 response to Lenkiewicz's email: "FOH recommended that neither your medical condition and treatment requires a period of incapacitation nor a recovery time that conflict with normal work hours." (*Id.*)  Rather than ask for additional information, Cumber urged Lenkiewicz to be "patien[t] while we wait" for the "results" of an unidentified "diagnostic procedure[.]" (*Id.*)

Yet another month went by.  Contrary to HUD's assertion that Cumber's March 16, 2011 email was "unreturned" (*see* Def. Br. at 42), Lenkiewicz emailed Cumber on April 14, 2011 imploring that she was "***still in need of a written response to [her] request for Reasonable Accommodations***[.]" (Pl. Ex. 20, Def.00306 (emphasis added).)  The agency continued stringing Lenkiewicz along.  Responding later that day, Cumber did not mention that Dr. Allen had recommended denying the request.  She did not seek additional medical documentation, contact information for other physicians, or clarification about Lenkiewicz's medical problems.  She did not ask a single question.  She simply stated that FOH had provided no further information and that "Patterson will follow up again and give you an update." (*Id.*)

23

It took Patterson over a month to try contacting Lenkiewicz.  HUD has the gall to argue that "Plaintiff herself failed to properly engage in the interactive process"  because she "simply chose not to respond" to "multiple e-mails and phone calls attempting to reach Plaintiff to determine whether she had additional medical documentation to support her accommodation request." (Def. Br. at 41.)  There is no evidence that Lenkiewicz actually received any "e-mails and phone calls" after her breathing difficulties kept her away from the office starting in May 2011.  (*See* Pl. SoF ¶ 87; Pl. Opp'n Ex. 2, Def.00555.)  More seriously, the record puts the lie to HUD's misstatement that *anyone* asked "whether she had additional medical documentation."[12]

Patterson finally sent an email to Lenkiewicz's HUD account in May 2011, the same month in which Lenkiewicz had "such difficulty breathing that she could no longer endure working and thereafter did not return to work[,]" (Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 9), and by which time Lenkiewicz had come to believe that "HUD was not handling her requests for accommodation in good faith" and "would not give her reasonable accommodations[.]"  (Pl. Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6.)  Lenkiewicz was out of the office when Patterson's May 2011 email was sent, and there is no evidence that Lenkiewicz was checking her HUD email account while away or that she read it.  In that email, Patterson offered a confusing spin on Dr. Allen's opinions without actually revealing his recommendation to deny the request: "no functional limitations were provided nor a justification to support teleworking 5 days a week."  (Pl. Ex. 20, Def.00301.)  Patterson *still* did not ask for additional medical documentation, physician contacts, or clarification on Lenkiewicz's

---

[12] For example, Cumber admitted that in her March 2011 email, she did not "ask Ms. Lenkiewicz to identify any major life activities that are limited by any impairments" or "to identify any other physicians who might submit documentation on her behalf," or "inform [Lenkiewicz] that the request is recommended to be denied."  (Pl. Ex. 14, Cumber Dep. 82:1–4, 111:1–10.)

limitations.  Patterson asked only that Lenkiewicz identify her supervisor and indicate whether she was "teleworking" and "[i]f so, for how many days."  (*Id.*)

Long before May 2011, the RA Branch knew (or should have known) that something was not adding up.  On one hand, Lenkiewicz had complained of "dizziness, fatigue, [and] joint pain w/ swelling" and noted her "inability to keep up with work in [her] current situation."  (Pl. Ex. 22, LENK_0055.)  She reported "2 hindering disabilities" of "COPD with chronic bronchitis, and debilitating arthritis."  "Because of her severe multi joint condition," Dr. Shammas recommended "light duty" and "telework[.]"  (Pl. Ex. 22, LENK_0057.)  And Dr. Cabalar's report confirmed her diagnoses of "COPD" and "degenerative joint disease of the lumbar spine and the right knee[.]"  (*See* Pl. Ex. 28, SHA_0080.)  On the other, Dr. Allen purported to see no evidence of functional limitations and recommended denying Lenkiewicz's accommodation request.  Yet he never explained to the RA Branch why Lenkiewicz was having difficulty at work, why she was experiencing her symptoms, or why Dr. Shammas' recommendation of telework should not be honored.  Patterson recognized this disconnect when she wrote in a June 22, 2011 note to herself: "***Based on medical documentation, employee does have a disability*** but no major life activities were documented."  (Pl. Ex. 20, Def.00288 (emphasis added).)

HUD's RA Branch, for its part, was content to let this disconnect lie.  Even though Lenkiewicz had been willing to authorize physicians to speak on her behalf and to provide other information at HUD's request, the agency never asked Lenkiewicz to provide additional medical documentation, identify other physicians, or clarify precisely how her disabilities limited major life activities like breathing, walking, performing manual tasks, concentrating, or thinking.  (*See* Pl. SoF ¶¶ 67, 69.)  Nor did the agency attempt to draw reasonable inferences from the symptoms that Lenkiewicz reported and the physical impairments that Dr. Shammas and Dr.

Cabalar both confirmed.  (*See id.* ¶¶ 70, 72.)  It made its bad faith manifest when it assumed, for example, that "difficulty traveling" does not refer to "walking" and that "light duty" does not pertain to physical activity.  (*See* Pl. Ex. 13, Patterson Dep. 81:20–82:2, 84:7–13, 219:8–14.)  *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 581 (S.D.N.Y. 2008) (employer's argument as to "allegedly scant information" in doctor's letters was "somewhat disingenuous" where it was "not terribly difficult to make [a] logical leap").

The agency further showed its bad faith by denying Lenkiewicz's December 2010 request without even telling her.  The denial was finally reduced to writing in late May 2011—five months after the request.[13]  HUD cannot decide *who* denied the request.  (*See* Pl. SoF ¶ 86.)  Regardless, even though HUD's Procedures indisputably required Dr. Cole, as Lenkiewicz's second-level supervisor, to review the request independently, Cole never did so.  (Pl. Ex. 17, Cole Dep. 14:18–21; Pl. Ex. 20, Def.00022; Pl. SoF ¶ 93.)  Nor was a RAC scheduled to issue a final decision, as HUD's Procedures indisputably require.  (Pl. SoF ¶ 82.)  Only after her termination did Lenkiewicz receive a "written response[.]"  (Pl. Ex. 20, Def.00306.)

Well before and long after the denial of Lenkiewicz's December 2010 request, Lenkiewicz's supervisors (especially her first-level supervisor, Vicky Lewis) were disengaged from the process of handling Lenkiewicz's request.  (*See* Pl. SoF ¶¶ 73–74.)  The RA Branch had "problems trying to reach Ms. Lewis … to discuss the case" and "wasn't getting any return calls or Emails from her."  (Pl. Ex. 13, Patterson Dep. 160:21–161:9.)  Worse, Lewis obstructed the process by withholding information from both Lenkiewicz and the RA Branch.  For example:

---

[13] Patterson backdated the denial to the date of the request, so it is impossible to tell exactly when the request was denied.  (Pl. SoF ¶ 83.)

- Lewis never shared doctor's notes, FMLA requests, telephone logs, Lenkiewicz's complaints, her own observations,[14] or other information she had regarding Plaintiff's medical conditions with anyone in the RA Branch.  (*See* Pl. SoF ¶¶ 74, 79.)

- Lewis did not share with RA Branch that Lenkiewicz was no longer in the office after May 2011.  (*See, e.g.*, Pl. Ex. 20, Def.00289 (June 8, 2011 email from Lewis to Patterson stating only that Lenkiewicz "has not been approved to telework").)

- Lewis did not tell Lenkiewicz that she apparently shared Lenkiewicz's concerns about mold in the office.  (*See* Pl. Ex. 21, DEF.EMAIL.0057.)

- Lewis did not bother to read FOH's report regarding mold on the 10th floor of HUD headquarters, much less inform Lenkiewicz that the report confirmed her complaints about mold in the office.  (*See* Pl. SoF ¶ 49.)

- Lewis sent an email about the relocation of the Office of the Executive Secretariat only to Lenkiewicz's work email address, not her personal email address as a human resources employee had suggested.  (*See* Pl. SoF ¶ 50.)

- Lewis did not forward the worker's compensation application in which Lenkiewicz identified two treating pulmonary specialists, or forward their contact information, to anyone in the RA Branch.  (*See* Pl. Ex. 22, LENK_0049 – LENK_0054; Pl. Ex. 16, Lewis Dep. 120:8–124:13.)

Cole also obstructed the process by terminating Lenkiewicz even while acknowledging that Lenkiewicz had "raised medical reasons that impact [her] ability to report and/or perform work." (Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 2; Pl. Ex. 23, LENK_0922.)

Lenkiewicz's supervisors obstructed the process because they held the very attitudes that the Rehabilitation Act was intended to dispel.[15]  First, Lewis refused to entertain the possibility

---

[14] Lewis failed to inform the RA Branch of "physical signs of Plaintiff's disabilities, including Plaintiff's inability to walk while she recovered from a broken foot, her use of a scooter during that recovery, swollen joints, difficulty walking, labored breathing, transport by ambulance from the HUD building and her hospitalization for breathing problems, and complaints to Ms. Lewis that she could not breathe in the office."  (Pl. Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory 3.)

[15] Because Lenkiewicz alleges failure to accommodate and not, as HUD suggests, disparate treatment (*see* Def. Br. at 42–44), she need not show that the agency's reasons for terminating Lenkiewicz were pretext.  *Floyd v. Lee*, 968 F. Supp. 2d 308, 316 (D.D.C. 2013) ("The failure to accommodate is itself discriminatory.").

that whatever attendance and performance issues Lenkiewicz had were the product of unaccommodated disabilities.  Disregarding years of evidence that Lenkiewicz had health problems, Lewis never "consider[ed] the possibility" that Lenkiewicz had a "disability" because Lewis claimed that she never "received sufficient medical documentation to support any disabilities," as if conclusive proof of disability were necessary even to raise a question in Lewis' mind.  (*See* Pl. Ex. 16, Lewis Dep. 48:2–12.)  Lewis similarly did not consider transferring Lenkiewicz to another position because Lewis saw no "requirement, no reason to consider that." (*Id.*, 200:21–201:6.)  Second, Lewis assumed that accommodations are not required where other employees with similar disabilities do not need them, even though the nature and severity of similar disabilities might vary from person-to-person:

> I do consider that the knee injury is a limited disability.  However, there are numerous employees at the agency now that come to work in a scooter.  They utilize a scooter on a daily basis, but they are there regularly, and they are performing their duties."

(*Id.* 56:21–57:5.)  Finally—and most importantly—by endorsing disability retirement, suspension, and termination instead of reasonable accommodation, Lewis assumed that a disabled individual like Lenkiewicz cannot be helped and is doomed to be an unproductive employee.  (*See* Pl. SoF ¶ 79; Pl. Opp'n Ex. 4, DEF.EMAIL.0224 – DEF.EMAIL.0226.)[16]

In sum, the communications between Lenkiewicz and HUD demonstrate Lenkiewicz's good faith just as much as they demonstrate the agency's bad faith.  It would have been "futile for [Lenkiewicz] to continue a process which had lasted for [over] a year and a half without any meaningful progress," especially given the RA Branch's repeated failures to communicate and

---

[16] HUD's assertion that Lenkiewicz was "the lowest performing specialist in the office" (Def. Br. at 4) is based on inadmissible hearsay and testimony that lacks foundation.  Whatever productivity problems Lenkiewicz had, as noted elsewhere, were the product of disability; it is striking, if not downright cruel, that her supervisors never even considered that a possibility.

her supervisors' obstructionism.  *Branson v. West*, No. 97cv3538, 1999 WL 311717, at \*15

(N.D. Ill. May 11, 1999) (granting *employee's* motion for summary judgment).  *See Spurling v.*

*C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061–62 (7th Cir. 2014) (reversing summary judgment

for employer that "did not seek further clarification from either [plaintiff] or her doctor,"

"disregarded the medical evaluation altogether," and "never engaged in an interactive attempt to

find a reasonable accommodation").

### B.   HUD's Remaining Excuse Fails as a Matter of Law.

The only other evidence HUD cites in defense of its role in the interactive process is that,

with respect to Lenkiewicz's first request for reasonable accommodation, Lewis denied the

request but suggested that Lenkiewicz ask a HUD contractor to retrieve print jobs.  (*See* Def. Br.

at 25–27; Pl. SoF ¶¶ 31, 33; *see also* Pl. Ex. 20, Def.00646.)  However, "not every

accommodation will be a reasonable accommodation."  *Hodges v. District of Columbia*, 959 F.

Supp. 2d 148, 155 (D.D.C. 2013).  Thus, the mere fact that Lewis proposed an alternative does

not make it reasonable.  *See Goonan v. Federal Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 483–

84 (S.D.N.Y. 2013).  Lewis' alternative was "cumbersome" because the contractor "had a

multitude of things to do[.]"  (Pl. Ex. 18, Lenkiewicz Dep. 113:12–20, 225:6–25.)  Lenkiewicz

would have been uncomfortable "interrupting [the contractor] for my needs" and considered it

"kind of degrading to have to keep jumping up" to retrieve print jobs.  (*Id.* 225:6–25; *see also* Pl.

Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.)  Also, coming months after Lenkiewicz had

broken her foot, Lewis' proposal was as untimely as it was unworkable; it struck Lenkiewicz

"like a slap in the face."  (Pl. Ex. 18, Lenkiewicz Dep. 116:10–21.)  HUD therefore cannot

escape liability for its denial of this request based on Lewis' unreasonable, belated proposal.

This was the last time the agency proposed an alternative accommodation, reasonable or

not.  HUD's touting of the *sole example* of an alternative proposal starkly contrasts with its clear

failure to propose an alternative, workable or otherwise, in response to *any other* requests, including the December 2010 telework request.  Importantly, HUD concedes that an employer "does not have to provide an employee with the accommodation that he/she requests or prefers," but "need only provide *some* reasonable accommodation" for a qualified person with a disability. (Def. Br. at 25 (emphasis added).)  HUD's view of the law is correct, and it provides another reason that the agency is not entitled to summary judgment: the agency did not provide "*some* reasonable accommodation*" in response to Lenkiewicz's other requests.

