**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DENISE L. LENKIEWICZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 1:13-cv-0261 (RCL) |
| v. | ) |
| | ) |
| JULIAN CASTRO, Secretary, | ) |
| U.S. Department of Housing and | ) |
| Urban Development | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

On March 6, 2015, Defendant, Julian Castro, Secretary, U.S. Department of Housing and

Urban Development, filed its Motion for Summary Judgment arguing that Plaintiff Denise

Lenkiewicz ("Plaintiff") is unable to establish her claims as a matter of law because (1) she

failed to properly exhaust a number of her failure to accommodate claims leaving this court

without jurisdiction to grant the relief requested; (2) with respect to Plaintiff's request to

telework, Plaintiff failed to provide any evidence that she suffers from a substantial limitation of

a major life activity – thus meeting the definition of qualified individual with a disability – and

that Plaintiff's request to telework would have caused an undue hardship on Defendant as it cost

approximately five (5) million dollars, in addition to substantial training of several individuals, to

put the systems in place to allow Plaintiff to telework; and (3) that Plaintiff's disability

discrimination claim fails as a matter of law because Defendant had a legitimate non-

discriminatory reason for terminating Plaintiff's employment, *i.e.* she ceased coming to work for

more than five (5) months.

On March 27, 2015, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment relying upon documents and medical assessments which Defendant did not have the benefit of considering.  *See generally* Pl's Opp.  Unable to refute that the evidence submitted in support of Plaintiff's accommodation request to telework showed no limitation of a major life activity, and that Plaintiff could return to work, Plaintiff now argues that the Court should ignore the medical evaluations and statements made by her treating physicians and rely upon medical evaluations, conducted several years after her request was made, to determine Defendant violated the Rehabilitation Act ("Rehab Act").  Despite Plaintiff's assertion to the contrary, It is Plaintiff's responsibility to show she meets the regulatory definition of "disabled" under the Rehab Act.  *See* 29 C.F.R. §§ 1630.2(j)(1)(i) and (j)(1)(iv.).  Plaintiff's failure to meet this burden proves fatal to her claim and Defendant is entitled to summary judgment.

**I.      Plaintiff was Required to Proffer Support for her Assertion that she Met the Legal Definition of Disabled to Support her Accommodation Request**

First, Plaintiff was required to proffer evidence in support of her assertion that she met the legal definition of a disabled person under the Rehab Act and she failed to do so.   Even under the ADAAA's relaxed standards, an individual seeking relief under the ADAAA/Rehabilitation Act must establish that he or she was "substantially" limited in even *one* major life activity.  29 C.F.R. §§ 1630.2(j)(1)(i) and (j)(1)(iv.).  Furthermore, under the Act, "[t]he term 'disability' means ... a physical or mental impairment that substantially limits one or more of the major life activities."  29 U.S.C. § 705(9)(B); *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002).

Despite the plain language of the statute and accompanying regulation, Plaintiff argues that she was only required to provide Defendant notice that she was seeking an accommodation

2

and that Defendant's request that she provide documentation to establish that she was disabled was a violation of the Rehab Act. *See* Pl's Opp at 4 – 5. Plaintiff, however, makes such an argument while citing cases explicitly holding that she must establish her disability. *See* Pl's Opp at 6 (citing *Marshall v. Potter*, 634 F. Supp. 2d 66, 71-72 n.5 (D.D.C. 2009) ("[T]here is no evidence to indicate that her knee injury was anything more than a temporary condition[.]"); *Ziegler v. Potter*, 641 F.Supp.2d 25, 29 (D.D.C. 2009) (finding of disability foreclosed by admission from plaintiff's physician that plaintiff's impairment had "no significant impact on his major life activities"); *Scarborough v. Natsios*, 190 F.Supp. 2d 5, 21 – 23 (D.D.C. 2002) (concluding, without mentioning which evidence was submitted to the employer, that a reasonable jury could not find a substantial limitation of walking or working based on evidence that was 'vague' or not in the record")).