Identifying alternative accommodations becomes a pivotal part of the interactive process once the employer determines that an employee's proposed accommodation is unworkable.  *See Sears*, 417 F.3d at 806.  In light of HUD's failure to engage Lenkiewicz in a conversation about her proposed accommodation of telework, the reasonableness (or practical availability) of telework is legally irrelevant.  It is no defense to argue for the first time in this litigation that the FOIA Specialist position was not conducive to telework.  If HUD had engaged in the interactive process at all, it would have raised this issue and proposed alternative accommodations in the course of informal conversations with Lenkiewicz.  There is no evidence that it did so.

## III.    HUD Has Failed to Show that Accommodating Lenkiewicz Would Have Imposed an Undue Hardship.

In its motion, HUD claims that Lenkiewicz's "request to telework would have created an undue hardship because Defendant did not have the systems in place to allow FOIA specialists to telework."  (Def. Br. at 35.)  HUD is not entitled to summary judgment on the basis of this procedurally barred and substantively unsupported defense.

### A.    HUD's Attempt to Cure Its Deficient Pleading on Summary Judgment Is Procedurally Improper.

As a threshold matter, HUD should not be allowed to raise undue hardship because it failed to plead it as an affirmative defense.  Undue hardship "is an affirmative defense" to a

Rehabilitation Act claim.  *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007); *see* 29 C.F.R.

§ 1630.15.   Federal Rule of Civil Procedure 8(c) states that, "[i]n responding to a pleading, a

party must affirmatively state any avoidance or affirmative defense."  In *Harris v. Secretary*,

*U.S. Dep't of Veterans Affairs*, the D.C. Circuit explained, quite simply, that "Rule 8(c) means

what it says: a party must first raise its affirmative defenses in a responsive pleading before it can

raise them in a dispositive motion."  126 F.3d 339, 345 (D.C. Cir. 1997).  As this Court clarified,

"*Harris* suggests that the pleading requirements of Rule 8 are designed to provide notice to the

parties, and rejects the practice of other circuits permitting parties 'to raise affirmative defenses

for the first time in dispositive motions where no prejudice is shown.'"  *Butler v. White*, No.

11cv574, 2014 WL 4436301, at *3 (D.D.C. Sept. 8, 2014) (Lamberth, J.) (quoting *Harris*, 126

F.3d at 344).  The clear rule from *Harris* is that a party cannot rely on an affirmative defense in a

dispositive motion that it failed to include, or seek leave to include, in a responsive pleading.

Because HUD has not pleaded undue hardship, the agency should not be permitted to rely

on the defense on a motion for summary judgment.  As HUD has not moved to amend its

Answer to add this defense, the Court should deem the undue hardship defense to have been

forfeited.  *See Butler*, 2014 WL 4436301, at *3 ("If defendant had argued the affirmative

defenses in its dispositive motion but never filed a motion to amend, *Harris* would certainly call

for the forfeiture of defendant's affirmative defenses.").

B.  <u>HUD Has Failed to Establish Undue Hardship.</u>

Even if the Court considers the agency's undue hardship argument, summary judgment

on this basis would be improper.  HUD's argument rises and falls on the purported unavailability

of a particular software program that would have permitted Lenkiewicz to perform the essential

functions of her position on a telework basis.  (*See generally* Def. Br. at 35–40.)  In support,

HUD offers the self-serving deposition testimony of Plaintiff's supervisors, Lewis and Cole,

which lacks foundation and is belied by documentary evidence and their own contemporaneous statements.  More broadly, one would expect that, if telework had posed an undue hardship, HUD would have advised Lenkiewicz of that fact and worked with her to identify an alternative. It did not, instead denying her request outright on other grounds.  Only in litigation does it offer a post-hoc rationalization of undue hardship that, in and of itself, is contradicted by contemporaneous record evidence.  Considering the record as a whole in the light most favorable to Lenkiewicz, HUD is not entitled to summary judgment on the basis of undue hardship.

HUD argues that permitting Lenkiewicz to telework would have imposed an undue hardship because, prior to the purchase of "the upgraded FMS2 system"[17] in September 2011, it "did not have the systems in place to allow FOIA specialists to telework."  (Def. Br. at 35, 40.) The agency concedes that FMS2 enabled FOIA Specialists to work from home, but only after Lenkiewicz had been terminated.  In support of its position that telework was untenable in 2011, Defendant relies on (1) the deposition testimony of Lenkiewicz and Dr. Cole, and (2) a handful of documents from July 2011 through September 2011 concerning "configuration" and training for the FMS2 system.  (*See generally* Def. Br. at 35–40; Def. Ex. 14.)

But other documents produced by HUD tell a different story.  Evidence submitted by Lenkiewicz refutes the agency's assertion that FMS2 was purchased in September 2011 and was not widely used until early 2012.  The evidence demonstrates that FMS2 was "up and running" by March 2009, and FOIA Specialists were actively using FMS2 in 2010 to receive requests and review and redact potentially responsive documents.  (*See* Pl. SoF ¶ 78; *see also* Pl. Ex.  9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 3; Pl. Ex. 21, DEF.EMAIL.0024, DEF.EMAIL.0032, DEF.EMAIL.0035, DEF.EMAIL.0174, DEF.EMAIL.0185; Pl. Ex. 20, Def.02933 – Def.02934,

---

[17] It is unclear what Defendant means when it uses the phrase "upgraded FMS2 system."

Def.02936 – Def.02940, Def.02950 – Def.02953; Pl. Opp'n Ex. 4, DEF.EMAIL.0223.)  For

example, on June 1, 2010, Lewis sent Plaintiff an email with the subject line "Assistance with

FOIAXpress (FMS2) & Your FOIA Cases."  (Pl. Ex. 21, DEF.EMAIL.0024.)  Lewis wrote: "For

all requests received on or after ***October 1, 2009***, the redact feature in FMS2 must be used to

redact non-releasable information."  (*Id.*, DEF.EMAIL.0024 (emphasis added).)  Later, on July

30, 2010, Lewis sent an email to numerous recipients, including Lenkiewicz, stating:

> This email is to inform you that ***effective Monday, August 2,
> 2010***, the FOIA Office will no longer hand-carry hard copies of
> FOIA requests to the program offices for response. All requests
> will be sent to the FOIA Liaisons electronically via the ***FOIA
> Management System (FMS2) or FOIAXpress*** as it is also called.

(*Id.*, DEF.EMAIL.0032 (emphasis added).)  In addition, specialists were instructed to use FMS2

to "prepare acknowledgement letters" and "Region and Field referrals."  (*Id.*)  Thus, the evidence

does not support the agency's contention that FMS2 was purchased in September 2011.  To the

contrary, the record demonstrates that the program was "up and running" in March 2009, and

FOIA Specialists were being instructed to use FMS2 for electronic redaction and delivery of

documents to program offices by 2010.  This is material to the undue hardship inquiry because

HUD concedes that the FMS2 system, once "fully functional," allowed employees in Plaintiff's

position to work from home.  (See Def. Br. at 36–38.)

        Still, even with FMS2 was "up and running" when Lenkiewicz made her request, there is

the agency's argument that FMS2 was not conducive to telework until early 2012, when it had

completed employee training on the software.  (*See* Def. Br. at 36; *see also* Pl. Ex. 21;

DEF.EMAIL.0185.)  The agency bases this argument on (1) the legally irrelevant contention that

no other FOIA Specialists were working from home in September 2011; (2) Dr. Cole's testimony

that FOIA Specialists were not yet fully trained and "confident" in using the software in

September 2011.  (See Def. Br. at 36–37, 39; *see* Cole Dep. 144:9–145:11.)  But this evidence raises more questions than it answers.  One has to wonder:  Did Lenkiewicz's supervisors debate whether FMS2, which was "up and running" as early as March 2009, was ready to be used by employees at home in 2011?  Did Lewis and Cole even consider the possibility that FMS2 would permit Lenkiewicz to perform the essential functions of her position from home?  Even though HUD bears the burden of establishing undue hardship, it leaves these questions unanswered, offering no evidence from the time period in which the agency was considering the request.

The absence of answers to these questions in the record is telling; it suggests undue hardship is merely a rationalization of HUD's denial for purposes of this litigation.  The only evidence of undue hardship comes from HUD's self-serving testimony, which is entitled to no weight.  *Cf. Howard Town Ctr. Developer, LLC v. Howard Univ.*, No. CV 13-1075, 2013 WL 6671748 (D.D.C. Dec. 19, 2013) ("Notably, self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." (quotation marks and brackets omitted)).  If a non-movant's "uncorroborated self-serving testimony cannot *prevent* summary judgment," *Vinewood Capital LLC v. Dar Al-Maal Al-Islami Trust*, 541 F. App'x 443, 447 (5th Cir. 2013) (emphasis added), then surely a movant's self-serving testimony cannot serve as the sole basis for granting summary judgment.  Here, that testimony is not simply uncorroborated.  It is flatly contradicted by Lewis and Cole's statements in 2009 and 2010 regarding the operability of FMS2.  And it is utterly lacking in foundation.

Finally, HUD fails to cite, let alone analyze, the statutory factors for determining undue hardship.  *See Taylor v. Rice*, 451 F.3d 898, 908-09 (D.C. Cir. 2006) ("An employer invoking the undue hardship defense must use [the statutory] factors to 'show special (typically case-specific)

34

circumstances that demonstrate undue hardship in the particular circumstances.'") (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002)); *see also* 42 U.S.C. § 12111(10)(A).

Moreover, even if it is true that "conversion to the necessary system, with appropriate upgrades, costs the Agency approximately five (5) million dollars" (Def. Br. at 35), this would not establish undue hardship.  HUD does not attempt to reconcile its stance with the fact that the agency *actually implemented* the technological upgrade that it claims would have been an undue hardship.  Lenkiewicz was still employed by HUD in September 2011, when HUD contends "the upgraded FMS2 system" was rolled out.  (*See* Def. Br. at 36.)  In light of evidence produced by HUD in this litigation, Defendant has failed to carry its burden of showing that Plaintiff's requested accommodation of telework constituted an undue hardship as a matter of law.

C.   HUD's Failure to Show that *Any* Accommodation Would Have Imposed an
Undue Hardship Precludes Summary Judgment Against Lenkiewicz.

 Even if permitting Lenkiewicz to telework in 2011 would have imposed an undue hardship on HUD, that conclusion does not end the inquiry.  Because Lenkiewicz was a qualified individual with a disability, the agency was obligated to provide her with some accommodation that did not pose an undue hardship.  As discussed above, HUD never proposed an alternative to telework.  Just as this fact demonstrates HUD's failure to engage in the interactive process, it also shows that it is not entitled to rely on the undue hardship defense.

HUD takes the view that it is a complete defense to a failure-to-accommodate claim where the employer can prove that implementing the particular accommodation suggested by the employee would create an undue hardship for the employer.  (Def. Br. at 35 ("An employer must reasonably accommodate a qualified employee with a disability only if the accommodation does not impose an undue hardship on its operations.").)  This, of course, is not the law.  The employer cannot summarily terminate the process simply because it determines that an

employee's specific accommodation request would pose an undue hardship.  Rather, if an employer determines that a specific proposal would require "significant difficulty or expense," 42 U.S.C. § 12111(10)(A), it must offer the employee a "reasonable and effective" alternative. *Noon v. IBM*, No. 12-CIV-4544, 2013 WL 6504410, at *10 (S.D.N.Y. Dec. 11, 2013); *see also Leiterman v. Johnson*, No. CV-13-394, 2014 WL 3708040, at *10 (D.D.C. July 28, 2014) (stating that "an employer need not offer the particular accommodation preferred by the employee so long as a reasonable alternative is provided") (quotation omitted).  Presumably, if the agency had considered telework to constitute an undue hardship when Lenkiewicz made the request, it would have proposed an alternative.  The agency never did so.

HUD should not be heard to complain that an employee's proposed accommodation would have posed an undue hardship after failing to propose an alternative.  This is particularly true where the agency never informed Lenkiewicz that telework was infeasible—a simple step that would have allowed employer and employee to explore alternatives.  The complete absence of such communications suggests undue hardship is simply a post-hoc rationalization of the agency's denial of accommodations.  In the end, HUD's failure to initiate a conversation with Lenkiewicz about possible alternatives to telework precludes its undue hardship defense.

## IV.  Lenkiewicz Exhausted Her Administrative Remedies with Respect to Each of HUD's Violations of the Rehabilitation Act.

It is undisputed that Lenkiewicz exhausted her administrative remedies with respect to each of her requests for reasonable accommodation, including the requests for a printer and a parking space.  29 U.S.C. § 794a(a)(1) extends the "remedies, procedures, and rights" of certain sections of the Civil Rights Act of 1964 to Rehabilitation Act claims where, as here, there was a "final disposition" of plaintiff's administrative "complaint[.]"  There undoubtedly was a "final disposition" of Lenkiewicz's administrative complaint.  Lenkiewicz alleged in her complaint

dated June 9, 2011 (Pl. Opp'n Ex. 2, Def.00384) that HUD failed to accommodate the disabilities prompting her requests for a printer and parking space, namely "a broken foot" and "meniscus tears in [her] right knee." (*Id.* Def.00382.)  She stated that her first "request for a reasonable accommodation was in 2009 for a broken foot along with other complications[.]" (*Id.*)  She also stated that she "had even approached Ms. Lewis concerning the use of an unused printer which was given to a male employee the day after I requested the printer accommodation." (*Id.*)  In her administrative deposition, Lenkiewicz testified about her requests for a printer and parking space.  An EEOC administrative law judge granted summary judgment against Lenkiewicz on her administrative complaint on August 24, 2012, which became final when HUD issued a Final Order on November 5, 2012.  (*See* Pl. Opp'n Ex. 3, LENK_0487 – LENK_0498, LENK_0476 – LENK_0477.)