Likewise, Plaintiff's argument that her disability was obvious and, therefore, notice of Plaintiff's medical condition was sufficient to establish her disability is without support. As previously stated, Dr. Allen explained that degenerative joint disease is not by itself a physical impairment. *See* Allen Depo at 80:22 – 81:20 ("Q: What is degenerative joint disease? A: It's a broad catchall condition in which the cartilaginous surfaces of the joints are just degenerating, deteriorating. Q: What are the symptoms of degenerative joint disease? A: Well, certainly, you can have pain. If it's due to arthritis, you can certainly have a lot of inflammation, swelling, but, certainly, pain would certainly be prominent. Q: Is degenerative joint disease a physical impairment? A: Well, it depends. Obviously, age is a huge risk factor for getting degenerative arthritis, so it would really depend as to how severe it is. Q: Severe degenerative joint disease would be a physical impairment, wouldn't it? A: Well, assuming that there are some limitations that you can assign to it, assuming there'd be some limitations of walking or lifting or

3

whatever."); *id.* at 90:6 – 90:9 ("Is this just degenerative disease as a result of the wear and tear

on your body as you age or is there a true disease process going on?").  Likewise, Plaintiff's own

physician Dr. Shammas also explained that degenerative joint disease is largely influenced by

age, and its impact may vary.  *See* October 30, 2014 Deposition of Dr. Sameer B. Shammas

("Shammas Depo"), attached to Def's Mt as Ex. 11, at 17:11 – 17:21 ("Q: Dr. Shammas, if you

know, can you state for the record what percentage in your opinion of the population may suffer

from degenerative joint disease?  A: It depends on the age.  Q: Okay.  And why do you say, it

"depends on the age?"  A: Because the higher the age, the more joint goes under stress, the more

the joint goes under pressure, and the more they actually develop the inflammation process that

leads eventually to the destruction of that – of the joint.").

     Furthermore, Dr. Allen explained that not all individuals with degenerative joint disease

suffer a substantial limitation of a major life activity.  *See* Allen Depo at 152:18 – 153:9 ("Q:

Can you state for the record, in your opinion, does everyone who has degenerative joint disease

suffer from a substantial limitation of a major life function?  A: No.  Q: What's your basis for

saying that?  A: Because I think if you took a large population of patients, x-rayed them or did a

physical exam and tried to find some evidence of degenerative joint disease, you'd find a

substantial number of people who've got some type of degeneration of arterial cartilages, but I

don't think every one of those are going to have limitations – a substantial limitation.").

Likewise, Plaintiff's physician Dr. Shammas concurred that not all individuals with degenerative

joint disease suffer mobility issues.  *See* Shammas Depo at 17:25 – 18:8 ("Q: And, Dr. Shammas,

does everyone who suffers from degenerative joint disease have limitations on their mobility?

A: It depends on where the degenerative process is.  Obviously, in the lower extremities, a high

possibility of having problem[s] with the (sic) mobility.  The low back is – become the second

one.  The upper-extremities, a lot of time, they can actually handle it better.").

Likewise, Dr. Allen also explained that everyone who suffers from COPD does not suffer

a substantial limitation of a major life activity.  *See id*. at 158:12 – 158:18 ("Q: And Dr. Allen,

does everyone who suffers from COPD also have a substantial limitation of a major life activity?

A: No.  Like any other type of disease, it's a spectrum.  And clearly, I think the first thing that

any primary care physician would say would be to the individual, stop smoking.").

Accordingly, a simple statement that Plaintiff suffered degenerative joint disease and/or COPD is

not sufficient to establish a disability without an additional showing of how those conditions

effected Plaintiff's daily activities.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483

(1999) ("The determination of whether an individual has a disability is not necessarily based on

the name or diagnosis of the impairment the person has, but rather on the effect of that

impairment on the life of the individual…  The determination of whether an individual is

substantially limited in a major life activity must be made on a case by case basis").  Defendant

was justified in requesting additional documentation regarding how Plaintiff's degenerative joint

disease affected a major life activity – if any.

## II.      Plaintiff's Attempt to Ignore the Evidence Submitted in Support of her Accommodation Request should be Rejected

In an attempt to save her claims, Plaintiff requests that the Court ignore the 2010

evidence submitted in support of her accommodation request, or lack thereof, and reply upon

2014 medical examinations that occurred several years later, to save her claim.  Indeed, Plaintiff

once again relies upon the medical examinations of Dr. Alan Schwartz and Dr. Eric Dawson to

argue that Defendant violated the Rehab Act, despite the fact that those doctors based their

testimony on 2014 medical evaluations and other medical records that were not provided to

Defendant in connection with Plaintiff's accommodation request.  *See* Pl's Opp at 8 – 9.