HUD's argument is not whether Lenkiewicz took the necessary steps to exhaust her administrative remedies, but rather whether those steps were taken *timely*.  HUD argues that "Plaintiff waited more than two (2) years to exhaust her claims that she was not provided a printer or a parking space[,]" (Def. Br. at 25),  notwithstanding the 45-day period for initiating contact with an EEO counselor under 29 C.F.R. § 1614.105(a).  There is no merit to HUD's position.  The administrative record makes clear that the agency's failures to grant Lenkiewicz's printer or parking requests were investigated, adjudicated, and decided on the merits without timeliness ever having been raised.  There was no finding of untimeliness; HUD does not even allege when the supposedly untimely contact with the EEO counselor occurred.  As a result, HUD clearly waived this defense.  And because the 45-day period is not a jurisdictional requirement, HUD's waiver is fatal to its timeliness defense.

A. <u>The 45-Day Counseling Period Is Not a Jurisdictional Requirement and Therefore May Be Waived.</u>

HUD maintains that a failure to seek EEO counseling within the 45-day period prescribed by 29 C.F.R. § 1614.105(a) is a defect that eliminates subject-matter jurisdiction over the subsequent suit.  In what has become a troubling refrain, HUD is yet again wrong on the law.  The non-jurisdictional character of the 45-day counseling period is manifest from the text of the regulations.  29 C.F.R. § 1614.604(c) states: "The time limits in this part [1614] are subject to waiver, estoppel and equitable tolling."  The 45-day counseling period also appears in Part 1614 (at § 1614.105), and because it is therefore "subject to waiver" under § 1614.604(c), it cannot be jurisdictional.  Congress could have overridden § 1614.604(c) or otherwise made the 45-day period a jurisdictional requirement, but there is no evidence that Congress ever did so.  Neither 29 U.S.C. § 794a(a)(1), which requires only that there be a "final disposition" of an administrative "complaint," nor any other provision in the Rehabilitation Act predicates jurisdiction on timely taking all steps in the administrative complaint process.

In arguing that the 45-day counseling period is a jurisdictional requirement, HUD chiefly relies on an inapposite case.  In *Spinelli v. Goss*, the D.C. Circuit held that the Rehabilitation Act's requirement of a "final disposition" was not satisfied because the plaintiff in that case simply had "never filed an administrative complaint."  446 F.3d 159, 162 (D.C. Cir. 2006).  The court held that this wholesale failure to pursue administrative remedies was a jurisdictional defect.  Recently the D.C. Circuit described *Spinelli*'s holding as limited to where, unlike here, no administrative complaint was filed at all: "In *Spinelli v. Goss*, we held that a district court lacks jurisdiction over a Rehabilitation Act claim if 'there was no administrative complaint [filed] and thus no final disposition of one.'" *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 34–35 (D.C. Cir. 2014) (quoting *Spinelli*, 446 F.3d at 162).  *See also id.* at 30 ("[T]his

court's decision in *Spinelli v. Goss* … held that there is no jurisdiction over the Rehabilitation Act claims of individuals who failed to file any administrative complaint."). *Spinelli* therefore did not address whether regulatorily prescribed time limits were jurisdictional requirements. Accordingly, *Spinelli* does not support converting prudential aspects of exhaustion (such as timeliness) into jurisdictional necessities.

Other courts in this district have recognized that notwithstanding *Spinelli*, failure to comply with the regulatorily prescribed time limits raises no jurisdictional bar as long as the plaintiff had actually filed an administrative complaint. *See Koch*, 777 F. Supp. 2d at 90 ("[B]ecause Mr. Koch filed an administrative complaint … his Rehabilitation Act claim is not foreclosed by *Spinelli v. Goss*."); *Perry*, 669 F. Supp. 2d at 65 (holding that plaintiff's "failure to comply with the EEOC's 45-day time limit … does not divest the Court of statutory jurisdiction"); *Fortune v. Holder*, 767 F. Supp. 2d 116, 120 n.5 (D.D.C. 2011) (recognizing that because the plaintiff "has exhausted his administrative remedies for purposes of establishing the Court's subject matter jurisdiction" over his Rehabilitation Act claim notwithstanding his failure to comply with the 45-day period).

Limited as it is, *Spinelli*'s holding as to the jurisdictional character of the Rehabilitation Act's "final disposition" requirement directly conflicts with Supreme Court precedent. In *Arbaugh v. Y&H Corp.*, Justice Ginsburg, writing for an undivided Court, articulated a "clear statement" rule for determining whether a statutory requirement is jurisdictional or simply an "ingredient" of a claim: "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 546 U.S. 500, 516 (2006). The provision of the Rehabilitation Act at issue here, 29 U.S.C. § 794a, lacks any clear statement that it is jurisdictional. Indeed, like the requirement at issue in *Arbaugh*, the

"final disposition" requirement of the Rehabilitation Act "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts[.]"  *Arbaugh*, 546 U.S. at 515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).

It is not necessary for this Court to decide whether *Spinelli* must be overruled in light of *Arbaugh*.[18]  Rather, it is sufficient to hold that the 45-day counselor contact period under 29 C.F.R. § 1614.105(a) is not jurisdictional.  This holding is amply supported by a long line of cases recognizing that the time limits involved in the administrative complaint process are not jurisdictional requirements.  The leading case is *Zipes v. Trans World Airlines, Inc.*, in which the Supreme Court held that filing an administrative complaint with the EEOC within Title VII's statutorily prescribed time limits (*see* 42 U.S.C. § 2000e-5(d)) "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  546 U.S. at 392.

Following *Zipes*, courts have held similarly with respect to time limits prescribed by regulation rather than statute.  The EEOC regulations setting deadlines for administrative complaints under the Rehabilitation Act (such as the 45-day counseling period) are not limited to that statute; they govern complaints under other federal civil rights statutes like the ADA and Title VII.  *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 51 (D.D.C. 2012).  Courts have long recognized that these regulations are not jurisdictional.  In *Bowden v. United States*, for example, the D.C. Circuit reaffirmed that "the administrative time limits created by the EEOC erect no jurisdictional bars to bringing suit" and therefore "are subject to equitable tolling, estoppel, and

---

[18] At least one circuit has rejected *Spinelli* outright after considering it.  The Third Circuit in *Wilson v. MVM, Inc.* held that "the exhaustion requirements of the RA [Rehabilitation Act] are prudential" rather than jurisdictional.  475 F.3d 166, 175 (3d Cir. 2007) (holding that, contrary to *Spinelli*, "it seems unlikely that, although explicitly adopting Title VII's exhaustion requirements, Congress intended to change their nature from prudential to jurisdictional").

waiver." 106 F.3d at 437 (citing *Zipes*, 546 U.S. at 393). It is unsurprising, then, that other

circuits have recognized that the EEOC's time limits are not jurisdictional, even as applied to the

Rehabilitation Act.[19]   The same conclusion should be reached here.

None of the other cases cited in HUD's opening brief supports a contrary conclusion.

*Mahoney v. Donovan* did not squarely address whether the 45-day period under § 1614.105 was

jurisdictional because the plaintiff argued that this provision was either satisfied or never

triggered at all. 824 F. Supp. 2d 49, 59 (D.D.C. 2011). The plaintiff's argument for equitable

tolling was decided on the merits and without any suggestion that the 45-day period was

jurisdictional and therefore not capable of being tolled. *Id.* at 60–61. The court in *Ramsey v.*

*Moniz*, while concluding that certain allegations were not timely exhausted, relied on *Spinelli* for

the general proposition that "a failure to exhaust administrative remedies is a jurisdictional

defect" and did not consider whether the 45-day period *specifically* was jurisdictional in nature.

--- F. Supp. 3d ---, 2014 WL 5778521, at *7, *11 (D.D.C. Nov. 6, 2014). And *Cobel v. Zalazar*

appears to have been cited in error, as the case does not mention the Rehabilitation Act at all.

816 F. Supp. 2d 10, 12 (D.D.C. 2011) (denying motions for appeal bond and sanctions arising

from appeal challenging settlement of claim that the United States mismanaged Native

Americans' valuable assets).

---

[19] *See Kraus v. Presidio Trust Facilities Div. / Res. Mgmt. Branch*, 572 F.3d 1039, (9th Cir. 2009) (observing that "the regulatory pre-filing exhaustion requirement at § 1614.105 … is not a jurisdictional prerequisite for suit in federal court"); *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) ("The requirement that a federal employee initiate contact with an EEO counselor within 45 days of the alleged discrimination is not a jurisdictional prerequisite [to a Rehabilitation Act claim].") (internal citation omitted); *Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000) (recognizing similarly); *Johnson v. Runyon*, 47 F.3d 911, 917 (7th Cir. 1995) (noting that the 45-day period under § 1614.105(a) "is … not as a jurisdictional prerequisite").

Other decisions from district are not to the contrary.[20]  The court in *Doak v. Johnson* concluded that the failure to comply with the 45-day period was a jurisdictional bar to a Rehabilitation Act claim without explaining why *Spinelli*'s holding as to the "final disposition" requirement extended to time requirements or why it rejected the conclusions of *Koch* and *Perry*. 19 F. Supp. 3d 259, 270 & n.11 (D.D.C. 2014) (declining to follow *Koch v. Shapiro*, 777 F. Supp. 2d 86 (D.D.C. 2011), and *Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60 (D.D.C. 2009)).[21]  In *Ellison v. Napolitano*, this Court never decided whether the 45-day counseling period was jurisdictional because the plaintiff argued that discriminatory incidents outside the counseling period were part of her hostile work environment claim, not that timeliness had been waived.  901 F. Supp. 2d 118, 125–28 (D.D.C. 2012).  *Ragsdale v. Holder* involved a "fail[ure] to file another administrative complaint" after "separately actionable" conduct had occurred. 668 F. Supp. 2d 7, 18–18 (D.D.C. 2009).  *See also Porter v. Jackson*, 668 F. Supp. 2d 222, 229–30 (D.D.C. 2009) (similar).[22]  None of these decisions stands in the way of holding that the 45-day counseling period is not a jurisdictional prerequisite for a Rehabilitation Act claim.

### B. HUD Failed to Plead or Prove that Administrative Remedies Were Untimely Exhausted.

Lenkiewicz agrees that she had the burden to plead and prove that she had filed an administrative "complaint" as required by 29 U.S.C. § 794a(a)(1).  This burden was plainly

---

[20] HUD cited none of these cases in its opening brief, but Lenkiewicz discusses them here in the interest of thoroughness.

[21] The plaintiff in *Doak* never argued that the 45-day counseling period was non-jurisdictional. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss and for Summ. J. at 10, *Doak v. Napolitano*, No. 1:12cv1177 (D.D.C. Oct. 9, 2013) (ECF No. 17).

[22] For the reasons discussed above, Lenkiewicz respectfully submits that the 45-day counseling period is not a jurisdictional requirement notwithstanding this Court's holding in *Saba v. U.S. Department of Agriculture*, 26 F. Supp. 3d 16, 22 (D.D.C. 2014) (Lamberth, J.).

satisfied by the EEO complaint Lenkiewicz timely filed on June 9, 2011.  (*See* Pl. Opp'n Ex. 2, Def.00379 – Def.00384; *see also* Compl. ¶ 40.)  It was *the agency's* burden, however, to plead and prove whether the time limits prescribed by regulation were satisfied.  Courts recognize in other contexts that "untimely exhaustion of administrative remedies is an affirmative defense," and "the defendant bears the burden of pleading and proving it."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  Because these regulatorily prescribed time limits are non-jurisdictional even for purposes of the Rehabilitation Act (as discussed above), the logic of requiring defendants to plead and prove untimeliness applies with equal force to Rehabilitation Act claims as it does to Title VII and other claims that are governed by the same time limits.

HUD failed to plead untimely exhaustion, much less prove it.  In its answer, HUD did not plead failure to exhaust administrative remedies—on timeliness grounds or otherwise—as an affirmative defense.  HUD did not seek discovery on exhaustion.  Now, on summary judgment, HUD does not even suggest when Lenkiewicz first contacted an EEO counselor.  HUD's attempt to assert yet another affirmative defense for the first time on summary judgment therefore fails.

C.  HUD Waived Any Defense as to the 45-Day Counseling Period.

It is settled in this circuit that "'waiver occurs when the agency decides the [administrative] complaint on the merits without addressing the untimeliness defense.'" *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 87 (D.D.C. 2009) (quoting *Horton*, 369 F.3d at 911).  Here, the agency "responded to the merits of [Lenkiewicz's] complaint without ever questioning its timeliness[.]"  *Bowden*, 106 F.3d at 438–39.  In her June 9, 2011 administrative complaint, Lenkiewicz alleged that HUD's failure to accommodate her disabilities included the fact that she "never received a response" to her "first request for reasonable accommodation [] in 2009[.]" (*See* Pl. Opp'n Ex. 2, Def.00382.)  Lenkiewicz also noted Lewis' failure to grant her request for a printer, which occurred in 2009.  (*Id.*)  Lenkiewicz testified that she had requested

43

accommodations as early as 2009, including requests for a printer and parking space, and that

those requests had been denied as early as 2009.  (*See* Pl. Ex. 22, Lenkiewicz EEO Aff.,

LENK_0174; Pl. Opp'n Ex. 1, Lenkiewicz EEO Dep. 7:15–8:2, 9:17–23, 10:21–11:10, 43:10–

23.)  Critically, neither the ALJ's decision granting summary judgment against Lenkiewicz nor

the Final Order mentioned untimeliness.  (*See* Pl. Opp'n Ex. 3, LENK_0494, LENK_0476 –

LENK_0477.)  HUD therefore waived any untimeliness defense.  *See Nurriddin*, 674 F. Supp. 2d

at 88 (finding waiver under nearly identical circumstances).

Finding waiver here serves the purpose of exhaustion requirements, which are "practical

and pragmatic … and should not be invoked when they serve no practical purpose."  *Bowden*,

106 F.3d at 439 (citation and punctuation marks omitted).  Lenkiewicz "alert[ed] the EEOC and

the charged employer with the nature of the alleged wrongdoing," *Johnson–Parks v. D.C.*

*Chartered Health Plan*, 806 F. Supp. 2d 267, 270 (D.D.C. 2011) (citation and quotations

omitted), thereby giving the agency "'a chance to act on'" her complaint.  *Faison*, 896 F. Supp.