Likewise, aware that the documents actually submitted in support of her accommodation request

demonstrate no limitations of a major life activity, and include a statement by Plaintiff's

physician that she can return to work, Plaintiff argues that the Court should ignore the documents

from her own physicians.  *See* Pl's Opp at 12 – 13 ("Dr. Williams, [Plaintiff's treating physician

who Plaintiff requested Defendant speak with to obtain information in support of her

accommodation request – and who informed Defendant Plaintiff could return to work] knew

hardly anything about Lenkiewicz's medical conditions anyway."); ("It is ultimately immaterial

whether Dr. Cabalar's report, [which indicated Plaintiff had full range of motion and no swelling

or tenderness in any of her joints] – in isolation and without regard to other evidence – is

conclusive proof of an orthopedic disability.").  Plaintiff, also now cites to an additional

orthopedic report by Dr. Cabalar that was never provided to Defendant and argues that

Defendant should be held liable for a violation of the Rehab Act based upon a document that was

never presented.  *See* Pl's Opp at 13.  Such documents cannot be used and Defendant is entitled

to summary judgment.

## III.   <u>Failure to Engage in Interactive Process</u>

Plaintiff, once again, ignores her failure to engage in the interactive process and requests

that the Court deny Defendant's Motion for summary judgment.  First, Plaintiff, once again,

focuses on unexhausted claims and allegations in hope that the Court ignores Defendant's

repeated communication attempts and Plaintiff's failure to respond in connection with Plaintiff's

December 2010 request.  Indeed, despite multiple e-mails and phone calls attempting to reach

Plaintiff to determine whether she had additional medical documentation to support her

6

accommodation request, Plaintiff simply chose not to respond and not to submit additional information in support of her claim.  *See* Unanswered e-mails, attached to Def's Mt. as Ex. 15 (demonstrating multiple e-mails informing Plaintiff that her medical documentation did not establish a substantial limitation of a major life activity and requesting Plaintiff respond in order to complete the interactive process and discuss Plaintiff's request).

Furthermore, Plaintiff's narrative about not being informed of Dr. Allen's assessment in January 2010 is misleading because Dr. Allen was continuing to discuss Plaintiff's condition with her physicians.  Plaintiff argues that Defendant withheld information and failed to inform Plaintiff of the missing documentation needed to support her accommodation request in January 2010 and February 2010.  *See* Pl' Opp. at 22.  Plaintiff, however, ignores the fact that the FOH physician continued to gather additional information during that time.  *See* FOH documents (illustrating Dr. Allen's attempts at follow-up calls with Plaintiff's physicians as well as requests for an additional medical evaluation scheduled for February 2011).  In that Defendant properly engaged in the interactive process, Defendant is entitled to summary judgment on Plaintiff's claims.

**IV.    Plaintiff's Request for a Printer**

Plaintiff's argument that Defendant violated the Rehab Act with respect to her request for a printer simply because she did not want to inconvenience the staff member who was assigned to pick up papers for her is without legal support.  *See* Pl's Opp at 29.  As previously stated, "accommodations are reasonable if they allow the employee to perform the essential functions of the job without imposing undue hardship on the employer."  *Norden v. Samper,* 503 F. Supp. 2d 130, 145 (D.D.C. 2007).  Plaintiff does not dispute that she was offered an alternative that permitted her to perform the essential functions of her job but alleges that Defendant is now

liable for a violation of the Rehab Act because Plaintiff subjectively felt that using the assistance of an individual assigned to help her was an "inconvenience." *See* Pl's Opp at 29.  Plaintiff cites to no case law regarding subjecting an employer to liability under such circumstances.  Given that Defendant proffered a reasonable alternative accommodation, which Plaintiff chose not to use; Defendant is entitled to summary judgment. *See* Lenkiewicz Depo at 113:12 – 114:5 ("Q: Do you recall whether you were – Ms. Lewis told you that she could make the secretary available to come and pick up documents for you?  A: That was – I was just getting ready to say that it was offered that the – it was a contractor that was sitting up front that had a multitude of things to do.  I mean, she ran both sides from FOIA correspondence, and that I could ask her to run and get my documents every time I needed them off the printer. . . .  Q: Thank you.  To the best of your recollection was that offered, that you could use the contractor to get your documents off the printer?  A: Yes.").

## V.   <u>Plaintiff's Failure to Exhaust</u>

Plaintiff's attempt to ignore her exhaustion requirements should be rejected.   Plaintiff does not dispute that there is an exhaustion requirement.  Plaintiff also does not dispute that failure to exhaust is a jurisdictional bar. *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011) ("A failure to exhaust administrative remedies for Rehabilitation Act claims is a *jurisdictional* defect . . . ."); *Cobell v. Salazar*, 816 F.Supp.2d 10, 15 (D.D.C. 2011) (exhaustion is jurisdictional under the Rehabilitation Act).  It is, likewise, undisputed that Plaintiff did not exhaust multiple claims, including her claim that the decision to terminate her was an act of disability discrimination, and Plaintiff's claims raised for the first time in her motion for summary judgment – and which she failed to raise in her Complaint, that she requested to move to a different office as an accommodation and a 2009 request to telework on rainy days.  At no

time did Plaintiff exhaust these claims, and Plaintiff's unexhausted claims must, therefore, be dismissed.