2d at 55 (quoting *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997)).  There

is no evidence that HUD was "concerned" that the "complaint was stale or that deciding [her]

case would upset settled expectations[.]"  *Bowden*, 106 F.3d at 439.  Nor did HUD lack "an

opportunity to informally resolve [the] employee's complaint by conducting internal

investigations."  *Lloyd v. Chao*, 240 F. Supp. 2d 1, 3 (D.D.C. 2002).  To avoid making

exhaustion "a tripwire for hapless plaintiffs," this Court should conclude that HUD waived any

untimeliness defense.  *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012).

D.   At the Least, HUD's Denial of These Requests Evidences a Pattern of Denying
     Accommodations and Disregarding the Interactive Process.

Even if not separately actionable, HUD's denial of Lenkiewicz's requests for a printer

and parking space are relevant "background evidence to support her timely exhausted claims."

*Ellison*, 901 F. Supp. 2d at 128.  There is no dispute that Lenkiewicz timely exhausted her claims

that the agency failed to grant her requests for relocation and telework.  These claims are

"independently discriminatory" and were "timely filed" in her EEOC charge.  *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  The facts surrounding the denial of her

requests for a printer and parking space remain probative of (i) HUD's pattern of denying

Lenkiewicz's accommodations and (ii) Lenkiewicz's reasonable belief by May 2011 that "HUD

was not handling her requests for accommodation in good faith" and therefore that "HUD would

not give her reasonable accommodations" and "no additional medical documentation or

information would prompt HUD to grant her request for accommodations."  (Pl. Ex. 9, Pl.'s

Supp. Resp. to Def.'s Interrogatory No. 6.)

## **CONCLUSION**

HUD fundamentally misunderstands the nature of its obligations under the Rehabilitation

Act.  The agency believes now, as it did then, that it owes nothing to an employee until she

comes forward on her own with "objective," conclusive proof that she is substantially limited in

a major life activity.  The agency is wrong.  It has a duty to help an employee who says she is

disabled and wants some accommodation.  For employers like HUD who insist on proof of

disability before granting accommodations, its duty includes making that expectation clear to the

employee and explaining what the employee must do to meet it.  If, instead, the employee is left

to guess what must be done to meet the expectation, then the employer must face liability where,

as here, the employee is actually disabled and accommodation would have been possible.

Accordingly, Plaintiff respectfully requests that this Court deny Defendant's cross-motion for

summary judgment and grant her motion for summary judgment.

## **ORAL ARGUMENT REQUESTED**

Pursuant to Local Civil Rule 7(f), Plaintiff respectfully requests an oral hearing.

Respectfully submitted,

*/s/ J. Wells Harrell*
J. Wells Harrell (D.C. Bar No. 995368)
Evan E. North (D.C. Bar No. 995360)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6181
wharrell@bsfllp.com
enorth@bsfllp.com

Dated: March 27, 2015                    *Attorneys for Plaintiff Denise Lenkiewicz*

46

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DENISE L. LENKIEWICZ, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 13-0261 (RCL) |
| | ) |
| JULIÁN CASTRO, | ) |
| Secretary, U.S. Department of | ) |
| Housing & Urban Development, | ) |
| | ) |
| *Defendant*. | ) |

**PLAINTIFF'S STATEMENT IN RESPONSE TO DEFENDANT'S
REVISED STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h),

Plaintiff Denise L. Lenkiewicz respectfully submits the following response to the Revised

Statement of Material Facts Not In Dispute of Defendant Julián Castro, Secretary, U.S.

Department of Housing and Urban Development ("HUD" or the "agency") (ECF No. 58-1).  To

the extent not specifically stipulated to below, each factual assertion by Defendant is denied.[1]

Plaintiff's Responsibilities

1.  Plaintiff, Denise L. Lenkiewicz, worked as a Freedom of Information Act or

("FOIA") specialist from 2008 through 2011.  *See* Complaint.

---

[1] As used herein, "Pl. SoF" refers to Plaintiff's Statement of Undisputed Material Facts in
Support of Her Motion for Summary Judgment dated March 4, 2015 (ECF No. 56).  "Pl. Ex."
refers to an exhibit to the Declaration of J. Wells Harrell in Support of Plaintiff's Motion for
Summary Judgment dated March 4, 2015 (ECF No. 56).  "Pl. Opp'n Ex." refers to an exhibit to
the Declaration of J. Wells Harrell in Support of Plaintiff's Opposition to Defendant's Motion
for Summary Judgment dated March 27, 2015.

**Response:**  Admitted.

2.       Plaintiff's job duties and responsibilities included processing FOIA cases and determining which documents should be released.  *See* Oct. 29, 2014 Deposition of Denise L. Lenkiewicz ("Lenkiewicz Depo"), attached hereto as Ex. 1, at 38:7 – 39:1.

**Response:**  Denied to the extent that "processing FOIA cases" is vague, ambiguous, and incorrectly suggests that Lenkiewicz's responsibilities related to FOIA litigation.  Otherwise admitted insofar as Lenkiewicz was responsible for reviewing FOIA requests, assigning those requests to a responding office, researching and analyzing the contents of HUD records to determine whether disclosure was proper, and redacting responsive documents.  *See* Pl. SoF ¶ 4.

3.       Plaintiff, and other FOIA specialists, were tasked with processing confidential information, personal identifiable information, trade secrets as well as other information that was not appropriate for release.  *See* Lenkiewicz Depo at 78:19 – 79:21; October 23, 2014 Deposition of Vicky J. Lewis ("Lewis Depo"), attached hereto as Ex. 2, at 62:13 – 62:19

**Response:**  Admitted that Lenkiewicz and other FOIA Specialists occasionally "process[ed] confidential  information, personal identifiable information, trade secrets as well as other information that was not appropriate for release" but denied that this was the only sort of information that Lenkiewicz and other FOIA Specialists processed.

<u>Previous Conditions</u>

4.       During her tenure with the Agency, Plaintiff submitted doctor's notes for various conditions.  Each of the doctor's notes were for finite periods of time with information indicating that Plaintiff could return to work on set dates.  *See* 2009 – 2010 Doctor's Notes, attached hereto as Ex. 5.

**Response:**  Admitted that Lenkiewicz submitted doctor's notes but denied that "[e]ach"

of them was for a "finite period[] of time with information indicating that Plaintiff could return

to work on set dates."  Many of the doctor's notes Lenkiewicz submitted gave no time periods

for recovery or return to work, and many such notes indicated that Lenkiewicz's condition was

chronic.  *See, e.g.*, Pl. Ex. 22, LENK_0057 (recommending telework with no time restriction or

date for returning to work), LENK_0739 (stating dates during which Lenkiewicz was

"incapacitated" but providing no date for returning to work); Pl. Ex. 25, FOH_0005 (same),

FOH_0011 (informing Lewis that Lenkiewicz "was seen at health unit and she needs to take her

antibiotics and inhaler"); Pl. Ex. 23, LENK_0782 (recommending that Lenkiewicz be given "a

disability tag and/or parking privileges" without any specified recovery time), LENK_0798

(stating that Lenkiewicz was "off work" "because of acute and recurrent bronchitis"),

LENK_0801 (noting that Lenkiewicz had a "lower extremity impairment" that was "chronic and

permanent" beginning in "2003"), LENK_0806 (same), LENK_0809 (noting that Lenkiewicz

had a "[d]ocumented orthopedic injury," "planar fasciitis," "crondomacica patellar knee and toe

injuries[,] foot" and that the condition was "chronic and permanent" beginning in "2003"); Pl.

Opp'n Ex. 5, LENK_1308 (noting that Lenkiewicz "should not participate in fire drills" because

"stairs aggravate her knee"), LENK_0591 (indicating that Lenkiewicz was "incapacitated" due to

"bronchitis" without specifying a date for return to work), LENK_0772 (indicating that

Lenkiewicz was "disabled" for a time but not specifying a date for return to work), LENK_0774

(same), LENK_0783 – LENK_0784, LENK_0786 (noting that Lenkiewicz was "incapacitated"

for a time but not specifying a date for return to work).

<u>Request for a Printer</u>

5.        In 2009, Plaintiff requested that a printer be placed at her desk because of

mobility issues.  *See* Compl. at ¶ 17.

**Response:**  Admitted that, after Lenkiewicz broke her right foot in August 2009, she requested that a spare, unused printer be moved to her workstation so that she would not have to walk to retrieve printed documents.  Answer ¶ 17 (ECF No. 21); Pl. Ex. 28, SHA_0063; Pl. Ex. 16, Lewis Dep. 58:14–18; Pl. Ex. 18, Lenkiewicz Dep. 111:18–112:24; Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

6.       Plaintiff injured herself and requested that she receive her own personal printer to prevent walking back and forth throughout the office.  *See id* at ¶¶ 10-15.

**Response:**  Admitted that Plaintiff injured herself in August 2009 when she broke her right foot and then in early 2010 when she tore the meniscus tendon in her right knee.  Admitted that Plaintiff requested a printer to reduce the amount she had to walk while suffering from these orthopedic impairments.  A personal printer also would have permitted Lenkiewicz to print documents without risking a fall or delaying the healing process, as well as sparing her the pain of walking on an injured foot and with inflamed joints and reducing her level of physical activity generally.  Pl. Ex. 10, Dawson Report ¶ 20; Pl. Ex. 11, Schwartz Report ¶ 25; Pl. Ex. 12, Schroeder Report ¶ 33; Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3, 9.

7.       Plaintiff's supervisor, Vicky Lewis, requested a printer on Plaintiff's behalf and then offered Plaintiff an alternative accommodation upon learning that there were no printers available.  *See* Lewis Depo at 209:19 – 210:18.

**Response:**  Admitted that Plaintiff's supervisor, Vicky Lewis, made inquiries on Plaintiff's behalf to determine whether a printer could be provided.  On or about December 7, 2009—months after the request had been made—Lewis informed Lenkiewicz that Lenkiewicz's request for a printer had been denied and  suggested that Lenkiewicz submit Form 1000.

Admitted that Lewis suggested in December 2009 that Plaintiff ask a HUD contractor to retrieve her print jobs.  Answer ¶ 17 (ECF No. 21); Pl. Ex. 20, Def.00646; Pl. Ex. 18, Lenkiewicz Dep. 113:12–20; Pl. Ex. 2, Pl's. Resp. to Def.'s Interrogatory No. 3.

8.      Plaintiff's supervisor offered to have a member of the support staff pull documents off the printer and personally deliver them to Plaintiff to avoid Plaintiff walking back and forth to the printer.  *See* Lenkiewicz Depo at 113:12 – 114:5; Lewis Depo at 210:5 – 210:18.

**Response:**  Admitted that Lewis suggested, on or around December 2009, that Lenkiewicz ask a HUD contractor to retrieve her print jobs.  This suggestion struck Lenkiewicz as unworkable because the contractor was only available intermittently, the process would be cumbersome, and Lenkiewicz was uncomfortable imposing on the contractor, who already was very busy. Answer ¶ 17 (ECF No. 21); Pl. Ex. 18, Lenkiewicz Dep. 113:12–20, 225:6–25; Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

9.      Plaintiff was also informed that if the personal assistance was not sufficient, she could formally contact the Accommodations office and another attempt for a printer could be made.  *See* Lenkiewicz Depo at 114:6 – 115:19.

**Response:**  Denied to the extent Defendant's statement suggests Plaintiff was informed that she should contact the Reasonable Accommodations Branch ("RA Branch") if she deemed Lewis's proposal to be insufficient. Admitted that, on or around December 7, 2009, Lewis suggested that Lenkiewicz submit Form 1000 to the RA Branch.  Answer ¶ 17 (ECF No. 21); Pl. Ex. 20, Def.00646; Pl. Ex. 18, Lenkiewicz Dep. 113:12–20; Pl. Ex. 2, Pl's. Resp. to Def.'s Interrogatory No. 3.  Further, Lewis did not document Lenkiewicz's printer request using Form 1000.  Lewis was not aware that HUD's Procedures require a supervisor who receives a request to complete and submit Form 1000 on the employee's behalf if the employee does not do so.  Pl.

5

Ex. 20, Def.00020, Def.00027; Pl. Ex. 14, Cumber Dep. 22:15–17, 42:1–6; Pl. Ex. 16, Lewis

Dep. 70:11-72:17; Pl. Ex. 18, Lenkiewicz Dep. 227:18–228:5, 232:13–16.  A Form 11600 for the

denial of Lenkiewicz's printer request was never completed.  The printer request was never

forwarded to Lenkiewicz's second-level supervisor, Dr. Dolores Cole, for review.  No RAC was

convened to make a final decision on the printer request. *See* Ex. 17, Cole Dep. 51:21–54:4,

61:16–18.

        10.     Plaintiff chose not to contact the accommodations office and waited

approximately two (2) years to raise a claim.  *See* June 9, 2011 Administrative Complaint

("Admin. Compl."), attached hereto as Ex. 6.

        **Response:**  Denied.  In connection with her request for a printer, Lenkiewicz sought

assistance from Deborah Rizzo, who at the time was the head of HUD's RA Branch.  On

September 11, 2009, Lenkiewicz sent an email to Rizzo with the subject line "Reasonable

Accommodations" and wrote that her broken foot was making it difficult for her to maneuver at

the office.  She also noted that she had "given up on parking."  On September 22, 2009,

Lenkiewicz wrote Rizzo again, stating that she was still in need of guidance as to reasonable

accommodation options.  In this email, she suggested that a printer at her workstation would help

reduce the pain, physical strain, and mobility problems associated with her injury.  Pl. Ex. 21,

DEF.EMAIL.0006, DEF.EMAIL.0073.  The administrative complaint cited by HUD does not

indicate when Lenkiewicz first raised the denial of a printer with the EEO or otherwise in

connection with an administrative complaint.