Likewise, with the respect to the claims that Plaintiff failed to timely exhaust, Defendant is entitled to summary judgment. Plaintiff does not dispute the 45-day exhaustion requirement associated with her claims. Indeed, the procedures governing administrative processing of discrimination complaints brought by employees of the federal government under the Rehab Act are set forth in 29 C.F.R. § 1614 (Federal Sector Equal Employment Opportunity) and the relevant provision states that "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. at § 1614.105(a)(1). Furthermore, if the matter is not resolved through informal counseling, the aggrieved employee must, within 45 days, file a written complaint with the agency that allegedly discriminated against him or her. *See id.* § 1614.106(a)–(c). At the conclusion of the agency's investigation, the complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency. *See id.* § 1614.108(f).

Plaintiff does not dispute that she was required to exhaust her claims within 45 days and that she failed to do so with respect to her request for a parking spot and her request for a printer. Plaintiff, however, argues that failure to exhaust in 45 days is not jurisdictional and that the law allows for tolling. *See* Pl's Opp at 38. Plaintiff, however, provides no support for the general proposition that she may simply ignore the exhaustion requirements because they are not jurisdictional, nor does Plaintiff even attempt to present any facts to support tolling the 45-day exhaustion period for approximately two (2) years. Plaintiff effectively concedes that she did not fulfill her exhaustion requirements and, accordingly, her claims should be dismissed.

Finally, Plaintiff's waiver argument is without merit. This Court has *de novo* review of

Plaintiff's claims ad Defendant has raised exhaustion throughout this litigation. Defendant is,

accordingly, entitled to summary judgment with respect to Plaintiff's unexhausted claims.

This Court has made it clear that a Plaintiff cannot come to federal Court and obtain relief

under the Rehab Act without first giving the Agency a timely opportunity to address the alleged

violation. *See Mahoney*, 824 F. Supp. 2d at 58 (citing *Spinelli*, 446 F.3d at 162). Plaintiff's

failure to exhaust her claims is fatal and Defendant is entitled to summary judgment as the Court

lacks jurisdiction to grant Plaintiff the relief requested.

**VI.**     **It is Undisputed that Plaintiff's Request to Telework Created an Undue Hardship**

Finally, it is undisputed that Plaintiff's request to telework created an undue hardship

preventing Plaintiff from receiving the relief she now requests. As previously stated, an

employer must reasonably accommodate a qualified employee with a disability only if the

accommodation does not impose an undue hardship on its operations. *Martin v. D.C.*, No. CV

11-01069 (RC), 2015 WL 294723, at *28 (D.D.C. Jan. 23, 2015)); *Carr v. Reno,* 23 F.3d 525,

529 (D.C. Cir. 1994) (interpreting the Rehabilitation Act, 29 U.S.C. § 794(a)). Accommodations

are reasonable if they allow an employee to perform the essential functions of the job, without

imposing undue hardship on the employer. *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23 (D.D.C.

2003). Indeed, whether the requested relief constitutes an undue hardship relates to whether the

request is reasonable. *See id*. "Undue hardship" is defined as "an action requiring significant

difficulty or expense." 42 U.S.C. § 12111(10)(A).

Unable to show her request is reasonable Plaintiff now argues that Defendant may not

claim that the requested relief created an undue hardship because Defendant did not raise undue

hardship as a separate defense in its Answer.