Request for a Parking Spot

        11.     In 2009 Plaintiff also requested a parking spot.  *See* Compl. at ¶¶ 14 – 15.

**Response:**  Admitted that, shortly after breaking her right foot in August 2009, Lenkiewicz requested that she be given a parking space at or near HUD headquarters. Lenkiewicz made this request to Lewis.  Ex. 18, Lenkiewicz Dep. 100:14–104:13, 224:9–19; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.  In support of her parking request, Lenkiewicz submitted medical documentation to Lewis that included a note from Dr. Eric Dawson recommending that Lenkiewicz be given parking privileges and that her walking or standing be minimized. Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 5; Pl. Ex. 23, LENK_0782; Pl. Ex. 18, Lenkiewicz Dep. 100:14–102:11, 103:6–16.  A parking space at or near HUD headquarters would have reduced the number of steps Lenkiewicz had to take during her commute. It also would have reduced the severity of her respiratory and orthopedic impairments and therefore reduced her pain, spasms, and swelling, which, in turn, would have improved Lenkiewicz's ability to concentrate and think. Ex. 10, Dawson Rep. ¶ 20; Ex. 11, Schwartz Rep. ¶ 25; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 3.

12.     Plaintiff injured herself, and as a result, suffered temporary mobility issues.  *See id* at ¶¶ 10 – 15.

**Response:**  Admitted, except denied insofar as Lenkiewicz suffered from other "mobility issues" that were not "temporary," including degenerative joint disease in her spine and lower extremities.  Pl. Ex. 10, Dawson Rep. ¶¶ 8, 14, 16–18, 20; Pl. Ex. 28, SHA_0066, SHA_0073 – SHA_0075, SHA_0080; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Pl. Ex. 24, DAW_0001 – DAW_0016; Pl. Ex. 18, Lenkiewicz Dep. 138:14–139:4, 190:8–13.

13.     Plaintiff was informed that she could contact the parking office and request a space.  Plaintiff contacted the parking office and was informed that there were no parking spots available at that time.  *See* Lenkiewicz Depo at 104:2 – 104:13.

**Response:**  Admitted that Lewis informed Lenkiewicz that she could contact HUD's

Mail and Transportation Branch (which includes the "parking office") to request a parking space.

HUD's Mail and Transportation Branch informed Lenkiewicz that there were no parking spaces

available. Ex. 16, Lewis Dep. 74:8–18; Ex. 18, Lenkiewicz Dep. 102:3–104:13; Ex. 2, Pl.'s

Resp. to Def.'s Interrogatory No. 2.  In support of her parking request, Lenkiewicz submitted

medical documentation to Lewis that included a note from Dr. Eric Dawson recommending that

Lenkiewicz be given parking privileges and that her walking or standing be minimized.  Ex. 2,

Pl.'s Resp. to Def.'s Interrogatory No. 5; Ex. 23, LENK_0782.  Also, in connection with her

request for a parking space, Lenkiewicz sought assistance from Rizzo and offered to submit

doctor's notes.  Lenkiewicz periodically sought updates from Rizzo on the status of the request.

Lenkiewicz emailed Rizzo on December 7, 2009, concerning her request for "temporary

handicap parking." She wrote that she had "an updated doctor's note requesting parking and

physical accommodations." Three days later, Lenkiewicz wrote to Rizzo again to request a status

update, noting that she "hadn't heard from anyone on the parking."  Ex. 21, DEF.EMAIL.0077,

DEF.EMAIL.0078.  When Cole injured herself, she was quickly given a ground-level parking

space when she visited the parking office and filled out a form.  Pl. Ex. 17, Cole Dep. 80:13–

81:7.

14.     Plaintiff waited approximately two (2) years to raise a claim.  *See* Admin. Compl.

**Response:**  Denied.  The administrative complaint cited by HUD does not indicate when

Lenkiewicz first raised the denial of a parking space with the EEO or otherwise in connection

with an administrative complaint.

<u>Request to Telework</u>

15.     In January 2011, Plaintiff requested that she be permitted to telework as a

reasonable accommodation.  In her initial conversation, Plaintiff requested telework based on Chronic Obstructive Pulmonary Disease ("COPD") and degenerative joint disease.

**Response:**  Admitted that, on <u>December 22, 2010,</u> Lenkiewicz submitted a written request for reasonable accommodation.  She submitted a Form 1000 and supporting medical documentation in person to Yolanda Patterson, an employee with HUD's RA Branch.  On Form 1000, Lenkiewicz cited "2 hindering disabilities; COPD with chronic bronchitis, and debilitating arthritis."  She listed "dizziness, fatigue, joint pain w/ swelling, confusion which are made worse by workplace stresses," explaining that she had fallen into the file cabinet at her workstation twice and was experiencing depression due "to the inability to keep up with work in current situation." Answer ¶ 26 (ECF No. 21); Pl. Ex. 22, LENK_0055.  The word "telework" does not appear in Lenkiewicz's original Form 1000 but was later handwritten in parentheses.  *Compare* Pl. Ex. 22, LENK_0055 *with* Pl. Ex. 20, Def.00263.

16.    Plaintiff submitted four (4) documents in support of her accommodation request and signed a release permitting the agency to contact two physicians. *See* Lenkiewicz Depo at 177:4 – 177:10.

**Response:**  Denied that Lenkiewicz submitted only "four (4) documents in support of her accommodation request[.]"  HUD (via FOH) also received a report from Dr. Imelda Cabalar diagnosing Lenkiewicz with COPD and degenerative joint disease and noting that x-rays showed arthritis in Lenkiewicz's spine and right knee.  *See* Pl. Ex. 28, SHA_0079 – SHA_0080; Pl. Ex. 15, Allen Dep. 77:17–78:9, 94:1–15.   Admitted that, in support of her December 22, 2010 request, Lenkiewicz submitted a letter from Dr. Sameer Shammas recommending "[b]ecause of her severe multi-joint condition" that Lenkiewicz be allowed "to work three days a week from home."  Pl. Ex. 22, LENK_0057.  Lenkiewicz submitted a note from Dr. Shammas note listing

"dizziness, fatigue, and multi joint pain" and recommending "light duty only due to fatigue and dizziness."   Lenkiewicz also submitted a note from Dr. Michael Williams, who was treating Lenkiewicz for a possible endocrine system issue and recommended that Lenkiewicz "start working from home immediately."   Admitted that Lenkiewicz, at HUD's request, signed two releases authorizing the agency to speak with Dr. Shammas and Dr. Michael Williams.   Ex. 22, LENK_0057 – LENK_0058; Ex. 20, Def.00194 – Def.00202, Def.00265, Def.00276 – Def.00279.

17.     None of the four (4) documents addressed Plaintiff's alleged COPD and the two physicians only discussed Plaintiff's degenerative joint disease.   *See* Accommodation Documents, attached hereto as Ex. 7.

**Response:**   Denied.   It is not "alleged" that Lenkiewicz had COPD; it is an undisputed fact.   *See* Pl. SoF. ¶¶ 10–15.   Lenkiewicz's Form 1000 made clear that she sought accommodation for "COPD with chronic bronchitis" as one of "2 hindering disabilities," but HUD never sent that form to FOH.   *See* Pl. Ex. 15, Allen Dep. 137:16–138:4, 150:7–21.   FOH received a report from Dr. Imelda Cabalar diagnosing Lenkiewicz with "COPD" and "degenerative joint disease" and noting that x-rays confirmed arthritis in Lenkiewicz's spine and right knee.   Pl. Ex. 28, SHA_0079 – SHA_0080; Pl. Ex. 15, Allen Dep. 77:17–78:9, 94:1–15.   No admissible evidence establishes one way or another whether Dr. Shammas and Dr. Williams "discussed" COPD with Dr. Allen.   Neither Dr. Shammas nor Dr. Williams recalls ever having spoken with Dr. Allen (*see* Pl. Ex. 19, Shammas Dep. 25:4–9, 26:8–18), and Dr. Allen does "not have any memory of that specific conversation" with Dr. Shammas (Pl. Ex. 15, Allen Dep. 89:9–15).   Dr. Allen's worksheets inadmissible hearsay under Fed. R. Evid. 802.   To the extent that the hearsay-within-hearsay statements from Dr. Shammas and Dr. Williams are relevant for a

non-hearsay purpose (*i.e.* their effect on Dr. Allen), there is no evidence that Dr. Allen memorialized every subject of his conversations with those two physicians.  Dr. Allen's worksheets are, at best, evidence that Dr. Allen did not write down that COPD was discussed; they are not evidence that COPD was never discussed.

18.     The Agency submitted Plaintiff's request to Federal Occupational Health ("FOH") along with Plaintiff's documents, releases, and a number of questions the Agency requested that FOH answer.  *See* FOH submission, attached hereto as Ex. 8.

**Response:**  Denied that Lenkiewicz's December 22, 2010 Form 1000 memorializing her accommodation request was ever sent to FOH.  *See* Pl. Ex. 15, Allen Dep. 137:16–138:4, 150:7–21.  Admitted that RA Branch forwarded the following to FOH for medical review: Dr. Shammas' December 16, 2010 letter recommending telework, Dr. Shammas' December 16, 2010 note with diagnoses of "dizziness, fatigue, and multi joint pain" and recommending "light duty only," an undated note from Dr. Michael Williams referring Lenkiewicz to "Endocrinology" for "hyperthyroidism," signed releases authorizing HUD to speak with Dr. Shammas and Dr. Williams, and an undated note from Dr. Williams recommending that Lenkiewicz "start working from home immediately."  Pl. Ex. 20, Def.00194 – Def.00202; Def.00265; Allen Dep. 150:7–21.  In its cover letter, HUD's RA Branch sought FOH's assistance "to help … evaluate medical information for the purpose of determining if the employee should be given an accommodation which would allow her to telework."  Pl. Ex. 20, Def.00195 – Def.00196; Pl. Ex. 13, Patterson Dep. 64:16-19, 135:8-14.

19.     Dr. James Allen is a board-certified physician, with a specialty in occupational medicine, working as a consultant for FOH.  *See* Oct. 28, 2014 Deposition of Dr. James William Allen ("Allen Depo"), attached hereto as Ex. 9, at 10:12 – 13:15.

**Response:**  Admitted.

20.     FOH is "a branch of Health and Human Services [] that specifically provides occupational health care for the – for federal agencies."  Allen Depo at 15:1 – 15:5.

**Response:**  Admitted.

21.     Dr. Allen's consultation work included providing expert medical opinions on reasonable accommodation requests and family medical leave requests.  *See* Allen Depo at 15:19 – 15:16.

**Response:**  Admitted that Dr. Allen, as an FOH consultant, "would comment primarily on whether there was a substantial limitation of a major life activity."  Pl. Ex. 15, Allen Dep. 33:9–34:17.  Denied that any of these comments are "expert" under Fed. R. Evid. 702 or 703.

22.     In January / February 2011, Dr. Allen was tasked with serving as a consulting physician with respect to Plaintiff's accommodation request.  *See* Allen Depo at 66:3 – 66:21.

**Response:**  Admitted.

23.     Dr. Allen's role was to respond to specific questions raised by the Agency and to determine whether Plaintiff had a substantial limitation.  *See* Allen Depo at 67:16 – 67:21.

**Response:**  Admitted.

24.     In consulting with Plaintiff's physicians, Dr. Sameer Shammas and Dr. Michael V. Williams, Dr. Allen created a medical worksheet that included the activities that occurred in  the case he worked on.  *See* FOH Medical Provider Worksheets, attached hereto as Ex. 10; Allen Depo at 78:21 – 79:2.

**Response:**  Admitted that Dr. Allen uses worksheets "to report [his] activities concerning a specific case that we're working on."  Pl. Ex. 15, 78:21–79:2.  Denied that the worksheets include *all* such activities.  Denied that these worksheets are admissible.  The worksheets are

hearsay under Fed. R. Evid. 802, they contain hearsay-within-hearsay, and HUD has not established that the worksheets meet any hearsay exception or exemption.

Dr. Allen's Assessment

25.     Plaintiff's diagnosis of degenerative joint disease is not dispositive of whether she has a substantial limitation on a major life activity.  Dr. Allen explained that degenerative joint disease is "a collection of conditions that cause degeneration in the cartilages, typically, the major joints.  Usually, it's related to aging, so it's a condition that is a population (sic).  Lots of people have it."  Allen Depo at 152:10 – 152:17.

**Response:**  Denied except insofar as HUD accurately quotes Dr. Allen's testimony.  Whether Dr. Allen "explained" something is irrelevant.  Based on the information in support of Lenkiewicz's December 2010 accommodation request, it was more likely than not that her degenerative joint disease of the spine and lower extremities substantially limited the major life activities of walking and performing manual tasks.  *See* Pl. Ex. 22, LENK_0055 ("hindering disabilities" included "debilitating arthritis"); Pl. Ex. 20, Def.00197 (recommending work from home because of Lenkiewicz's "severe multi-joint condition"), Def.00180 (noting Dr. Shammas' observations that "[t]ravel is difficult" for Lenkiewicz and that he "has seen [Lenkiewicz] for many years all related to complains of her joint [*sic*] including elbow, knee, neck & low back"); Pl. Ex. 28, SHA_0080 (diagnosing Lenkiewicz with "degenerative joint disease of the lumbar spine and right knee"); Pl. Ex. 19, Shammas Dep. 17:25–18:8 (testifying that for persons who, like Lenkiewicz, suffer from degenerative joint disease in the "lower extremities," there is "a high possibility of having problem[s] with [] mobility").  Dr. Allen admitted that "[s]evere degenerative joint disease would be a physical impairment … assuming that there are some

13

limitations that you can assign to it, assuming there'd be some limitations of walking or lifting or whatever." Pl. Ex. 15, Allen Dep. 81:15–20.

In any event, Dr. Allen's opinions are inadmissible. First, they are procedurally barred under Fed. R. Civ. P. 26(a)(2) because they are not "rebuttal" (Dr. Allen was disclosed only as a rebuttal expert) and fall outside the scope of HUD's expert disclosure. Second, they are unreliable under Fed. R. Evid. 702 and 703 because Dr. Allen reviewed only a fraction of the relevant medical evidence, did not personally examine Lenkiewicz, unreasonably minimized medical information showing Lenkiewicz's disabilities, and failed to pose follow-up questions to her physicians. Third, they are irrelevant under Fed. R. Evid. 402 because he does not opine whether Lenkiewicz actually has or lacks a disability.