10

Finally, Plaintiff's argument that there is a dispute of fact regarding whether the systems were in place permitting Plaintiff to telework prior to February 2012 is without merit.  Plaintiff alleges that some witnesses have claimed to have worked on portions of the FMS-2 program in 2009 and 2010.  Plaintiff, however, cites to no evidence that the portions of the system utilized at those times permitted FOIA specialists to telework.   Whether the updated system is classified as an upgrade or a new system, it is undisputed that the upgraded FMS-2 system was installed on a rolling basis beginning in August 2011, and the installation and training was completed in February 2012, the upgraded system cost the agency several millions of dollars, and that necessary safe-guards were not in place to permit FOIA specialists to telework until after the system was up and running in February 2012.  *See* 2011 migration, configuration, and training schedule for the upgraded FMS2 system, attached to Def's Mt. as Ex. 14 (showing initial migration and configuration of the FMS2 system in August 2011 and various training on a rolling basis from September 2011 through February 2012); Cole Depo at 70:22 – 72:1 ("We started the [rolling out of FMS2] process in the fourth quarter of Fiscal 2011 and we actually started the training or did the first wave of training in the last week of September 2011.  And it was a major upgrade.  I mean, it really did require training.  You couldn't, just because you had been using FMS, begin to use this without the training, and we continued to train people.  I mean, it was a little rough, but we felt in the first quarter of 2012 that we had done enough training that people could actually use it, but we were still – people were still clinging to the ACORN system, which was 20 to 25 years old.  They didn't want to give that up.  And we finally had to say, we're yanking the plug on ACORN effective – I believe it was March 31st or something.  You've got to use FMS2.  So it was a significant transition."); *id*. at 144:9 – 145:11 ("Q: In September of 2011, were FOIA specialists in your office capable of working from home?

11

A: No.  Q: Why were they not capable of working from home as soon as the FMS[2] system was first rolled out?  . . .  THE WITNESS: It's a complicated system.  You had to learn how to use the system and other people at HUD who handled the Freedom of Information Act requests had to learn how to use it as well.  So then you had the – I mean, you were trained, but then maybe you were trained for three days and a week, but you weren't ready to start using it the following week.  You had to work with it, try it out, make mistakes, actually learn it.  So I would say the FOIA specialists were confident with it by January, but you still had a lot of people in the program offices that they had to send things to get things from.  They needed time.  And even though they went through the training, they weren't using it on a daily basis like the people in my office were, so it took them longer to get comfortable with it."); *See* Cole Depo at 146:18 – 147:10 (explaining that with the original FMS and ACORN systems, employees were not capable of transmitting documents securely online between the program offices because "[t]he program offices weren't using" those systems, and employees "couldn't redact online" requiring use of paper copies of documents to redact information.").

Contrary to Plaintiff's citation to individuals who claim to have used parts of the FMS system – that did not lend themselves to telework – prior to August 2011, it is undisputed that at the time Plaintiff left the Agency no FOIA specialists were teleworking because the proper systems were not in place.  *See* Lenkiewicz Depo at 90:10 – 91:25 (explaining  that, to Plaintiff's knowledge there were no FOIA specialists teleworking at the time Plaintiff left the agency); Cole Depo at 64:21 – 65:4 ("Q: . . .  For how long have FOIA specialists been permitted to telework? A: Since about June or so of 2012.  Q: Did any FOIA specialists telework prior to June 2012?  A: No.").  Prior to the FMS2 system, FOIA specialists were required to perform their job duties from the office in an effort to safeguard the sensitive, confidential, and trade secret information

they processed.  Under such circumstances a request to telework has been viewed as an undue

hardship.  *See Morris v. Jackson*, 994 F.Supp.2d 38, 48 (D.D.C. 2013) (granting Defendant's

motion for summary judgment, despite Plaintiff's disability, because attendance "was an

essential function of [plaintiff's] position" making telework an undue hardship); *see also Carr v.*

*Reno*, 23 F.3d 525, 526 -29 (D.C. Cir. 1994) (granting Defendant's motion for summary

judgment, despite Plaintiff's disability because Plaintiff's job required time-sensitive coding of

information and attempting to accommodate Plaintiff's erratic schedule would be an undue

burden).   Defendant is, accordingly, entitled to summary judgment.[1]

*       *       *

---

[1] The evidence regarding the telework systems Defendant had in place, and the undue hardship, including a $5 million dollar price-tag and the extensive training and conversion over to the system noted above apply equally to Plaintiff's newly-raised claims of a failure to transfer Plaintiff to a new office/building and failure to provide Plaintiff the ability to telework on rainy days in 2009.  *See* Pl's Mt.  Even if Plaintiff had exhausted her claims, which she did not, there is no evidence that the systems were in place in a different building and the evidence is clear that the telework systems were not in place for FOIA specialists in 2009.  Plaintiff is, accordingly, not entitled to summary judgment.

Dated:  April 24, 2015,
         Washington, DC

                                   Respectfully Submitted,

                                   RONALD C. MACHEN JR., D.C. BAR#447889
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Civil Chief

By: */s/ Carl E. Ross*_____
CARL EZEKIEL ROSS, D.C. Bar #492441
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel:  (202) 252-2533
Fax:  (202) 252-2505
Attorneys for Defendant

14