26.     Dr. Allen further explained that degenerative joint disease is not by itself a physical impairment. *See* Allen Depo at 80:22 – 81:20; *id*. at 90:6 – 90:9.

**Response:**  Denied except insofar as HUD faithfully summarizes Dr. Allen's testimony. Whether Dr. Allen "explained" something is irrelevant. As explained above (*see* ¶ 25), Dr. Allen's opinions are inadmissible because they are procedurally barred under Fed. R. Civ. P. 26(a)(2), unreliable under Fed. R. Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402. Dr. Allen admitted that "[s]evere degenerative joint disease would be a physical impairment … assuming that there are some limitations that you can assign to it, assuming there'd be some limitations of walking or lifting or whatever." Pl. Ex. 15, Allen Dep. 81:15–20. Dr. Shammas testified that for persons who, like Lenkiewicz, suffer from degenerative joint disease in the "lower extremities," there is "a high possibility of having problem[s] with [] mobility." Pl. Ex. 19, Shammas Dep. 17:25–18:8.

27.     Likewise, Plaintiff's physician Dr. Shammas also explained that degenerative

joint disease is largely influenced by age and its impact may vary.  *See* October 30, 2014

Deposition of Dr. Sameer B. Shammas ("Shammas Depo"), attached hereto as Ex. 11, at 17:11 –

17:21.

**Response:**  Denied.  HUD mischaracterizes Dr. Shammas' testimony, which speaks for

itself.  *See* Pl. Ex. 19, Shammas Dep. 17:11–21 ("Q.  Dr. Shammas, if you know, can you state for

the record what percentage in your opinion of the population may suffer from degenerative joint

disease?  A.  It depends on the age.  Q.  Okay.  And why do you say it, 'depends on the age'?  A.

Because the higher the age, the more joint goes under stress, the more the joint goes under

pressure, the more they actually develop the inflammation process that leads eventually to the

destruction of that – of the joint.").

28.     In fact, Dr. Allen explained that not all individuals with degenerative joint disease

suffer a substantial limitation of a major life activity.  *See* Allen Depo at 152:18 – 153:9.

**Response:**  Denied.  As explained above (*see* ¶ 25), Dr. Allen's opinions are inadmissible

because they are procedurally barred under Fed. R. Civ. P. 26(a)(2), unreliable under Fed. R.

Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402.  Whether Dr. Allen "explained"

something or whether "not all individuals with degenerative joint disease suffer a substantial

limitation of a major life activity" is irrelevant.

The well-supported, uncontroverted opinion of Dr. Eric Dawson establishes that

Lenkiewicz's degenerative joint disease substantially limited the major life activities of

performing manual tasks, walking, standing, lifting, bending, and engaging in other physical

activity.  Ex. 10, Dawson Rep. ¶¶ 8, 18; Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Ex. 18,

Lenkiewicz Dep. 190:8–13.  Based on the information Lenkiewicz submitted, it was more likely

than not that her degenerative joint disease of the spine and lower extremities substantially limited

the major life activities of walking and performing manual tasks. *See* Ex. 22, LENK_0055

("hindering disabilities" included "debilitating arthritis"); Ex. 20, Def.00197 (recommending

work from home because of Lenkiewicz's "severe multi-joint condition"), Def.00180 (noting Dr.

Shammas' observations that [t]ravel is difficult" for Lenkiewicz and that he "has seen

[Lenkiewicz] for many years all related to complains of her joint [*sic*] including elbow, knee, neck

& low back"); Pl. Ex. 28, SHA_0080 (diagnosing Lenkiewicz with "degenerative joint disease of

the lumbar spine and right knee"). Dr. Shammas testified that for persons who, like Lenkiewicz,

suffer from degenerative joint disease in the "lower extremities," there is "a high possibility of

having problem[s] with [] mobility." Pl. Ex. 19, Shammas Dep. 17:25–18:8. Dr. Allen admitted

that "[s]evere degenerative joint disease would be a physical impairment … assuming that there

are some limitations you can assign to it, assuming there'd be some limitations of walking or

lifting or whatever." Pl. Ex. 15, Allen Dep. 81:15–20.

     29.     Likewise, Plaintiff's physician Dr. Shammas concurred that not all individuals

with degenerative joint disease suffer mobility issues. *See* Shammas Depo at 17:25 – 18:8.

     **Response:** Denied. HUD mischaracterizes Dr. Shammas' testimony, which speaks for

itself. *See* Pl. Ex. 19, Shammas Dep. 17:25–18:8 ("Q. And, Dr. Shammas, does everyone who

suffers from degenerative joint disease have limitations on their mobility? A. It depends on

where the degenerative process is. Obviously, in the lower extremities, a high possibility of

having problem with the mobility. The low back is – become the second one. The upper-

extremities, a lot of time, they can actually handle it better.")

     30.     Dr. Allen also explained that he looked for limitations that Plaintiff suffered

throughout her daily routines both at work and outside of work. *See* Allen Depo at 84:3 – 86:5.

**Response:**  Denied.  Dr. Allen never asked Lenkiewicz or any of her physicians to identify which major life activities were limited by her impairments.  Pl. Ex. 15, Allen Dep. 102:13–103:6; Pl. Ex. 4, Pl.'s Request for Admission No. 10.[2]  Dr. Allen dismissed relevant medical evidence, such as Lenkiewicz's pain and fatigue, simply because he did not consider that evidence to be "objective[.]"  *See* Pl. Ex. 15, Allen Dep. 123:9–124:8.  Dr. Allen even dismissed Dr. Shammas' recommendation that Lenkiewicz be permitted to work from home based on Dr. Allen's unsupported speculation that "Lenkiewicz asked the doctor [Dr. Shammas] to … please write something that tells them I have a severe multijoint condition."  Pl. Ex. 15, Allen Dep. 153:14–154:8.

31.     Dr. Allen further explained that because of Dr. Shammas' history with Plaintiff, Dr. Shammas could tell how Plaintiff's injuries and treatment have evolved.  *See* Allen Depo at 87:6 – 87:11.

**Response:**  Admitted.

32.     Dr. Allen reviewed the four (4) documents submitted by Plaintiff in support of her  request, in addition to a medical assessment submitted by one of Plaintiff's physicians.  *See* Allen Depo at 94:1 – 94:13.

**Response:**   Admitted that Dr. Allen reviewed (i) Dr. Shammas' December 16, 2010 letter recommending telework, (ii) Dr. Shammas' December 16, 2010 note with diagnoses of "dizziness, fatigue, and multi joint pain" and recommending "light duty only," (iii) an undated

---

[2] Defendant failed to serve a timely response to Plaintiff's requests for admission numbers 5–12, which therefore are deemed admitted under Fed. R. Civ. P. 36(a)(3).  By motion on December 10, 2014, Defendant sought (1) permission to withdraw these admissions and (2) a *nunc pro tunc* extension of the deadline to serve its otherwise untimely responses.  (ECF No. 47.)  Plaintiff filed a memorandum in opposition to the motion on December 29, 2014.  (ECF No. 48.)  Defendant did not file a reply, and its motion remains pending.

note from Dr. Michael Williams referring Lenkiewicz to "Endocrinology" for

"hyperthyroidism," (iv) signed releases authorizing HUD to speak with Dr. Shammas and Dr.

Williams, (v) an undated note from Dr. Williams recommending that Lenkiewicz "start working

from home immediately[,]" and (vi) Dr. Cabalar's December 30, 2010 report diagnosing

Lenkiewicz with, among other things, "COPD," "chronic bronchitis," and "degenerative joint

disease of the lumbar spine and right knee[.]"  Pl. Ex. 20, Def.00194 – Def.00202; Def.00265; Pl.

Ex. 15, Allen Dep. 150:7–21; Pl. Ex. 28, SHA_0079 – SHA_0080.  Otherwise denied.

33.     Dr. Allen concluded that none of the documents submitted by Plaintiff or her

physicians identified a substantial limitation of a major life function.  *See* Allen Depo at 153:10 –

157:18.

**Response:**  Denied.  It is irrelevant what Dr. Allen "concluded."  As explained above (*see*

¶ 25), Dr. Allen's opinions are inadmissible; they are procedurally barred under Fed. R. Civ. P.

26(a)(2), unreliable under Fed. R. Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402.

Based on the information in support of Lenkiewicz's December 2010 accommodation

request, it was more likely than not that her degenerative joint disease of the spine and lower

extremities substantially limited the major life activities of walking and performing manual tasks.

*See* Pl. Ex. 22, LENK_0055 ("hindering disabilities" included "debilitating arthritis"); Pl. Ex. 20,

Def.00197 (recommending work from home because of Lenkiewicz's "severe multi-joint

condition"), Def.00180 (noting Dr. Shammas' observations that [t]ravel is difficult" for

Lenkiewicz and that he "has seen [Lenkiewicz] for many years all related to complains of her

joint [*sic*] including elbow, knee, neck & low back"); Pl. Ex. 28, SHA_0080 (diagnosing

Lenkiewicz with "degenerative joint disease of the lumbar spine and right knee"); Pl. Ex. 19,

Shammas Dep. 17:25–18:8 (testifying that for persons who, like Lenkiewicz, suffer from

degenerative joint disease in the "lower extremities," there is "a high possibility of having

problem[s] with [] mobility").  Based on the information submitted in support of Lenkiewicz's

December 2010 accommodation request, it was also more likely than not that her COPD with

chronic bronchitis substantially limited the major life activity of breathing.  *See* Pl. Ex. 22,

LENK_0055 ("hindering disabilities" included "COPD with chronic bronchitis"; symptoms

included "dizziness" and "fatigue"); Pl. Ex. 20, Def.00198 (recommending "light duty only due to

fatigue and dizziness"); Pl. Ex. 28, SHA_0079 – SHA_0080 (diagnosing Lenkiewicz with

"COPD" and "chronic bronchitis" and noting that Lenkiewicz "complains of feeling tired all the

time and having no energy" and "feels like she has no strength"); Pl. Ex. 13, Patterson Dep. 88:5–

90:14 (Lenkiewicz feeling "tired" and having "no strength" are functional limitations).

   34. Dr. Allen, specifically, reviewed the only clinical evaluation and determined that

there were no limitations in her joints that would affect any activities, major or minor.  *See* Allen

Depo at 104:14 – 105:1; *id.* at 98:22 – 99:12; *id.* at 128:20 – 129:6; *id.* at 157:1 – 157:18; *see

also* December 30, 2010 medical report of Dr. Cabalar, attached hereto as Ex. 12.

   **Response:** Denied.  It is irrelevant what Dr. Allen "determined."  As explained above (*see*

¶ 25), Dr. Allen's opinions are inadmissible; they are procedurally barred under Fed. R. Civ. P.

26(a)(2), unreliable under Fed. R. Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402.

   Dr. Cabalar's December 30, 2010 report is not "the only clinical evaluation[.]"  Dr.

Cabalar's December 20 report, unlike the December 30 report that concerned an evaluation after

Lenkiewicz had been off work for days, the physical examination found "tenderness" in various

joints, including "shoulders," "elbows," "hips," "the left knee," "cervical spine," and "the

lumbosacral area[.]"  Pl. Ex. 28, SHA_0076.  Dr. Cabalar in her December 20 report notes that

"[j]oint pains are apparently worse with activity."  *Id.* SHA_0075.  Dr. Cabalar's December 20,

2010 report was available to Dr. Allen, but Dr. Allen did not ask for it; he typically does not "ask the employee's physician for all of their files on the patient[.]"  *See* Pl. Ex. 15, Allen Dep. 60:10–14.  There were other "clinical evaluation[s]" that could have been provided, such as Dr. Dawson's treatment notes and lung function tests, but neither Dr. Allen nor anyone at HUD asked for additional medical documentation.  *See* Pl. Ex. 24, DAW_0001 – DAW_0016; Pl. Ex. 26, KOUL_0001; Pl. Ex. 27, OMA_0001 – OMA_0002; Pl. Ex. 4, Pl.'s Request for Admission No. 10.[3]

HUD mischaracterizes Dr. Allen's opinion.  He never opined that "there were no limitations[.]"  At most, he opined that "there were no limitations" *evident to him*.  This distinction is critical.  Dr. Allen merely concluded that any limitations Lenkiewicz may have had were not evident to him based on the narrow universe of information he considered.  He never opined that Lenkiewicz *lacked* a disability.  He did not consider any information beyond the documentation given to him and his conversations with Dr. Shammas and Dr. Williams.  The opinions of Lenkiewicz's medical experts that her physical impairments substantially limited several major life activities are therefore uncontroverted.  *See* Pl. SoF ¶¶ 7–15.

35.     Likewise, the two treating physicians that Plaintiff signed releases for, Dr. Shammas and Dr. Williams, both found that the objective medical evaluation included amongst Plaintiff's accommodation documents show no limitation of a major life activity due to degenerative joint disease.  *See* Shammas Depo at 21:3 – 21:16; *id*. at 23:7 – 23:14; December 17, 2014 Deposition of Michael Vincent Williams ("Williams Depo"), attached hereto as Ex. 13, at 18:5 – 18:21.

---

[3] *See supra* note 2.

**Response:**   Denied.   Dr. Cabalar's December 30, 2010 report is not the *only* "objective medical evaluation[.]"   Dr. Cabalar's observations about Lenkiewicz's joints focused on "range of motion," "effusion," and "tenderness," not functionality.   Pl. Ex. 28, SHA_0079 – SHA_0080. Dr. Cabalar simply did not evaluate whether Lenkiewicz's joint disease made it difficult for Lenkiewicz to walk or perform manual tasks.   It is therefore irrelevant whether her report, considered by itself and not in light of other medical evidence, shows a "limitation of a major life activity due to degenerative joint disease[.]"   The well-supported, uncontroverted opinion of Dr. Eric Dawson establishes that Lenkiewicz's degenerative joint disease substantially limited the major life activities of performing manual tasks, walking, standing, lifting, bending, and engaging in other physical activity.   Pl. Ex. 10, Dawson Rep. ¶¶ 8, 18; Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 4; Pl. Ex. 18, Lenkiewicz Dep. 190:8–13.   Dr. Dawson considered Dr. Cabalar's December 20 and December 30 reports, yet still concluded, especially in view of other evidence, that Lenkiewicz was substantially limited in walking, performing manual tasks, and other major life activities.   Pl. Ex. 10, Dawson Rep. Ex. C (materials considered).

36.   Dr. Shammas explained that he referred Plaintiff to Dr. Cabalar, the doctor who provided the objective examination indicating normal functional activity in Plaintiff's joints, because at the time of Plaintiff's telework request she did not have "a specific ailment" but was dealing with "generalized aches and pains."   *See* Shammas Depo at 10:23 – 11:23.

**Response:**   Denied.   HUD mischaracterizes Dr. Shammas' testimony, which speaks for itself.   Pl. Ex. 19, Shammas Dep. 10:21–11:7 ("Q  Okay. Do you recall why you referred her at that time for rheumatology? A  Usually in orthopedics, we deal with a specific ailment in a specific body. Orthopedic is primarily more of a surgical specialty. Q  Okay.  A  Now, when it become[s] to the point where it's generalized aches and pains, where – it's usually dealt with

rheumatology, which deals with aches and pain without the surgical intervention to a certain

point.  So I thought at that point, she will benefit more from a rheumatologist, versus from

orthopedics.")  Dr. Cabalar's December 30, 2010 report is not the *only* "objective medical

evaluation[.]"  Her report did not indicate "normal functional activity in Plaintiff's joints[.]"  Dr.

Cabalar's observations about Lenkiewicz's joints focused on "range of motion," "effusion," and

"tenderness," not functionality.  Pl. Ex. 28, SHA_0079 – SHA_0080.  Dr. Cabalar simply did not

evaluate whether Lenkiewicz's joint disease made it difficult for Lenkiewicz to walk or perform

manual tasks.

37.     Dr. Shammas further explained that he submitted the telework request at issue not

to accommodate a specific physical limitation of a major life activity but based on Plaintiff's

reported stress, and general aches and pains, with the hope that Plaintiff could be more

productive in a less stressful environment.  *See* Shammas Depo at 13:20 – 15:6.

**Response:**  Denied.  HUD mischaracterizes Dr. Shammas' testimony, which speaks for

itself.  Pl. Ex. 19, Shammas Dep. 13:20–14:3 (testifying that Lenkiewicz "had a lot of complaints

of aches and pain in multiple joints, and so I thought if ***she can be more productive on a lighter***

***type of environment for work, she probably would be able to continue working***") (emphasis

added), 14:7–10 ("Q. In your opinion, did the aches and pains that she was suffering prevent her

from being able to come to work at that time? A. To a certain point, yes.").

38.     Finally, when Dr. Williams, Plaintiff's second treating physician completed his

tests of Plaintiff's condition, he determined that Plaintiff could return to work.  *See* Allen Depo

at 168:21 – 170:7.

**Response:**  Denied.  During his deposition, Dr. Williams did not even remember who

Lenkiewicz was.  Any statement Dr. Williams might have made to Dr. Allen is inadmissible as

hearsay, lacking foundation, and irrelevant. There is no evidence that Dr. Williams ever

"completed his tests of Plaintiff's condition" or that Dr. Williams ever "determined that Plaintiff

could return to work." To the contrary, any statements Dr. Williams made to Dr. Allen merely

indicated that any diagnostic tests on Lenkiewicz's thyroid could be performed "on an outpatient

basis" and thus did not require inpatient treatment. *See* Pl. Ex. 15, Allen Dep. 168:21–170:7. Dr.

Williams' knowledge of Lenkiewicz's medical conditions was limited regardless. He first saw

Lenkiewicz for the first time *after* she had submitted her December 2010 accommodation request.

His treatment of Lenkiewicz was narrowly focused on a possible endocrine issue, which unlike

COPD and joint disease was not cited as a basis for Lenkiewicz's accommodation requests. *See*

Pl. Ex. 20, Def.00276 – Def.00279. There is no evidence that Dr. Williams was even aware of

Lenkiewicz's COPD and joint disease.

39.     Based on the information submitted, Dr. Allen concluded that he did not have

sufficient medical documentation to determine Plaintiff's functional limitations and whether they

limited a major life activity. *See* Allen Depo at 122:20 – 123:1; *id*. at 132:19 – 133:2.

**Response:**  Admitted only to the extent that Dr. Allen believed that "he did not have

sufficient medical documentation to determine Plaintiff's functional limitations and whether they

limited a major life activity." Denied that Dr. Allen's beliefs or conclusions are admissible,

reliable, relevant, or correct. As explained above (*see* ¶ 25), Dr. Allen's opinions are

inadmissible; they are procedurally barred under Fed. R. Civ. P. 26(a)(2), unreliable under Fed. R.

Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402.

Based on the information in support of Lenkiewicz's December 2010 accommodation

request, it was more likely than not that her degenerative joint disease of the spine and lower

extremities substantially limited the major life activities of walking and performing manual tasks.

23

*See* Ex. 22, LENK_0055 ("hindering disabilities" included "debilitating arthritis"); Ex. 20, Def.00197 (recommending work from home because of Lenkiewicz's "severe multi-joint condition"), Def.00180 (noting Dr. Shammas' observations that [t]ravel is difficult" for Lenkiewicz and that he "has seen [Lenkiewicz] for many years all related to complains of her joint [*sic*] including elbow, knee, neck & low back"); Pl. Ex. 28, SHA_0080 (diagnosing Lenkiewicz with "degenerative joint disease of the lumbar spine and right knee"); Pl. Ex. 19, Shammas Dep. 17:25–18:8 (testifying that for persons who, like Lenkiewicz, suffer from degenerative joint disease in the "lower extremities," there is "a high possibility of having problem[s] with [] mobility").  Based on the information submitted in support of Lenkiewicz's December 2010 accommodation request, it was also more likely than not that her COPD with chronic bronchitis substantially limited the major life activity of breathing.  *See* Ex. 22, LENK_0055 ("hindering disabilities" included "COPD with chronic bronchitis"; symptoms included "dizziness" and "fatigue"); Pl. Ex. 20, Def.00198 (recommending "light duty only due to fatigue and dizziness"); Pl. Ex. 28, SHA_0079 – SHA_0080 (diagnosing Lenkiewicz with "COPD" and "chronic bronchitis" and noting that Lenkiewicz "complains of feeling tired all the time and having no energy" and "feels like she has no strength"); Pl. Ex. 13, Patterson Dep. 88:5–90:14 (Lenkiewicz feeling "tired" and having "no strength" are functional limitations).

40.     Dr. Allen recommended that the Agency deny Plaintiff's request to telework. *See* Allen Depo at 134:9 – 134:21; *see also* Recommendation, attached hereto as Ex. 16.

**Response:**  Admitted.

COPD

41.     Dr. Allen explained that "COPD stands for chronic obstructive pulmonary disease.  It's a disease – the primary risk factor for COPD is smoking."  Allen Depo at 158:2 –

158:4.

**Response:**  Admitted.

42.    Dr. Allen also explained that everyone who suffers from COPD does not suffer a substantial limitation of a major life activity.  *See id.* at 158:12 – 158:18.

**Response:**  Denied.  It is irrelevant what Dr. Allen "explained[.]"  As discussed above (*see* ¶ 25), Dr. Allen's opinions are inadmissible; they are procedurally barred under Fed. R. Civ. P. 26(a)(2), unreliable under Fed. R. Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402. Dr. Allen described COPD as "a serious condition" and "a life-threatening condition."  Pl. Ex. 15, Allen Dep. 158:9–11.  Dr. Allen testified that the "shortness of breath and a productive cough" noted in Dr. Cabalar's December 30 report "[c]learly … could be due to early COPD."  *Id.* 159:2– 5.  HUD distorts Dr. Allen's testimony.  Dr. Allen responded "No" to the question "does everyone who suffers from COPD also have a substantial limitation of a major life activity."  *Id.* 158:12–16. Dr. Allen does not opine, as HUD suggests, that *most* people with COPD are not substantially limited in a major life activity.  To the contrary, the most Dr. Allen says is that *not everyone* with COPD is substantially limited in a major life activity, which strongly implies that *most* suffers of COPD *are* substantially limited in a major life activity.

43.    Plaintiff did not provide medical releases for her physicians treating her for COPD and her physicians who were consulted did not raise COPD as a basis for alleging any form of an accommodation.  *See* Allen Depo at 149:7 – 149:13; *id*. at 150:7 – 150:16; Lenkiewicz Depo at 154:10 – 154:22.

**Response:**  Admitted that Lenkiewicz did not provide medical releases for other treating physicians because (i) HUD did not ask to speak with other physicians, failed to inform Lenkiewicz what information HUD believed was missing or needed, or suggest that speaking with

other physicians would have helped her reasonable accommodation request in any way, and (ii) Lenkiewicz reasonably came to believe based on HUD's conduct that "HUD would not give her reasonable accommodations no matter what she did" and that "no additional documentation or information would prompt HUD to grant her request for accommodations."  Pl. Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; Pl. Ex. 4, Pl.'s Request for Admission Nos. 10–11.[4]

  Denied that "her physicians who were consulted did not raise COPD as a basis for alleging any form of accommodation."  Lenkiewicz's Form 1000 made clear that she sought accommodation for "COPD with chronic bronchitis" as one of "2 hindering disabilities," but HUD never sent that form to FOH.  *See* Pl. Ex. 15, Allen Dep. 137:16–138:4, 150:7–21.  FOH received a report from Dr. Imelda Cabalar diagnosing Lenkiewicz with "COPD" and "degenerative joint disease" and noting that x-rays confirmed arthritis in Lenkiewicz's spine and right knee.  Pl. Ex. 28, SHA_0079 – SHA_0080; Pl. Ex. 15, Allen Dep. 77:17–78:8, 94:1–15. No admissible evidence establishes one way or another whether Dr. Shammas and Dr. Williams "discussed" COPD with Dr. Allen.  Neither Dr. Shammas nor Dr. Williams recalls ever having spoken with Dr. Allen (*see* Pl. Ex. 19, Shammas Dep. 25:4–9, 26:8–18), and Dr. Allen does "not have any memory of that specific conversation" with Dr. Shammas (Pl. Ex. 15, Allen Dep. 89:9–15).  Dr. Allen's worksheets constitute inadmissible hearsay under Fed. R. Evid. 802.  To the extent that the hearsay-within-hearsay statements from Dr. Shammas and Dr. Williams are relevant for a non-hearsay purpose (*i.e.* their effect on Dr. Allen), there is no evidence that Dr. Allen memorialized every subject of his conversations with those two physicians.  Dr. Allen's worksheets are, at best, evidence that Dr. Allen did not write down that COPD was discussed; they are not evidence that COPD was never discussed.

---

[4] *See supra* note 2.

44.     The only medical document discussing potential breathing impairments submitted in support of Plaintiff's accommodation request demonstrated that Plaintiff had no breathing impairments.  *See* Allen Depo at 149:14 – 150:6; *id*. at 159:20 – 160:10; *id*. at 161:5 – 161:10.

**Response:**  Denied.  As explained above (*see* ¶ 25), Dr. Allen's opinions are inadmissible; they are procedurally barred under Fed. R. Civ. P. 26(a)(2), unreliable under Fed. R. Evid. 702 and 703, and irrelevant under Fed. R. Evid. 402.   HUD grossly distorts Dr. Allen's testimony. Dr. Allen described COPD as "a serious condition" and "a life-threatening condition."  Pl. Ex. 15, Allen Dep. 158:9–11.  Dr. Allen testified that the "shortness of breath and a productive cough" noted in Dr. Cabalar's December 30 report "[c]learly … could be due to early COPD."  *Id.* 159:2–5.  In none of the portions HUD cites does Dr. Allen testify that Lenkiewicz was *unimpaired*, nor does he dispute that Lenkiewicz had COPD.  Dr. Schwartz considered Dr. Cabalar's December 20 and December 30 reports, yet still concluded, especially in view of other evidence, that Lenkiewicz was substantially limited in breathing.  Pl. Ex. 11, Schwartz Rep. Ex. B (materials considered).

Other "medical document[s] discussing potential breathing impairments"—many of which were possessed by or accessible to HUD without Lenkiewicz's authorization—demonstrated that Lenkiewicz had breathing impairments.  *See* Pl. SoF ¶¶ 11, 14, 74; Pl. Ex. 26, KOUL_0001; Pl. Ex. 27, OMA_0001 – OMA_0002; Pl. Ex. 25, FOH_0003 – FOH_0004, FOH_0006; Pl. Ex. 22, LENK_0049 – LENK_0054; Pl. Opp'n Ex. 4.  The firsthand knowledge of Lenkiewicz's supervisors corroborates that Lenkiewicz was substantially limited in breathing.  *See* Pl. SoF ¶¶ 44, 66, 74, 79, 87.

45.     Plaintiff also concedes that she smokes.  *See* Lenkiewicz Depo at 143:1 – 143:17.

**Response:**  Admitted.

46.     Plaintiff further concedes that her smoking affects her COPD, breathing and bronchitis.  *See* Lenkiewicz Depo at 143:22 – 144:4.

**Response:**  Admitted that Lenkiewicz testified that smoking "affect[s]" her "breathing problems," "COPD," and "chronic bronchitis" in unspecified ways.  Pl. Ex. 18, Lenkiewicz Dep. 143:22–144:4.  Denied to the extent HUD suggests that Lenkiewicz's prognosis would improve if she stopped smoking.  Dr. Schwartz opined without contradiction that "COPD is a progressive condition, meaning that it is expected to worsen over time[.]"  Pl. Ex. 11, Schwartz Rep. ¶ 19. Lenkiewicz testified that "you can't reverse COPD."  Pl. Ex. 18, Lenkiewicz Dep. 144:12–17.

47.     Plaintiff also concedes that her doctors told her that her breathing would improve if she stopped smoking.  *See* Lenkiewicz Depo at 144:18 – 144:20.

**Response:**  Denied.  HUD mischaracterizes Lenkiewicz's testimony, which speaks for itself.  *See* Pl. Ex. 18, Lenkiewicz Dep. 144:9–20 ("Q.  Did any of the doctors ever told [*sic*] you that your COPD may improve if you stop smoking?  A.  No.  Q.  To the best of your recollection, it's your testimony that no doctor has ever told you that your COPD would improve if you stopped smoking?  A.  Not that my COPD would improve.  My breathing would get better, that – in other words, once you have COPD and no oxygen you – you can't reverse COPD.  A.  But you were told that your breathing would get better if you stopped smoking?  A.  Yes.").  What Lenkiewicz might have been told by some unspecified persons, whether or not they were doctors, is irrelevant and therefore inadmissible under Fed. R. Evid. 402.

## Departure from the Agency

48.     In May 2011, Plaintiff decided that she would no longer return to work at the Agency.  Despite the fact that Plaintiff's accommodation request, which the Agency denied, was

to telework three (3) days a week, after an initial five (5) day per week period, Plaintiff decided that she did not wish to work in the office at all and ceased coming to work.

**Response:**  Admitted that, in May 2011, after Plaintiff informed her supervisor, Lewis, that she was concerned about toxic mold in the office, Plaintiff's breathing problems had become so severe that she could no longer endure working in the HUD headquarters building without a reasonable accommodation.  Plaintiff told Lewis that she would not return to the office until HUD did something to address her breathing problems.  Answer ¶ 30 (ECF No. 21); Pl. Ex. 18, Lenkiewicz Dep. 165:9–167:6, 193:13–16; Pl. Ex. 16, Lewis Dep. 159:20–161:6; Pl. Ex. 9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 6; Pl. Ex. 2, Pl.'s Resp. to Def.'s Interrogatory No. 9.  Admitted that the agency denied Lenkiewicz's request to telework.  Otherwise denied.

49.    Plaintiff stayed away from the office for more than five (5) months before the Agency decided to terminate Plaintiff's employment in order to hire a new FOIA specialist capable of completing his or her work assignments.  *See* Lenkiewicz Depo at 165:14 – 165:24.

**Response:**  Admitted that Plaintiff did not report to her job at the HUD headquarters building after leaving in May 2011.  Admitted that HUD ultimately terminated Plaintiff's employment due to her absences.  Pl. Ex. 17, Cole Dep. 21:13–17; 152:6–11; Pl. Ex. 16, Lewis Dep. 42:12–17.  In the letter finalizing Lenkiewicz's termination, Cole acknowledged that Lenkiewicz had "raised medical reasons that impact [her] ability to report and/or perform work" but suggested "disability retirement" in lieu of an accommodation.  Pl. Ex. 23, LENK_0922. Denied that HUD hired "a new FOIA specialist" to replace Lenkiewicz or that Lenkiewicz was not "capable of completing his or her work assignments."  There is no evidence that HUD hired a FOIA Specialist to replace Lenkiewicz.  Lenkiewicz would have been able to perform the

29

essential functions of the FOIA Specialist Position with a reasonable accommodation.  Pl. SoF ¶¶ 25, 78.

FMS2 System

50.     The upgraded FMS2 system cost the Agency approximately 5 million dollars and allowed FOIA specialist to securely process FOIA requests remotely. *See* Cole Depo at 69:15 – 70:21.

**Response:**  Denied.  The phrase "upgraded FMS2 system" is vague and ambiguous.  As such, it is also unclear what "cost the Agency approximately 5 million dollars."  It is further unclear what "securely process FOIA requests remotely" means.  Cole's testimony about the FMS2 system, its capabilities, and the cost of any upgrades lacks foundation and is unsupported by documentary evidence.  Cole was a second-level supervisor in the Office of the Executive Secretariat.  There is no evidence that Cole had firsthand knowledge of the technical features of the FMS2 system before or after any upgrades.  Nor is there evidence of the source of Cole's beliefs about the cost of any such upgrades.  The FMS2 system predated Lenkiewicz's arrival at HUD.  It launched "around 2007."  Pl. Ex. 16, Lewis Dep. 199:1–3.  None of the specific "glitches" in the FMS2 system before upgrades related to security.  *Id.* 222:21–223:12.

The cost of any upgrades is irrelevant.  HUD began training employees on the "upgraded" and "new system" in "September, 2011" while Lenkiewicz was still employed at the agency.  Pl. Ex. 1, Def.'s Resp. to Pl.'s Interrogatory No. 10.  For cost information to have any probative value, HUD would have to show what additional marginal cost would have been incurred to implement the upgrade *earlier*, but there is no evidence of such cost.

51.     Prior to the purchase and integration of the upgraded FMS2 system, FOIA specialists were not permitted to work "because of the nature of the documents" in that they

contained "confidential information."  Lewis Depo at 62:13 – 62:19; *id*. at 196:4 – 196:13; Cole

Depo at 72:13 – 72:21; *id.* at 82:6 – 82:13.

      **Response:**  Denied.  It is unclear what "upgraded FMS2 system" means.  It is also

unclear what "integration" means in the context of the "upgraded FMS2 system."  It is also

unclear what is meant by "FOIA specialists were not permitted to work 'because of the nature of

the documents' in that they contained 'confidential information.'"  Cole's testimony about the

FMS2 system, its capabilities, and the cost of any upgrades lacks foundation and is unsupported

by documentary evidence.  Cole was a second-level supervisor in the Office of the Executive

Secretariat.  There is no evidence that Cole had firsthand knowledge of the technical features of

the FMS2 system before or after any upgrades.  Nor is there evidence of the source of Cole's

beliefs about the cost of any such upgrades.  The FMS2 system predated Lenkiewicz's arrival at

HUD.  It launched "around 2007."  Pl. Ex. 16, Lewis Dep. 199:1–3.  None of the specific

"glitches" in the FMS2 system before upgrades related to security.  *Id.* 222:21–223:12.  Any

belief by Cole or Lewis to the contrary is unsupported by foundation.  There is no evidence that

accessing the FMS2 system remotely prior to any upgrades would have involved greater security

risks than accessing the system from a computer connected to HUD's network.  There is no

contemporaneous documentary evidence that Cole or Lewis did not allow telework due to

security or feasibility concerns, and there is no evidence that they expressed any such concerns to

others (including Lenkiewicz).

      52.      The Director of the Office of the Secretariat, where the FOIA office is a

component, Dr. Cole explained that the systems, prior to the upgraded FMS2 system, did not

"allow FOIA specialists to safeguard confidential information remotely."  *See* Cole Depo at

143:11 – 144:4; *id*. at 145:13 – 145:19; s*ee also* Cole Depo at 146:18 – 147:10 (explaining that

with the original FMS and ACORN systems, employees were not capable of transmitting

documents securely online between the program offices because "[t]he program offices weren't

using" those systems, and employees "couldn't redact online" requiring use of paper copies of

documents to redact information); *id* at 69:15 – 70:21; Lewis Depo at 198:5 – 198:11.

**Response:**  Denied.  It is unclear what "upgraded FMS2 system" means.  HUD

mischaracterizes Dr. Cole's testimony about the FMS2 system.  Dr. Cole did not provide

testimony about the "upgraded" FMS2 system, the definition of which is unclear.  Dr. Cole

testified that, "[p]rior to having the FMS2 system … the computer systems that the office used

[did not] allow FOIA specialists to safeguard confidential information remotely."  Pl. Ex. 17,

Cole Dep. 143:11-20.  This FMS2 system predated Lenkiewicz's arrival at HUD; it launched

"around 2007."  Pl. Ex. 16, Lewis Dep. 199:1–3.  FOIA Specialists used the FMS2 system to

review potentially responsive documents and even make redactions as early as 2009.  Ex. 9, Pl.'s

Supp. Resp. to Def.'s Interrogatory No. 3; Pl. Ex. 21, DEF.EMAIL.0024, DEF.EMAIL.0032,

DEF.EMAIL.0035, DEF.EMAIL.0174, DEF.EMAIL.0185.  Lenkiewicz could have performed

these tasks remotely.  *See* Pl. SoF ¶ 78.

53.    The Agency purchased the upgraded FMS2 system in September 2011 and began

migration at that time followed by training that lasted through the first quarter of 2012.  *See* 2011

migration, configuration, and training schedule for the upgraded FMS2 system, attached hereto

as Ex. 14 (showing initial migration and configuration of the FMS2 system in August 2011 and

various training on a rolling basis from September 2011 through February 2012); Cole Depo at

70:22 – 72:1; *id*. at 144:9 – 145:11.

**Response:**  Denied.  It is unclear what "upgraded FMS2 system" means.  The

documentary evidence cited by HUD is inadmissible hearsay with no applicable exception or

exemption.  Regardless, that documentary evidence does not establish that the agency purchased the FMS2 system in September 2011 or "began migration at that time followed by training that lasted through the first quarter of 2012."  The documentary evidence by Defendant does not establish that "initial migration and configuration of the FMS2 system" occurred in August 2011.  The documentary evidence does not establish that FMS2 training actually took place between September 2011 and February 2012.

Other evidence contradicts Cole's testimony and the "schedule" cited by HUD.  By 2009, FOIA Specialists processed FOIA requests electronically using FMS2 (also known as FOIAXpress). FMS2 is a web-based platform that is accessed from an internet browser.  Through FMS2, even as it existed in 2009, FOIA Specialists could receive FOIA requests and review and redact potentially responsive documents.  Pl. SoF ¶ 78; Pl. Ex.  9, Pl.'s Supp. Resp. to Def.'s Interrogatory No. 3; Pl. Ex. 21, DEF.EMAIL.0024, DEF.EMAIL.0032, DEF.EMAIL.0035, DEF.EMAIL.0174, DEF.EMAIL.0185; Pl. Ex. 20, Def.02933 – Def.02934, Def.02936 – Def.02940, Def.02950 – Def.02953.

54.    Plaintiff concedes that she did not have access to the previously used FMS system  from her home prior to leaving the Agency.  *See* Lenkiewicz Depo at 94:4 – 94:6.

**Response:**  Admitted that Plaintiff testified that she did not have access to the FMS system from her home before she left HUD.  Otherwise, HUD's statement is denied, particularly to the extent that it suggests the *FMS2* system was not in use while Lenkiewicz was employed at HUD,  Lenkiewicz's testimony is unsupported by foundation and therefore inadmissible because she "never went home and tried" to access the system.  Pl. Ex. 18, Lenkiewicz Dep. 93:14–25.  Even if she had personal knowledge whether she had access to the system from home, she testified that she "could have had access" to the FMS2 system while at HUD.  *Id.*

33

55. Plaintiff concedes that management informed employees they were waiting for the upgraded FMS system before several computer-based FOIA tasks could begin. *See* Lenkiewicz Depo at 99:9 – 99:22.

**Response:** Admitted that Plaintiff testified that she recalled some communication from management officials saying that they were waiting for an upgrade before they started using certain parts of FMS. Otherwise, HUD's statement is denied. Lenkiewicz's testimony is unsupported by foundation and therefore is inadmissible. Her testimony is also inadmissible under Rule 1001 to the extent that Lenkiewicz refers to a document HUD sent her. HUD fails to specify, and Lenkiewicz's deposition testimony does not clarify, which "tasks" allegedly awaited any upgrades, much less whether such "tasks" bear on the ability of FOIA Specialists to telework.

56. Plaintiff concedes that the necessary upgrades to FMS were very expensive. *See* Lenkiewicz Depo at 100:2 – 100:9.

**Response:** Admitted that Plaintiff testified that her understanding was that an upgrade of FMS was expensive. Otherwise, HUD's statement is denied. Lenkiewicz's testimony is inadmissible because Plaintiff lacked personal knowledge of how expensive the upgrades were, and so was simply speculating.

57. Plaintiff concedes that to the best of her knowledge no FOIA specialists were teleworking at the time she left the Agency. *See* Lenkiewicz Depo at 90:10 – 91:25; Cole Depo at 64:21 – 65:4.

**Response:** Admitted that Lenkiewicz testified that, to her knowledge, nobody was teleworking at the time she left the agency. Otherwise, HUD's statement is denied. Lenkiewicz's testimony is inadmissible because she lacked personal knowledge of whether at least one other FOIA Specialist might have been teleworking, and so was simply speculating.

34

Respectfully submitted,

*/s/ J. Wells Harrell*                              .
J. Wells Harrell (D.C. Bar No. 995368)
Evan E. North (D.C. Bar No. 995360)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax: 202-237-6181
wharrell@bsfllp.com
enorth@bsfllp.com

Dated: March 27, 2015                    *Attorneys for Plaintiff Denise L. Lenkiewicz*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DENISE L. LENKIEWICZ**, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 13-0261 (RCL) |
| ) | |
| **JULIÁN CASTRO**, ) | |
| Secretary, U.S. Department of ) | |
| Housing & Urban Development, ) | |
| ) | |
| *Defendant*. ) | |

## DECLARATION OF J. WELLS HARRELL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, J. Wells Harrell, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the bar of this Court, an attorney at Boies, Schiller & Flexner LLP, and counsel for Plaintiff Denise L. Lenkiewicz in the above-captioned action.  I submit this declaration in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated March 27, 2015.

2.      Attached as Exhibit 1 is a true and correct copy of the transcript from the deposition of Denise Lenkiewicz in connection with her EEO administrative proceeding, which took place on June 4, 2012.

3.      Attached as Exhibit 2 is a true and correct copy of a selection of documents produced by Defendant in discovery bearing the "Def." bates prefix.  These documents appear in numerical order and range from Def.00379 to Def.00555.

4.      Attached as Exhibit 3 is a true and correct copy of a selection of documents produced by Plaintiff in discovery bearing the "LENK_" bates prefix.  These documents appear in numerical order and range from LENK_0476 to LENK_0498.

5.      Attached as Exhibit 4 is a true and correct copy of a selection of documents produced by Defendant in discovery.  Although they were produced in native format without bates stamps, Plaintiff affixed bates stamps to these documents using the "DEF.EMAIL." prefix. These documents appear in numerical order and range from DEF.EMAIL.0222 to DEF.EMAIL.0227.

6.      Attached as Exhibit 5 is a true and correct copy of the Declaration of Denise Lenkiewicz dated March 27, 2015 and attaching an exhibit.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 27, 2015                    */s/ J. Wells Harrell*                                 _
Washington, DC                                      J. Wells Harrell

2